1

2

3             UNITED STATES DISTRICT COURT

4           NORTHERN DISTRICT OF CALIFORNIA

5

6   MORRIS GREEN,                          Case No.  17-cv-00607-TSH

7                  Plaintiff,

8          v.                              **ORDER GRANTING MOTION FOR**
                                           **SUMMARY JUDGMENT**
9   CITY AND COUNTY OF SAN
    FRANCISCO, et al.,                     Re: Dkt. No. 133
10
                 Defendants.
11

12

13              **I.     INTRODUCTION**

14          Morris Green ("Green") brings this action against the City and County of San Francisco

15  ("the City")[1] for alleged employment race discrimination, disability discrimination and failure to

16  provide reasonable accommodation, hostile work environment, and retaliation.  Pending before the

17  Court is the City's Motion for Summary Judgment or In The Alternative Partial Summary

18  Judgment ("Summary Judgment Motion").  ECF No. 133.  Green filed multiple Oppositions, but

19  the operative document is ECF No. 147, as it was filed by the February 25, 2021 deadline

20  ("Opposition").[2]  Hence the Court strikes Green's untimely, second Opposition, ECF No. 151.[3]

21  Green has also filed multiple Requests for Judicial Notice ("RJN") in support of his Opposition,

22  but the operative RJNs which the Court will consider are ECF Nos. 147-7, 152-157.  The City

23

24  _____
    [1] The Court refers to the Defendant generally as "the City" but, when a more specific designation
25  is relevant, it refers to the specific agency where Green worked, the Public Utilities Commission
    ("PUC"), or divisions thereof.
26
    [2] *See* ECF No. 146 (striking Green's overlength February 11, 2021 opposition and ordering him to
27  file a revised opposition by February 25, 2021).

28  [3] The City replied to ECF No. 151, but this is not material, as ECF No. 147 is substantially
    identical to ECF No. 151.

United States District Court
Northern District of California

filed its Reply at ECF No. 161.

The Court has found this motion suitable for disposition without oral argument and has decided the motion on the papers.  *See* Civ. L.R. 7-1(b).  Having considered the parties' positions, relevant legal authority, and the record in this case, the Court **GRANTS** the City's motion in its entirety for the following reasons.[4]

## II.    REQUEST FOR JUDICIAL NOTICE AND EVIDENTIARY RULINGS

### A.    Documents For Which Judicial Notice Is Sought

Green's Opposition requested judicial notice of several items, but Green did not provide the documents themselves.  ECF No. 147-7.  The City expressed no opposition to Green having additional time to submit the underlying documents, ECF No. 149, and the Court ordered him to do so by March 11, 2021.  ECF No. 150.  The result was Green filing six documents asking the Court to take judicial notice of approximately 2330 pages in support of his Opposition.  Requests for Judicial Notice ("RJN"), ECF Nos. 152-157.[5]  These are the Exhibits and corresponding ECF Nos:

> **ECF No. 152** – Exhibit A (containing Exhibit 1 to Exhibit 3, pages 1 to 279) (295 total pages):
> **152-1** – Exhibit A:
> Exhibit 1 ("Exh. A.1.").  Green's Resume, Performance Appraisal Reports (pp. 1-55, 55 pages)
> Exhibit 2 ("Exh. A.2.").  Work History and Timeline of Work Duties (JOC R&R Projects & Clarifier News) (pp. 56-171, 115 pages)
> Exhibit 3 ("Exh. A.3.").  Employee Handbook/CCSF Polices and other Laws and Policies related to Disability (ADA), Harassment, Hostile Work Climate, Retaliation, Reasonable Accommodation (pp. 172-279, 107 pages)
>
> **ECF No. 153** – Exhibit B (containing Exhibit 4, Exhibit 5

---

[4] The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF No. 9, ECF No. 18, ECF No. 24 at 3, and ECF No. 64 at 6.  Defendants "City and County of San Francisco" and "SF Public Utilities Commission" listed in the caption of the operative complaint, ECF No. 97 at 1, are the same entity because PUC is a division of the City.  The operative complaint also refers to "SFPUC-EEO Programs/Human Resources Services" and "CCSF-Workers' Compensation Division" on page 2, *id*. at 2, but those are just further divisions of PUC or the City.  The operative complaint also refers in the caption to the City's "agents involved in their individual and official capacities," who are described as "Does 1 through 100, inclusive," but no such agents are named as parties.  *Id*. at 1.

[5] ECF Nos. 152-157 contain the same first sixteen pages titled "Instructions for RFJN Exhibits," plus a brief Memorandum of Points and Authorities and correspondence regarding filing exhibits.

United States District Court
Northern District of California

(Attachment A), pages 280 to 770) (507 total pages):

**153-1** – Exhibit B:

Exhibit 4 ("Exh. B.4."). Rebuttals (i.e., Attendance (A), Eye Strain (B), Placed on Sick Leave Restriction (C), Written Warning for Bringing in a Tape Recorder (D) (Attachments A to D) (pp. 280-402, 122 pages)

Exhibit 5 ("Exh. B.5."). Email Correspondence to various SFPUC officials and agents/Timeline of Events (pp. 403-417, 14 pages), including:

Attachment A (Exh. B.5.A."). Emails to/from (Events from 2014 to 2016) (pp. 418-491, 73 pages)

**ECF No. 154** – "Exhibit C" (containing Exhibit 5 (Attachments B and C), pages 771 to 1127) (373 total pages):

**154-1** – Exhibit C:

Exhibit 5 (Attachment B) ("Exh. C.5.B."). Emails to/from (Events from 2017 to 2018) (pp. 771-958, 188 pages)

Exhibit 5 (Attachment C) ("Exh. C.5.C."). Email correspondence with SFPUC Human Resources Services staff and agents (pp. 959-1127, 169 pages)

**ECF No. 155** – "Exhibit E" (containing Exhibit 10 to Exhibit 11 from pages 1419 to 1885) (483 total pages):

**155-1** – Exhibit E:

Exhibit 10 ("Exh. E.10"). Discovery Documents (i.e., The City's Discovery Responses & Training Doc) (pp. 1419-1597, 178 pages)

Exhibit 11 ("Exh. E.11"). Depositions (Green, The Citys & Person Most Knowledgeable (PMK)) (pp. 1598-1885, 287 pages)

**ECF No. 156** – "Exhibit G" (containing Exhibits 19-21, pages 2219 to 2330) (128 total pages)

**156-1** – Exhibit G:

Exhibit 19 ("Exh. G.19"). SFPUC Organization Charts (Wastewater Enterprise and Human Resources) (pp. 2219-2263, 44 pages)

Exhibit 20 ("Exh. G.20"). Emails to/from (Events from 2014 to 2016) (pp. 2264-2275, 11 pages)

Exhibit 21 ("Exh. G.21"). Declarations ISO of Green's Opposition (pp. 2276-2330, pages 54):

Decl. of Morris Green (32 pp)

Decl. of Dolores Johnson (7 pp) (repeat submission, ECF No. 147-2)

Decl. of Ebbie Brown (3 pp) (repeat submission, ECF No. 147-3)

Decl. of Edgar Rodriguez (2 pp) (repeat submission, ECF No. 147-4)

Decl. of George Dugan (4 pp) (repeat submission, ECF No. 147-5)

Decl. of Cheryl Taylor (3 pp) (repeat submission, ECF No. 147-6)

**ECF No. 157** – "Exhibit D & F" - Exhibit D (containing Exhibit D (Exhibit 5 (Attachment D) to Exhibit 9, pages 1128 to 1418) & Exhibit F (Exhibit 12 to Exhibit 18, pages 1886 to 2218) (640 total pages):

**157-1** – Exhibit D (291 pages):

Exhibit 5, Attachment D ("Exh. D.5.D.") Emails: 5502 PM1 position, the City's hiring practices and Local 21 union (pp. 1128-1175, 47 pages)

Exhibit 6 ("Exh. D.6.") 2015, 2016 and 2018 EEOC/DFEH Charges, Intakes and Right to Sue letters and Letter to EEOC along with other EEOC support documents (pp. 1176-1282, 106 pages)

United States District Court
Northern District of California

Exhibit 7 ("Exh. D.7.")  Reasonable Accommodation Request and Medical Separation Letter (pp. 1283-1296, 13 pages)
Exhibit 8 ("Exh. D.8.")  Signed Medical Authorization Release Docs and Kaiser's Medical Release Emails (pp. 1297-1322, 25 pages)
Exhibit 9 ("Exh. D.9.")  Medical Letters/Work Status Reports/Docs/Notes/Health Care Provider Cert. (p. 1365) (pp. 1323-1885, 562 pages)

**157-2** – Exhibit F (333 pages):
Exhibit 12 ("Exh. F.12").  Green Briefs and The City CCSF Produced Documents and Email to RJO (pp. 1886-1947, 61 pages)
Exhibit 13 ("Exh. F.13").  SFPUC Workforce Equity Analysis public meeting illustrating Disparate Treatment in terms of underrepresentation in the SFPUC workforce for managerial and professional positions/roles and overrepresentation in higher average severity of Discipline/Employment Actions against Blacks and Latinx employees (pp. 1948-1967, 19 pages)
Exhibit 14 ("Exh. F.14").  Black Employee Alliance (BEA) Correspondence and SFPUC Letter to BEA (pp. 1968-2042, 74 pages)
Exhibit 15 ("Exh. F.15").  Sunshine Ordinance Task Force (SOTF) Correspondence and PUC Violation (pp. 2043-2071, 28 pages)
Exhibit 16 ("Exh. F.16").  Lawsuit/Cases (i.e., Class Action Suit (p.2092-2123) and other Cases) (pp. 2072-2119, 47 pages)
Exhibit 17 ("Exh. F.17").  Protests/Articles in Support of Black/African Americans' Claims & Adverse Experiences (pp. 2120-2174, 54 pages)
Exhibit 18 ("Exh. F.18").  Employment Job Applications/Job Announcements (pp. 2175-2263, 88 pages)

**B.    Evidentiary Rulings**

The Court **GRANTS IN PART** and **DENIES IN PART** Green's RJNs and **STRIKES** the City's objections, filed at ECF No. 162, because separately filed objections are prohibited by Local Rule 7-3(c): "Any evidentiary and procedural objections to the opposition must be contained within the reply brief or memorandum."

Although the Court may take judicial notice of facts not subject to reasonable dispute because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. Rule 201(b)(2), the Court must be "supplied with the necessary information."  Fed. R. Evid. Rule 201(c)(2).  Relevant evidence is defined in Fed. R. Evid. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Rule 402 provides that evidence which is not relevant is inadmissible.

Here, Green requests that the Court take judicial notice of 2330 pages of documents –

United States District Court
Northern District of California

1  nearly the entirety of Green's proffered evidence – without citation to any specific facts for which

2  judicial notice is requested, nor any explanation of why judicial notice is appropriate for any

3  particular document.  He asserts that the evidence is "largely administrative records . . . or

4  otherwise made publicly available by the government" (*see, e.g.*, ECF No. 147-7, p. 1:25-27), but

5  this is not true.  The proffered evidence includes, *inter alia*, Green's own resume, voluminous

6  email correspondence, medical records, and deposition testimony.  The first three of those

7  categories do not contain "facts not subject to reasonable dispute" and the last is not a proper

8  subject of judicial notice.  Hence, many of the documents in Green's submission do not meet the

9  basic requirements of Rule 201 and cannot be the subject of judicial notice.

10      Moreover, most of the documents for which Green has requested judicial notice are not

11  cited in his Opposition brief and their relevance remains unexplained.  Long lists of citations do

12  appear in Green's response to the Separate Statement of Material Facts ("SMF") filed by the City

13  ("Green's Response to SMF"), but they resemble laundry lists of largely irrelevant proffered

14  evidence in support of accusations, argumentation, immaterial narrative and commentary, as

15  opposed to focused evidentiary citations in support of legitimate disputes of fact.  As a result,

16  these requests for judicial notice remain largely unexplained.

17      In addition, much of the documentary evidence Green submits contains unexplained

18  modifications of unknown provenance, authentication, and significance, including handwritten

19  annotations and commentary, highlights, underlining, circling, other marks and modifications

20  scattered throughout.  *See, e.g.,* ECF 154-1 at 44-45 (printed email and separate document

21  containing unexplained highlights, handwritten commentary, underlining, and other marks).

22  Accordingly, the Court finds that documents marked with handwriting, highlights, underlining,

23  circling, or other modifications in Green's submissions lack authentication, contain hearsay in the

24  form of commentary from unknown sources, and are inadmissible under the best evidence rule.

25      Furthermore, the Court **STRIKES** Green's Declaration (ECF No. 156-1, Exhibit 21) in its

26  entirety as a violation of the Court's February 12, 2021 Order (ECF No. 146) striking Green's

27  opposition brief and supporting documents (ECF No. 145) for exceeding the page limits of Local

28  Rule 7-3(a) and for failure to comply with paragraph C of the Case Management Orders in this

1    case (ECF Nos. 95, 122, 131).  In Green's Declaration, he appears simply to have copied and

2    pasted thirty-two pages from his overlength Memorandum of Points and Authorities, including

3    argument, evidence citations, and case citations, into a new document and re-titled it his

4    "Declaration" thereby, in effect, submitting two briefs in support of his Opposition.

5          Green's Declaration is also largely unsupported lay opinion, argument, conclusory

6    statements, and speculation without foundation in personal knowledge or evidentiary support.  As

7    just one example, the first paragraph contains the conclusory allegation that Green was

8    "disciplined unfairly because of his race and retaliated against for participating in a protected

9    activity."  The purpose of Rule 56 "is not to replace conclusory allegations of the complaint . . .

10    with conclusory allegations of an affidavit."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888

11    (1990).  In any event, the Court will not find a genuine issue of material facts where the only

12    evidence presented is "uncorroborated and self-serving testimony," *see Villiarimo v. Aloha Island*

13    *Air, Inc.,* 281 F.3d 1054, 1061 (9th Cir. 2002), and will disregard "a self- serving declaration that

14    states only conclusions and not facts that would be admissible evidence."  *Nigro v. Sears, Roebuck*

15    *& Co.*, 784 F.3d 495, 497 (9th Cir. 2015).

16          The Court also **STRIKES** in their entirety the Declarations of Dolores Johnson, Ebbie

17    Brown, Edgar Rodriguez, George Dugan, Cheryl Taylor (filed in ECF No. 156-1 and as ECF Nos.

18    147-2 to 6 respectively) for similar reasons.  Green has provided no evidence that these declarants

19    have personal knowledge of any disputed fact in the Separate Statement of Material Facts or that

20    any of these individuals were similarly situated to Green at any relevant time.  These declarations

21    lack foundation, are irrelevant and comprise improper lay opinion, legal conclusions, and

22    character evidence.  Testimony such as this is prohibited under multiple Federal Rules of Evidence

23    and triable issues of fact may not be created by citing declarations with these attributes.  *See, e.g.,*

24    Rule 602 (a witness may not testify as to a matter "unless evidence is introduced sufficient to

25    support a finding that the witness has personal knowledge of the matter"); Rule 901(a)

26    (prohibiting improper authentication, foundation); Rule 701 (prohibiting improper lay opinion).

27          Finally, Green may not rely on his complaint as evidence in a motion for summary

28    judgment.  While on a motion to dismiss it is the defendant's conduct as alleged in the complaint

United States District Court
Northern District of California

1   that is scrutinized for "objective legal reasonableness," on summary judgment the plaintiff can no

2   longer rest on the pleadings but must present admissible evidence in support of his case.  *See* Fed.

3   Rule Civ. Proc. 56.  Furthermore, only a verified complaint signed under penalty of perjury may

4   be considered an affidavit in opposition to a motion for summary judgment and then only to the

5   extent that it sets forth facts within the plaintiff's personal knowledge that are admissible in

6   evidence.  *See Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995).  Hence, the Court will

7   not consider Green's references to his complaint and the allegations contained therein as evidence

8   in support of his Opposition.

9          Notwithstanding these exclusions, the Court will consider evidence contained in specific

10   exhibits that Green cites in his Opposition or in his response to the City's SMF and which is

11   discernably relevant and not otherwise inadmissible and where Green points the Court to specific

12   pages of specific exhibits.  That evidence is discussed below.

### III.    FACTUAL BACKGROUND

**A.      Green's Employment with San Francisco Public Utilities Commission Prior to 2015**

15          Green began working for San Francisco PUC as a Junior Engineer in December of 2006.

16   Declaration of Robert Rogoyski ("Rogoyski Decl."), Exh. 1, Transcript of July 16, 2018

17   Deposition of Morris Green ("Green July 2018 Dep.") at 22:23-25, ECF No. 133-6.  From 2009

18   until his termination, Green was employed by PUC's Wastewater Enterprise ("WWE").

19   Declaration of Brian Henderson, Engineering Manager at PUC-WWE Engineering Division

20   ("Henderson Decl.") ¶ 4, ECF No. 133-3; Declaration of Rachel Gardunio, Manager at PUC

21   Employee and Labor Relations Division ("Gardunio Decl.") ¶ 4, ECF No. 133-4.  The WWE

22   operates the city's sewer and treatment system, maintaining over nine hundred miles of sewer

23   mains and twenty-seven pump stations that collect sewage and storm water.  Henderson Decl. ¶ 4.

24   Green worked in the Engineering Division of the WWE from 2009 to March 2015.  Green Dep. at

25   23:7-22; Henderson Decl. ¶ 5.

26          Green holds three academic degrees, two of which are graduate level degrees in

27   Engineering and Urban Planning, and has specialized experience in various areas, for example

28   education, housing and company's receiving ISO 9001 quality standard certification.  Exh. A.1.,

United States District Court
Northern District of California

ECF No. 152-1.  Nevertheless, both Meei-Lih Ahmad, a PUC-WWE Senior Engineer and Green's immediate supervisor at the Engineering Division, and Brian Henderson, a PUC-WWE Engineering Manager, stated in their declarations that while he worked at the Engineering Division, Green performed entry-level engineering work, such as interfacing with PUC contractors and attending field inspections.  Henderson Decl. ¶ 5; Declaration of Meei-Lih Ahmad ("Ahmad Decl.") ¶ 5, ECF No. 133-2; Green July 2018 Dep. at 23:23-24:22.  This was because Green did not have an engineering license or specialized experience which could allow PUC to assign him higher-level engineering work.  Henderson Decl. ¶ 5; Ahmad Decl. ¶ 5.[6]  To counter this fact, Green submits five performance reviews from between 2010- 2014, before his transfer to PUC's Collection System Division ("CSD"), in which he either met or exceeded expectations, but these performance reviews do not establish whether his work was entry-level or more advanced.  *See* Green's Response to SMF 5, citing Exh. A.1.; ECF No. 152-1 at 11-13, 20-22, 28-30, 36-37, 43-

---

[6] The Court takes this opportunity to analyze one example that represents the tenor and approach of Green's Response to the City's SMF.  Green disputes that he "'only performed entry-level work' and 'did not have specialized experience' because [he] did more than just performed [sic] entry-level work and has specialized experience."  Green Response to SMF 5.  Green cites to his deposition testimony where he described what his duties were at PUC, including, *inter alia*, crack, bathroom, roof, and other infrastructure repair; monitoring project costs, schedules, and payments; getting vendors to "come in to talk about advanced technologies to help improve our treatment process."  Green July 2018 Dep. at 23:23- 24:22.  The City cites the same section of his deposition to demonstrate that his duties were, in its assessment, entry-level.  The Court claims no expertise in determining whether these job duties were entry-level or not, but both Ahmad, a Senior Engineer and Green's immediate supervisor, and Henderson, an Engineering Manager and reviewer for Green's performance appraisals, characterized them as such.

Green cites a long (though by no means his longest) list of evidence in support of his claim that he performed more than entry-level work: his Resume and Performance Appraisals at Green Exhibit 1, pp. 2-5, 7-12, 16-17, 20, 25-26, 28, 33-34, 36, 40-41, 48-50 (EFC No. 152-1); Work History/Timeline at Green Exhibit 2, pp. 57-63, 96-104, 106-111, 116, 120-124, 125-130, 136-148, 157-162, 164-171  (EFC No. 152-1); Harrison Dep. at 17:3-25 referring to Green's experience with ISO-14000.  EFC No. 133-6.  All of this purported evidence is irrelevant because none of these documents speak to what *level* of work he performed, nor has Green directed the Court's attention to what in the over seventy pages he cites supports his dispute of this fact.  The upshot of this, and most of Green's other responses to the Separate Statement, is that the references to which he cites do not create a genuine dispute of material fact.  In this case, his response fails to establish that he had an "engineering license or specialized experience which could allow PUC to assign him higher-level engineering work," and does not constitute conflicting evidence from relevant decisionmakers that the work he performed was, in their opinion, entry-level.

United States District Court
Northern District of California

44.[7]

Green testified in his deposition that in 2014, prior to his transfer to CSD, he overheard another PUC employee discuss confidential medical information with his coworker, Dolores Johnson.  Green July 2018 Dep. at 80:22-82:8.  Johnson complained to management and, during a Human Resources ("HR") investigation, Green confirmed that he had overheard Johnson's confidential information.  *Id.* at 82:9-21.  Green testified that no one at the City told Green that he was transferred to CSD, that he was not promoted to the position of Project Manager 1, or that the City took any other actions against him because he participated in the HR investigation.  *Id.* at 83:16-84:24.  Green also testified that he was not aware of other facts demonstrating retaliation for participating in that HR investigation.  *Id.* at 84:25-85:9.

**B.      Green's January 2015 Application For Project Manager I**

In January of 2015, Green applied for a Project Manager I position in the Project Management Bureau ("PMB"), position PEX-5502-063967.  *Id.* at 18:19-23.  Green met the minimum qualifications for the position and was therefore on the eligible list, but he was not one of the thirteen more qualified candidates invited to interview (out of fifty-four applicants).  *Id.* at 19:1-20:5; Rogoyski Decl. Exh. 40 at CCSF 127 (ECF 133 – p. 705; SMF 11-D).  Green testified in his deposition that he "felt he was qualified for the position" (Green July 2018 Dep. at 20:5-6) and asserts in his Opposition that he was "at least minimally qualified" (Opp. at 6:17), but he also admits that his application was "two points away from the questionable interviewing scoring threshold."  *Id*. at 5:19-21.  Compared to other candidates, Green lacked experience in project control, environmental planning, and supervision.  Rogoyski Decl. Exh. 40 at CCSF 127.  Green disputes this fact because "some candidates selected for interviews did not have wastewater experience related to electrical systems, distributed control systems and R&R [Repair and Replacement] work," while he had the required education and experience.  Green Response to SMF 11.  However, Green's assertion and cited evidence are non-responsive as they do not

[7] The Court will accept the performance reviews Green submits despite the hand writing thereon, as the writing appears to have been on the originals as contemporaneous commentary: "Any additional comments written after this report without my knowledge I do not agree with."  ECF No. 152-1 at 44.

United States District Court
Northern District of California

address experience in "special assignments" and other areas seen as beneficial to the position by the interview committee, nor does Green make a connection between his experience and education and that required by the position.

Green asserts in his Opposition that he "was competitive with the employees who were invited to interview" (Opp. at 6:1), but this assertion does not counter the fact that the selected candidate was in a more senior classification than Green, Associate Engineer, and had degrees and professional certifications Green lacked, including a California State Professional Engineering License.  Rogoyski Decl. Exh. 39 at CCSF 2602, Exh. 41 at CCSF 2653-54.  Green does not address these facts in his Opposition, nor does he address the fact that the candidate ultimately selected for the position had experience "represent[ing] WWE in many projects and special assignments" (*id.*) and "significant wastewater project management and supervisory experience" that were seen as beneficial to that specific Project Manager position.  Rogoyski Decl. Exh. 39 at CCSF 2602.  Green asserts that the City "has been recalcitrant in offering reason why, and therefore cannot establish, that those candidates were selected based on objective measures that have nothing to do with race" (Opp. at 17:15-17), but this is no more than a bare, unsupported argument.

**C.     Green's Reassignment to the Cross Bore Project in 2015**

In late 2014, CSD was tasked with carrying out the Cross Bore Project.  Henderson Decl. ¶ 6.  Cross bores happened across the City whenever PG&E installed a gas pipeline that damaged PUC sewer lines (*id.*) or where there was gas penetration of a sewer line.  Rogoyski Decl. Exh. 4, Transcript of Deposition of CSD Manager Lewis Harrison ("Harrison Dep.") at 13:10-11.  As part of an agreement between PG&E and the City, PG&E agreed to record videos of sewer lines and cross bores through the city.  Henderson Decl. ¶ 6.  CSD's Cross Bore Project was formed to review this video and then repair and replace identified cross bores.  *Id.*  Blocked sewer lines and gas line obstructions from cross bores presented a serious potential danger to the public because repair workers might be unaware that an obstruction was caused by a gas line.  Rogoyski Decl. Exh. 3, Transcript of Deposition of Green's CSD Supervisor Douglas Lipps ("Lipps Dep.") at 17:19-22:19.  Work crews from another agency using heavy equipment to address a sewer

1   problem, or even private contractors unaware of a cross bore and working on plumbing could

2   unknowingly rupture or even ignite a gas line, creating an explosion.  *Id.*  At the time, the number

3   and severity of the cross bores in the City, along with the level of danger to the public, was

4   unknown, creating an even greater urgency to assign additional staff to the project, with the

5   concern exacerbated by the recent San Bruno fire so that the pressure of potential "PG&E

6   negligence and danger was really pressing on [the City]."  Harrison Dep. at 13:6-22.

7           As CSD Manager, Harrison recognized that the Cross Bore Project would require

8   significant additional resources and discussed the need for more staff with Henderson, as the

9   Engineering Manager of the WWE Engineering Division.  Henderson Decl. ¶ 7.  Harrison also

10  conveyed to Henderson "an engineering need that was very urgent, very extreme" (Henderson

11  Dep. at 37:1-2) and that they had their "backs against the wall."  *Id.* at 18:5-8.

12          By the start of 2015, the project urgently needed civil engineers to identify cross bores by

13  reviewing videos, conducting field inspection of cross bore repairs, and interfacing with PG&E

14  and contractors.  Henderson Decl. ¶ 7; Rogoyski Decl. Exh. 2, Transcript of Deposition of Person

15  Most Knowledgeable ("PMK") for the City, Brian Henderson ("Henderson Dep.") at 15:19-17:17;

16  Harrison Dep. at 13:23-14:8.  Harrison told the Assistant General Manager of WWE Tommy

17  Moala that the Cross Bore Project was "in dire straits and that we had to do something."  *Id.* at

18  16:6-9.  As a result, Moala asked Henderson to identify engineers who could move to CSD to

19  work on the Cross Bore Project and, after consulting with section managers about potential

20  engineers, Henderson identified Green as an option.  Henderson Decl. ¶ 7.

21          Henderson testified that "[i]t was a relatively quick process to come to the conclusion that

22  Mr. Green was the best and most qualified."  Henderson Dep. at 33:11-17.  Henderson testified

23  that, unlike many of the other engineers at WWE, Green did not have an engineering license or

24  other credentials that would allow him to be assigned to more complex engineering tasks and that

25  the Engineering Division was "manufacturing work" assignments for Green in order to leverage

26  his skill set despite his lack of advanced credentials.  Henderson Decl. ¶ 8.  Green disputes this

27  and claims that he was being underutilized to dispute "the untenable justification" that the City

28  had been creating work for him.  Green's Response to SMFs 29, 30.  However, the evidence

United States District Court
Northern District of California

11

1   Green cites is non-responsive because it does not establish that he possessed an engineering

2   license or comparable credential, does not demonstrate that he was underutilized, and does not

3   address the comparison to other engineers.

4          Although Green believed he was "flourishing" in his role (Green July 2018 Dep. at 86:21-

5   87:5), the City's PMK testified that Green was sometimes performing tasks at the Division that

6   were typically assigned to student engineering interns.  Henderson Decl. ¶ 8; Henderson Dep. at

7   33:11-25.  Although Green disputes this fact, he provides no evidence to the contrary.

8          The Cross Bore Project was largely civil engineering work that matched Green's education

9   and experience in the Engineering Division and that did not require advanced, specialized

10  credentials.  Henderson Decl. ¶ 9; Harrison Dep. at 14:9-16, 17:6-18:8; Rogoyski Decl. Exh. 5,

11  Transcript of Deposition of the City's other PMK Kent Eickman ("Eickman Dep.") 16:5-18:14.

12  PMK Eickman also testified that Green was particularly qualified to conduct the field inspections

13  necessary on the Cross Bore Project because he had experience physically going out to the field

14  and inspecting sewers.  *Id.* at 17:25-18:14.

15         Green's transfer to CSD also made sense to Green's then-manager Ahmad, because

16  Green's "workload was not heavy or critical from a management perspective," he was "not the key

17  lead on any project," and "it was easier to move [Green] to a new project than other engineers in

18  the section" so he could be quickly available.  Ahmad Decl. ¶ 7; Harrison Dep. at 16:23-17:5.

19  Harrison testified that Green was a particularly good fit because he had experience with ISO

20  systems and Harrison "needed more people that spoke the language of the ISO system."  Harrison

21  Dep. at 17:6-25.  Although Green lacked video coding experience, CSD management thought he

22  could be trained quickly as part of a scheduled training coming up.  Harrison Dep. at 18:13-20.

23         Overall, Harrison believed they would be "batting a thousand to have an engineer" like

24  Green join the team, and that Green would be "coming to their rescue" if he joined.  Harrison Dep.

25  16:1-9, 18:1-8.  Green's new direct supervisor at CSD Lipps was "ecstatic" to have Green join the

26  team.  Lipps. Dep. at 34:1-9.  CSD Management believed that the move would be a "great

27  opportunity" for Green's learning and career advancement by providing a viable path to a utility

28  analyst position or another more senior position.  Harrison Dep. 16:23-18:20, 24:6-25:10, 56:16-

57:5; Ahmad Decl. ¶ 8.  Green disputes these facts – that his qualifications suited him to the CSD role and that CSD management was happy to have him move to the project – but the evidence he cites is non-responsive because none of it addresses the management perspective that Green was qualified for the position and could be relatively easily reassigned.  Green's Response to SMFs 32-37.

PUC management was not required to get Green's consent to change his project assignment.  Henderson Decl. ¶ 10.  Nevertheless, management consulted with Green and during discussions with Henderson and Harrison, Green expressed interest in the Cross Bore Project.  Green July 2018 Dep. at 31:18-32:15, 34:17-35:17; Henderson Decl. ¶ 10; Harrison Dep. at 25:6-10, 29:11-30:5.  The move involved consulting with Ahmad, Green's supervisor in the Engineering Division, as well as Harrison and Moala – all WWE management were in agreement.  Henderson Decl. ¶ 10; Harrison Dep. at 24:6-20; Lipps Dep. at 12:21-25.  Green was reassigned to the project in March of 2015.  Green July 2018 Dep. at 31:3-7.

Because Green was moving internally within the WWE from the Engineering Division to a CSD project, no transfer paperwork was required to effect the change.  Gardunio Decl. ¶ 4.  Green himself admitted that his pay, seniority status, and benefits remained the same.  *Id.* ¶ 4; Green July 2018 Dep. at 185:14-18.

## D.      Green's Work at CSD Before Going on Leave in July 2015

Although Green was assigned to CSD from March 2015 until the City medically separated him in February 2018, a time span of approximately 35 months, Green was on leave and not performing his work duties for 29 of those 35 months.  Gardunio Decl. ¶ 5.  His primary responsibility while at CSD was the Cross Bore Project, with an expected duration of 30 months.  Henderson Decl. ¶ 10; Lipps Dep. at 30:14-17; Harrison Dep. at 12:6-13; 22:8-18; 28:16-29:4.  His direct supervisor Lipps testified that because familiarity with cross bores was a critical and necessary part of Green's training, he was initially assigned to review and code sewer videos.  Lipps Dep. at 31:24- 33:14.  Lipps, Harrison and Eikman all testified that once Green demonstrated coding proficiency, he was expected build on this experience by moving on to field inspections of cross bores and working with contractors.  *Id.*; Harrison Dep. at 19:21-22:22;

United States District Court
Northern District of California

Eickman Dep. at 13:14-14:14, 16:5-18:14.

Green's supervisor testified that he did not perform well on the cross bore video coding from the start.  Lipps Dep. at 46:2-14; *see generally id.* 47:10-58:1.  The CSD benchmark for employees doing video coding was 1,250 feet per day, and Green did not meet this standard.  *Id.* at 46:13-14; Rogoyski Decl., Exh. 11 at CCSF 5131.  In the four and a half months between his start on March 15, 2015 and his going out on leave on July 30, 2015, Green coded 9,723.5 feet, or 7.8 days' worth of coding.  *Id.*

Green submits no evidence of positive – or even competent – performance of his job at CSD.  At the time, Green acknowledged his poor performance and blamed it on the difficulty of the work and his lack of experience, writing in a weekly status report for the week of May 9 to 15, 2015, that it was, "[d]ifficult to code/edit the inspection in Pipelogix . . . where Douglas and Kaumil want[] me to perform 1250 linear feet of inspection per day considering it is my first time doing it, my eyes, and that certain staff members have over 5+ years' experience in coding." Rogoyski Decl., Exh. 6 at CCSF 2954.  In this litigation, however, Green now alleges that he did not perform well because the work was "menial."  *See, e.g.,* Revised Amended Complaint ("RAC") ¶ 27(d), ECF No. 97.[8]  As an example of why he wanted to transfer, he said in his deposition, "Are you serious?  Looking at videos?  I have three degrees looking at sewer videos eight hours a day is to me ridiculous. . ."  Green July 2018 Dep. at 86:4-6.

Green's work issues did not end with his inability to perform his assigned duties; he also had difficulty working with his new CSD supervisor, Lipps.  Harrison Dep. at 33:21-34:13; Lipps

---

[8] In his Opposition, Green enigmatically asserts that "[w]hile the City and Mr. Lipps would bring questionable allegations to [Green's] poor performance in his coding sewer work in a public forum (Lipps' Depo. at 46:2-14; 47:10-58:1), which is a violation of the Work Climate Expectations (Exh. 5, p. 781), but evidence indicates a different narrative (Exh. 5 PG&E Coding Surveys p. 578 & 815, Green's Dep. at 210:2-212:5)."  Opp. at 8:17-20.  Unfortunately, Green does not specify what specific allegations he considers questionable and what he believes the evidence he cites shows instead, i.e., what constitutes this "different narrative" and what evidence creates a genuine issue of material fact regarding these allegations and narrative.  The Court is not obligated – and in fact is unable – to pick through the evidence cited to determine what Green's argument is and what part of the many pages of documents he cites supports his position.  "Judges are not like pigs, hunting for truffles buried in briefs."  *Christian Legal Soc. v. Wu*, 626 F.3d 483, 488 (9th Cir. 2010).  Green cannot make a general reference to many pages of documents and expect the Court to figure out what his argument is and how to bolster it or to construct an argument on his behalf.

United States District Court
Northern District of California

Dep. at 58:14-24.  Green believed that Lipps' efforts to manage Green were "harassment," including such commonplace interactions as providing detailed instructions for projects, sending Green emails about his work performance, monitoring whether Green was taking excessive lunch breaks, taping an urgent document to Green's computer while Green was away from his desk, and quizzing Green on his knowledge of codes for sewer defects.  Harrison Dep. at 51:9-25; Lipps Dep. at 73:13-74:8, 80:9-11.  Lipps, for his part, testified that he taped documents to other employees' computers (Lipps Dep. at 74:4-6) and that it was a common technique to quiz new employees on codes – that he quizzed other employees and asked them to quiz each other.  Lipps Dep. at 80:9-81:1.

Green testified that he felt he was "constantly under attack and harassment" as a result of "constant emails [Lipps] was sending me" and that this "restricted" him from "performing the best way possible."  Green July 2018 Dep. at 203:19-204:7.  Green alleges he was singled out and harassed by this behavior.  RAC ¶ 35.  However, Green also testified that neither Harrison nor Eickman told him that they took any action against him because of his race (Green July 2018 Dep. at 263:7-11) or because he filed complaints against the PUC.  Green July 2018 Dep. at 263:12-16.

Green became reluctant and argumentative in the workplace, questioning the assignments given to him by Lipps, sending out rude and unprofessional communications, ignoring and insulting Lipps – Harrison observed that Green had a "proclivity" for insulting Lipps – and even walking away from conversations.  Harrison Dep. at 41:20-42:13 and generally at 41:2-48:1.  One such example is an exchange on May 8, 2015 in which Lipps asked Green by email about his whereabouts after a training the day before, Green replied, "Oh Douglas, . . . Maybe you failed to see me while you were on your routine patrols around my cubicle, but I was here before you left."  Rogoyski Decl., Exh. 7 at CCSF 500.  Similarly, in the weekly progress report for the week of May 9 to May 15, under the section "Constraints" Green wrote, "Always. ☺ Waiting for PPE and a positive work climate and culture change."  Exh. 6 at CCSF 2954.

Within weeks of starting on the Cross Bore Project, Green began requesting that he be moved back to his prior project under a different supervisor.  Green July 2018 Dep. at 86:21-87:5.  However, because CSD management was still "desperate" for people to work on the project, CSD

15

refused to transfer Green away from the project.  Harrison Dep. at 55:6-57:18.  CSD management believed that with effective employee coaching and management, Green could become a productive member of the team.  *Id.*  During that time, Green did not formally request a transfer to another City department using the required City process, nor did Green request a transfer as a reasonable accommodation in connection with any alleged disability.  Gardunio Decl. ¶ 6.

CSD provided training and mentoring to Green to help him with his video review and coding duties and to learn more about the Cross Bore Project.  Lipps Dep. at 30:18-32:17; 34:10-35:12; 44:6-45:23; 46:15-47:8.  The training covered the Maximo platform used to code the videos, certification from the National Association of Sewer Service Companies ("NASSCO") on pipeline assessment, a suite of other computer software related to the work, mentoring on Green's video coding duties from the resident expert engineer, and shadowing senior members of the team so that Green could learn about the various roles and responsibilities in the Cross Bore project.  *Id.*  Green requested and was granted permission to attend optional trainings and to participate in an employee retreat.  Rogoyski Decl. Exh. 8 at Green 652, Exh. 9 at Green 664, Exh. 10 at CCSF 1200.

Green also had difficulty following many of the work rules that applied to all employees at CSD, including not following the rules for the CSD In/Out Board, an electronic timekeeping system that allowed supervisors to know an employee's whereabouts during the workday, because before his transfer to CSD he used a time card.  Lipps Dep. at 60:3-16; Rogoyski Decl. Exh. 12 at Green 0770.  Lipps had the impression that Green was "startled" that he no longer had "flex hours" when he transitioned to CSD, which had fixed hours.  Rogoyski Decl., Exh. 12.[9]  Indeed, throughout his RAC, Opposition, and Response to the Separate Statement, Green characterizes discipline related to his failure to follow these rules as part of the discrimination and hostile work

---

[9] Green objects to this fact about the In/Out Board in the same way he objects to most other facts, namely by argumentation and citations to evidence that is either inadmissible or does not support the argument he makes.  Green "disputes this SMF and the false narrative because he complained being lied to [sic], lack of transparency, about the ongoing harassment, false accusation, retaliation for making complaints against the City and Douglas Lipps. The In/Out Board system at CSD was used as a tool to unfairly discipline Plaintiff while other employees were not abiding by the same rules and guidelines imposed onto certain employees, thus went unpunished and were treated much differently than [Green]."  Green's Response to SMF 80.

United States District Court
Northern District of California

environment he experienced at CSD.

Green frequently failed to arrive to work on time despite the fact that, unlike Green's prior project, CSD used fixed hours and emphasized punctuality for all CSD employees. Harrison Dep. at 33:31-34:10; 36:16-37:12, Rogoyski Decl. Exh. 12 at Green 0770. After Green was late to work every day from April 1 to 17, 2015, Supervisor Douglas Lipps issued Green a letter of instruction. Gardunio Decl. ¶¶ 7-8; Gardunio Decl. Exh. 1 at Green 255-56. When that did not correct the issue, Lipps issued Green a written warning on May 18, 2015. Gardunio Decl. ¶ 9; Gardunio Decl. Exh. 2 at CCSF 3031-3047; Rogoyski Decl. Exh. 13 at CCSF 3029. Despite this progressive discipline, Green continued to arrive late to work. Gardunio Decl ¶ 11; Rogoyski Decl. Exh. 14 at CCSF 3111. During the period of March 2015 and June of 2015, no other employees under the supervision of Lipps were identified as being habitually late to work. Gardunio Decl. ¶ 12.

Green also refused to comply with directives related to driving. To drive City vehicles, employees must provide a copy of a valid driver's license, authorize a DMV background check, and sign the City's vehicle use policy. Gardunio Decl. ¶ 13. Green refused to provide the documentation or sign the policy form. *Id.*; Rogoyski Decl., Exs. 15-18. Per City policy, CSD placed Green on non-driving status until he complied with the policy. Gardunio Decl. ¶ 12; Rogoyski Decl. Exh. 18. Green disputes these facts as a "false narrative" because he was not required to provide a copy of his driver's license to "some random timekeeper" (Green's Response to SMF 88-90), but the evidence he cites is non-responsive because it does not address his refusal to follow City policy on driving City vehicles.

Green also had excessive absenteeism at CSD. At the time of Green's employment, CSD conducted regular audits of sick leave usage by all employees. Gardunio Decl. ¶ 14. If an employee was using an excessive amount of sick leave, CSD would place the employee on sick leave restriction for the next six months, as permitted by the City Civil Service Rules, and require medical certification for sick leave – i.e. a doctor's note. *Id.*; Rogoyski Decl., Exh. 19, Rules 120.4.1, 120.11.12. Application of sick leave restrictions was a routine employee management process at PUC. Gardunio Decl. ¶ 14. After an audit revealed Green had taken three weeks of

1    sick leave in his first four months at CSD, PUC followed its policy and placed Green on a sick

2    leave restriction.  Rogoyski Decl., Exh. 20 at CCS 4821-22; Rogoyski Decl. Exh. 21.

3          Green has deemed sick leave restriction as part of "harassment" contributing to a "hostile

4    work environment" (Rogoyski Decl. Exh. 20 at CCSF 004821-22, Exh. 21 at Green 437; Gardunio

5    Decl. ¶ 14; Green July 2018 Dep. at 224:20-226:21) and as disability discrimination.  Green July

6    2018 Dep. at 264:14-21.  Green argues that "CSD doesn't conduct regular audits of sick leave

7    usage of all employees unless directed by CSD Management in retaliation, targeted, threats to

8    withhold pay, harassing and disparate treatment matter."  Green's response to SMF 91.  This

9    argument, however, completely ignores the fact that Green's own supervisor, Douglas Lipps, had

10   previously been placed on sick leave restriction after a routine audit of all CSD employees.

11   Gardunio Decl. ¶ 14.

12         Green claims his vacation time was "docked for coming to work early" and that he was

13   "accused of being AWOL" (absent without leave).  *See, e.g.,* RAC ¶ 36.  This allegation appears

14   to refer to a May 8, 2015, incident when Green left work approximately two hours early.

15   Rogoyski Decl. Exh. 22 at CCSF 492-494.  Green sent his supervisor a same-day email requesting

16   two hours of vacation leave because "something came up unexpectedly," but did not wait for

17   supervisor approval to leave.  *Id.* at CCSF 494.  Then, without telling his direct supervisor, Green

18   told a different manager that he had to leave for an "emergency," which the other manager

19   approved.  *Id.* at CCSF 492.  Unaware of the emergency and that Green had gotten approval

20   elsewhere, Green's supervisor notified him that he was technically AWOL.  *Id.* at CCSF 492-93.

21   Further, an apparent math error in the time calculation led to a disagreement about whether Green

22   was out for an additional 15 minutes.  *Id.*  Ultimately, the issue was resolved informally and Green

23   was only charged the two hours of vacation time he actually took.  Gardunio Decl. ¶ 15.  Green

24   was not marked AWOL and PUC took no disciplinary action against Green for the incident.  *Id.*

25   Green has also characterized this administrative error as part of the discrimination and hostile

26   work environment he experienced at CSD, even though the matter was resolved as he requested.

27         Green continued to request reassignment throughout his time at CSD.  Green testified that

28   during a July 8, 2015 meeting, an HR analyst explained the process for transferring out of PUC to

United States District Court
Northern District of California

18

United States District Court
Northern District of California

1    a different City department saying, "I believe she mentioned  that there was some way you got to

2    fill out some transfer through different city agencies."  Green July 2018 Dep. at 101:25-103:5.

3    However, Green never at any time completed the paperwork to formally request such a transfer.

4    Gardunio Decl. ¶ 16.  Green alleges that he "completed the paperwork and reasonable

5    accommodation request form for a transfer/ reassignment."  Green response to SMF 108.

6    However, Green does not direct the Court's attention to any fully completed "Employee Request

7    for Transfer" form but only to an incomplete transfer form that does not, for example, specify any

8    department or job position that he would like to be transferred to.  *See, e.g.*, ECF No. 154-1 at 355.

9            According to Green, everything about his experience at CSD – management by his

10   supervisor, his co-workers, and the work itself – caused Green so much stress that he became

11   mentally disabled as a result.  *See, e.g.,* RAC ¶¶ 27, 29-36; Green July 2018 Dep. 263:21-264:6;

12   Rogoyski Decl. Exh. 42, Transcript of Deposition of Morris Green taken August 30, 2019

13   ("Green August 2019 Dep.") at 90:20-91:13; 92:20-93:13.  Instead of disclosing his alleged

14   disability to anyone at CSD however, Green provided only a doctor's note placing Green "off

15   work from 7/30/2015 through 8/14/15" without stating the cause or medical condition

16   necessitating leave.  Rogoyski Decl. Exh. 23 at CCSF 971.[10]  Supervisor Lipps approved the leave

17   request under Family Medical Leave Act/California Family Rights Act (Rogoyski Decl. Exh. 24 at

18   CCSF 970), which marked the start of a continuous leave of absence that extended for over two

19   years.

20   **E.      The City's Interactions with Green While on Leave**

21           Between July 2015 and November 2017, Green was granted 14 extensions of his leave.

22   Gardunio Decl. ¶ 17.  For the first several months on leave, Green submitted successive doctor's

---

24   [10] Green says he "disputes" this statement of fact, taken word for word from the actual note Green

25   provided, by claiming this was part of a "false narrative because [he] provided many doctor's
     notes to the City and the City, SFPUC failed to provide [him] with a reasonable accommodation

26   transfer request away from the hostile work environment at CSD and they failed to conduct a city
     wide search or conduct an investigation for Plaintiff's complaints. The City chose to medically

27   separate Plaintiff from employment."  Green's response to SMF 110.  This argument and the
     evidence with which he purports to support it are entirely non-responsive, as they fail to address

28   the existence and content of the doctor's note.  Accordingly, this SMF, like so many to which he
     makes a similar response, remains undisputed.

1    notes stating that Green was unable to work.  *Id.*  Each time, PUC approved Green's time off.  *Id.*

2    Interacting primarily with PUC Human Resources ("HR"), Green began with twelve weeks of

3    leave under the Family Medical Leave Act, then paid sick leave until December 28, 2015,

4    followed by unpaid sick leave.  *Id.* ¶¶ 17, 18.  Although PUC HR notified Green about the

5    reasonable accommodation process in February 2016, Green remained on unpaid leave and did not

6    submit reasonable accommodation paperwork at that time.  *Id.* at ¶ 19. Contacting a person on a

7    leave of absence in this manner was a routine HR process.  *Id.*

8         While out on leave, Green inquired informally about "the process of transferring to a

9    different City agency/department."  *See, e.g.,* Rogoyski Decl. Exh. 25 at CCSF 140-41; Gardunio

10   Decl. ¶ 16.  On multiple occasions, the City provided Green with an explanation of how to

11   complete the transfer process and paperwork, which required that the employee identify a vacancy

12   from City job listings, contact the City department with the vacancy, have the receiving City

13   department agree to the employee filling the vacancy, and then have the employee's current City

14   department agree to let the employee transfer, along with signed forms finalizing the agreement of

15   all concerned to the transfer.  *See, e.g., id.*; Rogoyski Decl. Exh. 26 at CCSF 143-144, Exh. 27 at

16   CCSF 207-10.  Green asked several times for the City to tell him what departments that had

17   vacancies would be interested in his experience and education.  *Id.*  The City responded just as

18   many times that "[i]t is your obligation to review the current openings and fill out the Employee

19   Request for Transfer form to submit to the department listed on the job announcement you are

20   interested in."  *See, e.g.,* Rogoyski Decl. Exh. 28 at CCSF 221-222.  Although Green apparently

21   applied directly for jobs, he did not complete the transfer paperwork at any time.  Gardunio Decl.

22   ¶ 16.  Green testified at his deposition that no one at PUC said he would be denied transfer based

23   on his race, retaliation, or any other reason.  Green July 2018 Dep. at 150:9-151:19.

24        PUC had a policy of only approving one consecutive year of leave through the leave

25   process, which balances PUC's interest in ensuring employee well-being with PUC's

26   responsibility to deliver services to the public, and prevents the disruption caused by indefinite

27

28

United States District Court
Northern District of California

1   leaves.  Gardunio Decl. ¶ 20.[11]  PUC alerted employees to this policy in a standard letter to

2   employees who had been on leave for ten months.  *Id.*

3   In May 2016, after Green had been on leave for ten months, PUC followed its usual

4   protocol and notified him by letter that it only intended to approve leave through July 29, 2016.

5   *Id.* and Exh. 3 at CCSF 00837-38.  The letter reminded Green that he could avail himself of the

6   reasonable accommodation process and included information about Employment Rights for

7   Persons with Disabilities, Employee Reasonable Accommodation Form, and Medical Release and

8   Authorization Form.  *Id.*  Green did not submit reasonable accommodation paperwork at that time.

9   Gardunio Decl. ¶ 20.  PUC sent Green a second letter in June 2016 reminding him about the

10  reasonable accommodation process, and that PUC would only approve leave for one year.  *Id.*,

11  Exh. 4 at CCSF 670-672.  PUC also informed Green in that letter that if he did not return to work,

12  begin the reasonable accommodation process, or resign his position by July 18, 2016, PUC might

13  pursue medically separating Green based on an inability to return to work.  *Id.*  Green did not

14  pursue any of these options by July 18, 2016, so PUC sent Green another letter informing him that

15  he had to notify PUC of whether he would return to work, begin the accommodation process, or

16  resign his position.  Gardunio Decl. ¶ 21 and Exh. 5 at CCSF 833-34.

17  On September 18, 2016, Green submitted an incomplete request for reasonable

18  accommodation on the basis of a disability, namely reassignment away from his supervisor

19  Douglas Lipps and other management at CSD.  Gardunio Decl. ¶ 23; Gardunio Decl. Exh. 6 at

20  CCSF 2760.  Green claimed that a "hostile work environment" was causing his disability in the

21  form of "enormous stress that affected [his] mental health," among other things.  *Id.*  Green

22

23  [11] In another example of disputation via unsupported argumentation, Green responds to this fact by
    saying, he "disputes this SMF because if SFPUC truly cared about ensuring employee's well-

24  being then they would have followed their own EEO and RA policies so that [he] didn't have to
    go out on medical leave twice and placed [sic] back in the same hostile work environment at CSD

25  and eventually medically separated.  PUC failed to abide by their own EEO rules, guidelines and
    procedures and those of the state and federal government.  PUC failed to provide [his] reasonable

26  accommodation transfer request, failed to conduct an investigation regarding [his] complaints of
    harassment, retaliation and so forth, they failed to prevent the ongoing harassment, discrimination,

27  hostile work environment at the workplace which affected the [his] health and productivity.  And
    the City, PUC failed to promote and provide professional development opportunities for [him] in

28  the same manner as other employees that are not apart [sic] of a protected category/class."
    Green's response to SMF 125.

admitted in his deposition that PUC informed him that he had to submit information about his medical provider to support the accommodation request.  Green July 2016 Dep. at 154:10-18.  However, his reasonable accommodation paperwork remained incomplete because he failed to provide the required, signed medical release form or even the name of his doctor.  Gardunio Decl. ¶ 24.  The medical release form is a standard procedure for PUC and is indispensable for the reasonable accommodation process because without it, medical providers will not respond to PUC's efforts to communicate about an employee's medical work restrictions.  *Id.* ¶ 20.  Because Green refused to submit the necessary medical release, and because his request was otherwise ostensibly based on his inability to work for his supervisor, the City did not conduct a city-wide search for other positions for Green in response to his reasonable accommodation request.  *Id.* ¶ 23.

From September through December 2016, PUC sent Green several letters to set a meeting to discuss his request for accommodation and to remind him that a signed medical release and the name of his doctor were necessary for PUC to respond to his request.  *Id.* ¶ 27.  The parties were unable to identify a meeting time where Green and his union representative were both available.  *Id.*  Green did not provide a signed release or the name of his doctor in response to any of these communications.  *Id.*  Eventually, on January 5, 2017, Green met with PUC HR to discuss his request for reasonable accommodation.  *Id.* ¶ 28.  Once again, Green failed to produce the necessary medical release form and refused at the meeting to sign a release or provide the name of his doctor.  *Id.*  On January 23, 2017, PUC sent Green another letter demanding that he provide the required medical authorization form, along with the name of his doctor, by January 30, 2017, otherwise PUC would deem his repeated failure a refusal to participate in the reasonable accommodation process.  *Id.* ¶ 29 and Exh. 7 at 60-61.  Green responded by emailing a medical release that was significantly redacted.  *Id.* at 64.  Green's modifications rendered the altered release unusable – PUC could not obtain the necessary information to assess Green's assertion of a disability and need for accommodation and, yet again, Green failed to provide the name of his doctor.  Gardunio Decl. ¶ 29.

On February 17, 2017, PUC sent Green a further letter demanding that he either (1) return

1   to work, (2) provide an unredacted medical release and the name of his doctor, or (3) resign his

2   position.  *Id.* ¶ 30.  On February 27, 2017, Green provided the name of his doctor—Dr. Valerie

3   Spivey Herd, Psy.D.—but requested an extension of time to complete the medical release.  *Id.*,

4   Exh. 7 at 71.  On April 18, 2017, PUC sent Green another letter demanding that he provide the

5   medical release by April 27, 2017 and participate in a final interactive process meeting, otherwise

6   PUC would medically separate Green from his position.  Gardunio Decl. ¶ 30 and Exh. 7 at 1-5.

7   On April 27, 2017, Green emailed another copy of the signed release, but he had again marked up

8   the document to identify the portions to which he did not consent and he added a signed codicil

9   limiting the effect of the release.  Gardunio Decl. ¶ 31 and Exh. 8 at 87.  Once more, PUC was

10  unable to use the release because Green refused to sign the standard form giving PUC permission

11  to assess his request.  Gardunio Decl. ¶ 31.

12          An "interactive process meeting" occurred on May 8, 2017, but Green continued to refuse

13  to sign a usable medical release.  *Id.* ¶ 32.  PUC sent Green a further letter on May 10, setting a

14  final deadline of May 22 for him to produce the necessary documentation and attaching yet

15  another copy of the medical release form.  *Id.* ¶ 33.  The City also provided Green with a

16  document entitled "Essential Functions Guide," which identified the essential functions of his

17  position.  *Id.*  The guide was formatted in way that could be reviewed by a doctor and filled in

18  with the doctor's opinions about Green's purported disability and work restrictions, if any.  *Id.*  On

19  May 22, Green again submitted an unusable, modified version of the medical release.  Finally, on

20  May 24, 2017 – close to two years after he first went on leave – Green submitted a completed and

21  signed less-modified, usable version of the medical release.  *Id.* ¶ 34 and Exh. 8 at 101-03, 115.

22          Without notifying the PUC, however, sometime on or before May 25, 2017, Green had

23  provided the Essential Functions Guide document to his medical provider, Dr. Herd.  *Id.* ¶ 35.  On

24  May 25, 2017, Dr. Herd certified Green to return to work on a gradual basis: 20 hours the first two

25  weeks, 30 hours the next two weeks, and then full time by the end of June 2017.  Gardunio Decl.

26  Exh. 8 at pp. 150-151.  The certification did not state that Green was disabled.  *Id.*  Dr. Herd gave

27  the certification directly to Green, but Green did not give it to PUC.  Gardunio Decl. ¶ 35.

28          Unaware that Green was already certified to return to work, PUC sent Green's medical

United States District Court
Northern District of California

1   release form, a copy of the Essential Functions Guide, and related certification forms to Dr. Herd,

2   Green's designated medical provider, on June 5, 2017, along with a copy to Green.  *Id.* ¶ 35;

3   Gardunio Decl. Exh. 8 at 105-117.  PUC learned only later that Dr. Herd had already signed the

4   Essential Functions Guide certifying Green to return to work.  Gardunio Decl. ¶ 35.

5        PUC did not receive a response from Dr. Herd regarding the reasonable accommodation

6   paperwork that Dr. Herd had already filled out, so PUC again sent the packet to Dr. Herd on July

7   27.  *Id.*  On August 8, Kaiser Permanente, on behalf of Dr. Herd, informed PUC that its own

8   policies prevented it from releasing such documents directly to employers and that Dr. Herd had

9   completed the paperwork and returned it directly to Green.  *Id.* ¶ 37.

10        After PUC learned from Kaiser Permanente that Dr. Herd had already provided the

11   paperwork to Green, PUC demanded several times that Green produce it.  Gardunio Decl. ¶¶ 37-

12   39; Gardunio Decl. Exh. 8 at pp. 135-136, 139-140.  Instead of providing the certification he

13   already had, however, on August 28, 2017, Green sent an email to PUC suggesting it had not

14   received responsive correspondence from Dr. Herd because PUC had sent the form to an incorrect

15   address.  Gardunio Decl. Exh. 9 at CCSF 2726.  This was, at a minimum, misdirection on Green's

16   part, given that Kaiser Permanente had previously informed PUC that Dr. Herd had returned the

17   paperwork directly to Green.  *Id.* at ¶ 38.

18        In response, PUC once again sent Green a letter on August 31, demanding that Green

19   participate in good faith in the interactive process, this time either by submitting a copy of the

20   paperwork PUC believed was likely in his possession, by returning to work, or by resigning.

21   Gardunio Decl. ¶ 38 and Exh. 8 at 135-36.  Green did not provide the paperwork demanded by

22   August 31 PUC letter.  Gardunio Decl. ¶ 39.  Instead, on September 6, Green requested an

23   extension of time to provide the paperwork because the certification prepared by Dr. Herd was

24   "incomplete" and Green was "working with Kaiser to get the document completed."  *Id.* and Exh.

25   10 at CCSF 7889.

26        On September 15, 2017, PUC sent another letter with the heading "Reasonable

27   Accommodation Request – Health Care Provider Certification 4th REQUEST," demanding that

28   Green provide the necessary paperwork by September 21.  Gardunio Decl. ¶ 39 and Exh. 8 at 139-

United States District Court
Northern District of California

40. Finally, on September 21, Green emailed a copy of "accommodation" paperwork he had received from Dr. Herd.  Gardunio Decl. ¶ 40 and Exh. 8 at 143-51.  The document revealed that nearly four months earlier, Dr. Herd had certified Green to return to work on a gradual basis starting May 25.  *Id.*

## F.    PUC Attempts to Reinstate Green into the Work Force

After receiving the missing paperwork, PUC suspected that Green had committed misconduct in the accommodation process.  Gardunio Decl. ¶ 41.  Nevertheless, PUC still attempted to re-integrate him back into the work force and, on October 2, 2017, it sent Green a letter setting a return-to-work date of October 10, based on Dr. Herd's certification that he had been cleared to return to work by the end of June.  *Id.*; Gardunio Exh. 8 at 155.  Consistent with Dr. Herd's recommendation, PUC gave Green a deadline of October 5, 2017 to submit a further accommodation request.  Gardunio Decl. Exh. 8 at 155.  At no point, however, did Green submit a new reasonable accommodation request, leaving intact Dr. Herd's certification that he was cleared to return to work.  Green July 2018 Dep. at 182:7-25; Gardunio Decl. ¶ 41.

In his deposition, Green testified that he changed doctors because he disagreed with Dr. Herd's assessment that he could return to work and because she would no longer certify him to be off.  Green July 2018 Dep. at 176:14-178:17.  On October 9, 2017, Green provided a note from a different doctor, Dr. Arthur Bakal, placing Green off work from October 9 to October 31, 2017, but stating that Green was "able to return to work at full capacity on 11/1/2017."  Gardunio Decl., Exh. 8 at 165.  PUC treated this as a proper request for accommodation, giving Green a fourteenth consecutive extension of time off and granting Green leave from October 9 through October 31.  *Id.* at 167; Gardunio Decl. ¶ 42.

On November 1, 2017, Green reported to work for the first time in over two years.  Gardunio Decl. ¶ 43.  The next day, Green informed PUC that he needed every Monday off from work so that he could attend "medical appointments."  Gardunio Decl. Exh. 8 at 169.  Green did not provide reasonable accommodation paperwork, but instead on November 3 Green provided a doctor's note from a social worker dated October 7, 2017, confirming that Green was participating

United States District Court
Northern District of California

1    in a Monday treatment group with a duration of 12 weeks.  *Id.* at 171; Gardunio Decl. ¶ 43.  The

2    letter did not state that Green would spend the entire workday in the group and it did not otherwise

3    satisfy reasonable accommodation information requirements.  *Id.*  Nevertheless, on November 6,

4    PUC granted Green leave on Mondays as an interim accommodation and requested, again, that he

5    complete reasonable accommodation paperwork, as he had been cleared to work by his previous

6    doctor.  *Id.* at 173.  Green did not do so.  Gardunio Decl. ¶ 43.  On November 16, 2017, PUC sent

7    Green another letter requesting that he provide paperwork necessary to support the interim

8    accommodation.  *Id.* ¶ 44; Gardunio Decl. Exh. 8 at 181.

9         Between November 1 and December 3, 2017, Green reported to work for a total of fifteen

10   days.  Gardunio Decl. ¶ 45.  On November 17, 2017, Supervisor Lipps and CSD Manager

11   Eickman had asked Green to report for a private meeting to discuss Green's work performance.

12   *Id.* Exh. 11 at CCSF 3220.  Unbeknownst to Lipps and Eickman, Green brought a tape recorder to

13   the meeting in order to take notes for use by his union representative and his lawyer.  Rogoyski

14   Decl., Exh. 42 (Green August 2019 Dep.) at 11:1-13:8.  When Green pulled out the tape recorder

15   and turned it on, Eickman and Lipps refused to agree to be recorded and objected to the recorder's

16   use on grounds that it was non-consensual and therefore illegal.  *Id.*  In California, surreptitious

17   recording of private conversations is illegal.  *See* California Penal Code § 632.  Because Green

18   refused to participate in the meeting without his tape recorder, Eickman ended the meeting.

19   Gardunio Decl. Exh. 11 at CCSF 3320-21.

20        Green was issued a formal written warning for the attempted non-consensual use of a tape

21   recorder, refusal to put it away after his supervisors objected, and the insubordinate disruption of

22   the work meeting.  Gardunio Decl. ¶ 46 and Exh. 11 at CCSF 3220-21; Green August 2019 Dep.

23   at 12:15-24; Lipps Dep. 71:5-13.  Lipps testified that no other of his employees asked to tape

24   record a meeting (*id.*), but PUC has taken similar corrective action against other employees

25   outside of Green's protected class for attempting to record meetings without consent.  Gardunio

26   Decl. ¶ 46.  When Lipps attempted to deliver a copy of the written warning to Green to sign and

27   acknowledge receipt, Green refused to sign, told Lipps "stop harassing me" and that Lipps was not

28   doing his job.  Rogoyski Decl., Exhs. 29, 30.

1    Also in November 2017, Green was repeatedly scheduled to meet with HR manager Bonita

2    Decker in order to update his onboarding paperwork – delayed by over two years – and to resolve

3    his non-driving status.  Rogoyski Decl. Exh. 31 at CCSF 3492, Exh. 32 at CCSF 3676.  Green

4    refused to sign the standard policy paperwork, refused to provide his driver's license, and refused

5    even to participate in these routine HR meetings without his union representative present.

6    Rogoyski Decl. Exhs. 32-35.

7    On December 4, 2017, Green did not return to work.  Gardunio Decl. ¶ 47.  Instead, Green

8    submitted: (1) a retroactive request for medical leave from December 1 to 10, 2017; (2) a note

9    from Dr. Bakal dated December 1, 2017, placing Green off work for unspecified reasons from

10   December 1 to 10, but deeming him "able to return to work at full capacity on 12/11/2017"; and

11   (3) a request for one year of personal leave from December 11, 2017 through December 11, 2018.

12   *Id.*; Gardunio Decl. Exh. 8 at 183-87.  These requests were not approved but Green did not return

13   to work.  Gardunio Decl. ¶ 47.  Green was therefore AWOL and remained AWOL from that date

14   until the City medically separated him.  *Id.*  On December 5, Green emailed PUC to notify it that

15   he refused, once again, to complete reasonable accommodation paperwork, but instead re-sent a

16   copy of his incomplete reasonable accommodation form from September 16, 2016 requesting a

17   new supervisor.  *Id.* ¶ 48; Gardunio Decl. Exh. 8 at 189-91.  Green also submitted another note

18   from Dr. Bakal, this one dated December 1, 2017, certifying that Green had "permanent

19   restrictions," namely that Green "need[ed] to work at a different location and with a different

20   supervisor."  Gardunio Decl. ¶ 48 and Exh. 8 at 198.  This medical note confirmed that Green

21   could not work under his assigned supervisor or perform work in his assigned location.  *Id.*

22   On January 25, 2018, PUC sent Green a letter stating that "The SFPUC is recommending

23   that you be medically separated from your Class 5502 Junior Engineer position due to your

24   inability to work, inability to perform your job duties, failure to participate in the interactive

25   process, and request for an unreasonable accommodation."  Gardunio Decl. ¶ 49; Gardunio Decl.

26   Exh. 8 at p. 1-8.  Green "disputes this SMF [211] and this narrative" by arguing that he "engaged

27   in the interactive process since 2015 and SFPUC failed to prevent the harassment, failed to

28   investigate the complaints, failed to engage in an interactive process in good faith effort and failed

United States District Court
Northern District of California

27

to provide reasonable accommodation for a transfer/reassignment away from the hostile/toxic work environment at CSD." Green's Response to SMF 211. However, Green's evidence is non-responsive because it does not respond to the contents of the January 25 letter or PUC's conduct at the relevant time, nor does it create a dispute as to whether he was unable to work or perform his job duties, whether he actually engaged in the interactive process, or whether his request for an accommodation was unreasonable. *Id.*

The January 25, 2018 letter also notified Green of a meeting set for February 5, 2018, which would be Green's final opportunity to provide PUC with information to demonstrate that he could perform the essential functions of his position with or without an accommodation. Gardunio Decl. ¶ 49; Gardunio Decl. Exh. 8 at 1, 8. Green did not attend the February 5, 2018 meeting or contact PUC to reschedule it. Gardunio Decl. ¶ 50. In line with his other responses, Green disputes these two facts – that the letter contained a statement written in black and white that notified him of the February 5, 2018 meeting and that he did not attend this meeting – by saying he "contacted PUC numerous times," though he provides no evidence of contact, such as letters or email, and by citing to a long list of irrelevant evidence that fails to create any genuine disputes to these material facts. *See* Green's Response to SMF 213, which differs only slightly from his response to SMF 214, and citations therein: Exhibit 5, p. 555-556; 772-775, 925-932, 935; Exh. 7, p. 1285-1289; Exh. 9, p. 1325, 1324-1364 (Med. Cert/Work Status Report), 1365-1368, 1369-1373, 1374-1394, 1399-1409. Exh. 10, Def's Discovery Response to Plaintiff's Interro. #12 and RFA #21 &#23, Set 2, p. 1435-1436, 1442-1443, 1464-1465; RFA #29, Set 2, p. 1467; RFA #2, Set 1, p. 1513 and Interro. #9, Set One, p. 1508-1509; Green 7/16 Dep. at 70:7-17 (medical leave), 202:9-204:4 (affected life activities).

PUC then medically separated Green on February 8, 2018. Gardunio Decl. ¶ 50; Gardunio Decl. Exh. 12 at pp. 1-3. Green attempts to "dispute" this fact by arguing that he "admits that he was medically separated from employment unfairly by SFPUC, but the City deliberately encouraged and supported disparate treatment, harassment and retaliation against [him] who suffered adverse employment actions" and provides an even longer list of irrelevant citations that do not in any way dispute this material fact. *See* Green's Response to SMF 215 with exactly the

28

1    same citations as to SMF 214.

2         PUC presented uncontradicted testimony that it had previously medically separated an

3    employee outside of Green's protected class for requesting a similar unreasonable accommodation

4    of transfer away from a different supervisor.  Gardunio Decl. ¶ 23.

5    **G.    EEOC Charges and Procedural Background**

6         On May 28, 2015, prior to going out on his over two year leave, Green filed EEOC Charge

7    550-2015-00803 ("the '803 Charge"), alleging that, in the previous three-hundred days, i.e.,

8    covering the period between August 1, 2014 - May 28, 2015, because of his race (Title VII) and in

9    retaliation for complaining about discriminatory treatment, he (1) was denied promotion to 5502

10   Project Manager 1 while the City instead hired someone outside his protected class, (2) was

11   denied multiple trainings "and other equal opportunities," (3) was transferred to another unit, and

12   (4) was "disciplined and treated unfairly regarding performance and attendance and punctuality

13   while others who perform similarly are treated better and are not similarly disciplined."  Rogoyski

14   Decl. Exh. 36 at CCSF 122-23.  The '803 Charge did not contain any allegations pertaining to

15   failure to transfer to another role or supervisor, denial of promotion to any position other than

16   project manager, disability discrimination, failure to provide reasonable accommodation, or hostile

17   work environment.  *Id.*

18        There is no EEOC charge that relates to conduct between May 28, 2015 and July 31, 2015.

19        On May 26, 2016, Green filed EEOC Charge 550-2016-00813 ("the '813 Charge"), which

20   the EEOC associated with the '803 Charge, alleging that in the previous three-hundred days, i.e.,

21   covering the period between July 31, 2015 - May 26, 2016, because of discrimination based on

22   race (Title VII) and an undefined disability (ADA) and in retaliation for filing the '803 Charge, he

23   (1) experienced "continued harassment and different terms and conditions of employment" that

24   resulted in him taking medical leave (beginning July 30, 2015), during which the City (2) sent him

25   harassing letters and emails, (3) accused him of being AWOL, and (4) denied his reasonable

26   accommodation request.  Rogoyski Decl. Exh. 37 at CCSF 1417.  The charge made no mention of

27   denial of any promotion.  *Id.*

28        Green received a "Dismissal and Notice of Rights" form from the EEOC for the '803 and

'813 Charges, both dated November 4, 2016.  *See* RAC, first and second attachments.  The forms contain generic "Notice of Suit Rights" sections but neither form specifies on which bases Green is permitted to sue.

There is no EEOC charge that relates to conduct between May 26, 2016 and September 12, 2017.

On February 6, 2017, Green filed the original Complaint in this action ("Compl."), appearing *pro se*.  ECF No. 1.  The Complaint contains six causes of action, to wit: (1) Discrimination/ Disparate Treatment - Race, Color, Religion, Sex, or National Origin; (2) Disability Discrimination/ Disparate Treatment, based on a disability he defines as a "mental disability resulting from excessive occupational work stress and depression while working in a harassing and hostile work environment" (Compl. at p. 10 of 37); (3) Disability Discrimination - Failure to Provide Reasonable Accommodation, based on the exact same definition of disability (Compl. at p. 13 of 37); (4) Hostile Work Environment Created by Green's Supervisor; (5) Hostile Work Environment Created by Green's Co-Workers; and (6) Retaliation.  The original deadline to amend the Complaint was November 27, 2017.

On May 19, 2017, the Court appointed *pro bono* counsel to represent Green for the limited purpose of settlement conference proceedings with Magistrate Judge Elizabeth Laporte.  ECF No. 30.  On April 17, 2018, the Court extended the scope of *pro bono* representation to include discovery.  ECF No. 57.

On July 9, 2018, Green filed EEOC Charge No 555-2018-01585 ("'1585 Charge"), alleging that in the previous three-hundred days, i.e., covering the period between September 12, 2017 - July 9, 2018, because of his race and color (Title VII), disability (ADA), and in retaliation for filing EEOC complaints and this lawsuit and for testifying for a coworker,[12] he (1) was medically separated from his job at the City, (2) was "denied several promotional opportunities for many positions [he] applied to," (3) did not receive training "and other equal opportunities," (4)

---

[12] Green checked boxes for discrimination based on "color" and "age" but no age discrimination allegations are included either in the narrative accompanying the charge, in his original Complaint, or in his RAC, so the Court declines to address them here.

United States District Court
Northern District of California

was involuntarily transferred to another unit in 2015,[13] (5) was "constantly harassed and retaliated against" by his supervisor, management, and other employees for complaining about unfair treatment of other African Americans, (6) was subjected to "bullying, false claims, stalking, intimidation," (7) was subjected to "constant threats of insubordination, disciplinary actions (i.e., uneven discipline), write-ups, and termination," (8) was subjected to "different terms and conditions of employment" such as menial or less desirable job duties, and (9) received "harassing letters and emails" while on leave.  Rogoyski Decl. Exh. 38.  Green refers to his "disability that [he] suffered from at CSD in 2015 and beyond" and alleges the City failed to provide him with reasonable accommodation, namely a transfer out of CSD, that he asserts he requested on September 16, 2016.  *Id.*

The Right-To-Sue letter for the '1585 Charge, issued on October 17, 2018, refers only to discrimination based on disability under the ADA and Title V, Section 503, not race, color, or age or to retaliation or hostile work environment.  *See* RAC, third attachment.

On February 22, 2019, the Court granted in part and denied in part Green's motion for leave to file an amended complaint ("Amendment Order") based on events following the initial Complaint, including his medical separation on February 8, 2018, for the period from November 2017 to February 2018, and to add FEHA as a basis for liability for allegations during that time period only.  *See* ECF No. 89.[14]  The Court explicitly disallowed amendment to add FEHA claims for existing allegations regarding conduct prior to November 2017, to name new defendants, or to broaden his disability beyond the mental disability alleged in the initial Complaint.  *Id.*

On March 25, 2019, Green filed the operative "Revised Amended Complaint" ("RAC"), drafted with the assistance of *pro bono* counsel appointed by the Court.  ECF No. 97.  In his RAC, Green defines himself as "a 43-year old African/Native American male of Cherokee ancestry."

---

[13] The only bases on which the Court will consider Green's transfer to CSD are those timely brought before the EEOC in the '803 Charge, namely race and retaliation for complaining about the treatment of other African-Americans.

[14] The Court allowed these amendments in part because Green did not receive a right to sue letter for the '1585 Charge until October 17, 2018.

RAC ¶ 6.  The RAC contains six causes of action, to wit: (1) Discrimination/ Disparate Treatment - Race, Color, Religion, Sex, Or National Origin; (2) Disability Discrimination/ Disparate Treatment; (3) Disability Discrimination - Failure to Provide Reasonable Accommodation; (4) Hostile Work Environment Created by Green's Supervisor; (5) Hostile Work Environment Created by Green's Co-Workers; and (6) Retaliation.[15]  *Id.*  The Court will address in turn each of the claims laid out in Green's RAC.

## IV.   LEGAL STANDARD

Summary judgment is proper where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[16]  The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that may affect the outcome of the case, and a dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."

---

[15] Paragraph 15 of the RAC states in a single sentence that Green alleges 10 claims for relief, a statement that is repeated at pages 3 and 4 of his Opposition brief.  However, the claims for aiding and abetting retaliation and unlawful discrimination in violation of FEHA; discrimination in violation of the California Constitution, Article I, Section 8; discrimination and retaliation in violation of 42 U.S.C. section 1983 and the Equal Protection Clause of the Fourteenth Amendment; retaliation and discrimination in violation of 42 U.S.C. section 1981; and wrongful demotion under California common law do not appear outside of this one paragraph, which is not sufficient to allege a claim under Federal Rule of Civil Procedure 8.  Pages 9 to 48 of the RAC lay out six specific claims for relief and state the factual allegations relevant to each.  Those are the causes of action Green has alleged.  Nonetheless, even if the additional claims referred to in paragraph 15 were considered to be alleged, they would not change the outcome, for the reasons explained in the main text.  For example, Green's failure to obtain a DFEH right-to-sue letter would also bar a claim for violating FEHA by aiding and abetting, assuming that such a claim exists.  His inability to establish a prima face case or to rebut PUC's legitimate nondiscriminatory reasons under Title VII would also doom his claims under Article I, Section 8 of the state constitution, Sections 1981 and 1983, and the Equal Protection Clause.  Similarly, Green's inability to show that transfer to CSD was an adverse employment action and, even if it were, to rebut PUC's showing of legitimate reasons for the transfer would foreclose a claim for wrongful demotion under the common law, assuming that such a common law claim exists.

[16] Green incorrectly includes the standard governing a motion to dismiss under Rule 12(b)(6) rather than the standard for a motion for summary judgment under Rule 56 and incorrectly states that "any allegations Plaintiff makes are presumed true."

United States District Court
Northern District of California

1    *Id.*

2         If the moving party meets its initial burden, the opposing party must, in a manner "as

3    would be admissible in evidence," set forth "specific facts showing that there is a genuine issue for

4    trial." Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 250.  "While the evidence presented at the

5    summary judgment stage does not yet need to be in a form that would be admissible at trial, the

6    proponent must set out facts that it will be able to prove through admissible evidence." *Norse v.*

7    *City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (citing Fed. R. Civ. P. 56(c) ("An affidavit

8    or declaration used to support or oppose a motion must be made on personal knowledge, set out

9    facts that would be admissible in evidence, and show that the affiant or declarant is competent to

10   testify on the matters stated.")).  Still, to survive summary judgment, the nonmoving party "must

11   set forth non-speculative evidence of specific facts, not sweeping conclusory allegations."

12   *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011)

13   (*citations omitted*).

14        The Ninth Circuit has held that "[i]n evaluating motions for summary judgment in the

15   context of employment discrimination, we have emphasized the importance of zealously guarding

16   an employee's right to a full trial, since discrimination claims are frequently difficult to prove

17   without a full airing of the evidence and an opportunity to evaluate the credibility of the

18   witnesses." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).  "In the context of

19   employment discrimination law under Title VII, summary judgment is not appropriate if, based on

20   the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence

21   that the defendant undertook the challenged employment action because of the plaintiff's race."

22   *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).

23        Nonetheless, "[o]ne of the principal purposes of the summary judgment rule is to isolate

24   and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a

25   way that allows it to accomplish this purpose." *Celotex*, 477 U.S. at 323-24.  The moving party

26   discharges its burden by showing that the nonmoving party has not disclosed the existence of any

27   "significant probative evidence tending to support the complaint." *First Nat'l Bank v. Cities Serv.*

28   *Co.*, 391 U.S. 253, 290 (1968).  "The mere existence of a scintilla of evidence in support of the

United States District Court
Northern District of California

1    plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably

2    find for the plaintiff." *Anderson*, 477 U.S. at 252.

3        Hence, a court will grant summary judgment "against a party who fails to make a showing

4    sufficient to establish the existence of an element essential to that party's case, and on which that

5    party will bear the burden of proof at trial . . . since a complete failure of proof concerning an

6    essential element of the nonmoving party's case necessarily renders all other facts immaterial."

7    *Celotex*, 477 U.S. at 322–23.  Where the moving party will have the burden of persuasion on an

8    issue at trial, it must "support its motion with credible evidence . . . that would entitle it to a

9    directed verdict if not controverted at trial."  *Id.* at 331.  On an issue for which the opposing party

10   will have the burden of proof at trial, however, the moving party need only point out "that there is

11   an absence of evidence to support the nonmoving party's case."  *Id.* at 325.

12       All reasonable inferences must be drawn in the light most favorable to the nonmoving

13   party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  However, it is not the

14   task of the Court "'to scour the record in search of a genuine issue of triable fact."  *Keenan v.*

15   *Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden "to identify with

16   reasonable particularity the evidence that precludes summary judgment."  *Id.*  Thus, "[t]he district

17   court need not examine the entire file for evidence establishing a genuine issue of fact, where the

18   evidence is not set forth in the opposing papers with adequate references so that it could

19   conveniently be found."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

20   "Judges are not like pigs, hunting for truffles buried in briefs."  *Christian Legal Soc*, 626 F.3d at

21   488.  If the nonmoving party fails to identify such evidence, or if it offers evidence that is "merely

22   colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477

23   U.S. at 249-50 (citations omitted).

24       Indeed, the purpose of Rule 56 "is not to replace conclusory allegations of the complaint ...

25   with conclusory allegations of an affidavit."  *Lujan*, 497 U.S. at 888.  The Ninth Circuit "has

26   refused to find a 'genuine issue' where the only evidence presented is uncorroborated and self-

27   serving testimony."  *Villiarimo*, 281 F.3d at 1061.  "A conclusory, self-serving affidavit, lacking

28   detailed facts and any supporting evidence, is insufficient to create a genuine issue of material

34

1    fact." *F.T.C. v. Publ'g Clearing House, Inc*., 104 F.3d 1168, 1171 (9th Cir.1997); *see also*

2    *Villiarimo*, 281 F.3d at 1059 n.5, 1061 (9th Cir.2002) (holding that the district court properly

3    disregarded the declaration that included facts beyond the declarant's personal knowledge and that

4    did not indicate how she knew the facts to be true); *Nigro*, 784 F.3d at 497 (a court may disregard

5    "a self-serving declaration that states only conclusions and not facts that would be admissible

6    evidence").

7                                          **V.    DISCUSSION**

8    **A.    Exhaustion**

9            **1.    In General**

10           To file suit for a Title VII or ADA employment claim, a plaintiff must first timely file a

11   charge of employment discrimination with the EEOC. *Alexander v. Gardner-Denver Co.*, 415

12   U.S. 36, 47 (1974) (describing requirements for Title VII claims under 42 U.S.C. § 2000e-5); 42

13   U.S.C. § 12117 (The ADA expressly incorporates Title VII's procedural requirements).

14           The scope of the plaintiff's court action depends on the scope of the EEOC charge and

15   investigation. *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir.1994); *Sosa v. Hiraoka*, 920

16   F.2d 1451, 1456 (9th Cir.1990).  In an EEOC charge, "the specific employment practice at issue

17   must be identified with precision." *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 110-

18   111 (2002); *Albano v. Schering-Plough Corp.*, 912 F.2d 384, 385 (9th Cir. 1990) ("The specific

19   claims involved in the court action ordinarily must also have been brought in the EEOC charge.").

20   However, because many filings are *pro se*, a liberal standard governs the interpretation of the

21   EEOC charge.  *See Federal Express Corp. v. Holowecki*, 552 US at 402-403; *B.K.B. v. Maui*

22   *Police Dep't*, 276 F.3d 1091, 1100 (9th Cir. 2002), as amended (Feb. 20, 2002) (construing the

23   language of EEOC charges "with utmost liberality since they are made by those unschooled in the

24   technicalities of formal pleading.").  Therefore "[i]t is sufficient that the EEOC be apprised, in

25   general terms, of the alleged discriminatory parties and the alleged discriminatory acts." *Sosa*,

26   920 F.2d at 1458 (internal quotes omitted).

27           Federal courts cannot consider incidents of discrimination that are not included in a

28   plaintiff's EEOC charge unless those new allegations are "like or reasonably related to" the

United States District Court
Northern District of California

allegations made before the EEOC, as well as charges that are within the scope of an EEOC investigation that reasonably could be expected to grow out of the allegations, *Sosa*, 920 F.2d at 1456; *Green v. Los Angeles Cnty. Superintendent of Schs.*, 883 F.2d 1472, 1475-76 (9th Cir. 1989), including new acts occurring during the pendency of the charge before the EEOC. *Oubichon v. North American Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir. 1973).  To make this determination, courts look to such factors as (1) the alleged basis of the discrimination; (2) dates of discriminatory acts alleged; (3) perpetrators named in the EEOC charges; and (4) the locations at which the discrimination is alleged to have occurred.  *B.K.B.*, 276 F3d at 1100.  "[T]the crucial element of a charge of discrimination is the factual statement contained therein."  *Id.*  Courts in the Ninth Circuit have considered in various contexts whether a federal complaint impermissibly exceeds the scope of the agency charges and have excluded such claims as theories of discrimination, i.e., religion, race and color, not raised before EEOC, *see, e.g., Shah v. Mount Zion Hosp. and Medical Ctr.*, 642 F.2d 268 (9th Cir. 1981), and incidents not alleged in the EEOC charge.  *See, e.g., Oubichon*, 482 F.2d at 571; *Freeman v. Oakland Unified School Dist.*, 291 F3d 632, 637-638 (9th Cir. 2002) (an employee's EEOC charge of racial and sexual discrimination among faculty members in a faculty election were not "like or reasonably related" to claims for race-based employment discrimination by the school district itself).  Because Green has raised a number of specific allegations for the first time in his RAC, the Court will assess whether they are "like or reasonably related" to allegations included in his EEOC charges and/or the likelihood of an investigation growing from his EEOC allegations.

Given these parameters, where the City has raised the issue of exhaustion, the Court may consider only the allegations timely made in Green's three EEOC charges and those that are "like or reasonably related to" allegations or within the scope of an EEOC investigation that reasonably could be expected to grow out of the allegations.

In general, a separate charge period applies for and runs from each discrete discriminatory act.  *Nat'l R.R. Pass. Corp*, 536 U.S. at 113 (holding that claims for discrete acts of discrimination—such as termination, refusal to hire or promote, denial of transfer—are barred if not filed within the 180-day or 300-day period even if other, similar discriminatory acts occurred

within that period.)  "A discriminatory practice, though it may extend over time and involve a series of related acts, remains divisible into a set of discrete acts, legal action on the basis of each of which must be brought within the statutory limitations period."  *Lyons v. England*, 307 F.3d 1092, 1108 (9th Cir. 2002) (holding that where federal employees alleged their agency denied African-Americans favorable work assignments and job promotions in violation of Title VII, the limitations period ran from the date of each allegedly discriminatory act).  However, evidence of the earlier discriminatory acts and the employer's knowledge of those acts may be admissible as background evidence in support of a timely claim.  *Nat'l R.R. Pass. Corp*, 536 US at 112.

As a result, for example, the only bases the Court will consider for the discrete action of Green's March 15, 2015 transfer to CSD are race and retaliation for complaining about the treatment of other African-Americans brought before the EEOC in the '803 Charge, covering the period between August 1, 2014 - May 28, 2015.

In contrast, a continuing violation may be established either by demonstrating a company-wide policy or practice or by demonstrating a series of related acts against a single individual. *Green*, 883 F.2d at 1480.  In the latter instance, "[the] question ... boils down to whether sufficient evidence supports a determination that the 'alleged discriminatory acts are related closely enough to constitute a continuing violation.'"  *Id.* at 1480-81 (*citation omitted*).  Similarly, hostile environment claims may be based on acts occurring outside of the time period, so long as at least one act contributing to the claim occurred within the time period.  *Id.* at 118; *Porter v. California Dept. of Corrections*, 419 F3d 885, 894 (9th Cir. 2005) (acts within Title VII time period need not be as egregious as earlier acts).

As a result, for example, the Court may consider Green's hostile environment allegations that predate or postdate the time periods covered by his EEOC charges.

### 2.    Scope of Claims In Relation To The EEOC Right-To-Sue Letters

The Ninth Circuit is unequivocal that a complainant is not to be prejudiced by the failure of the EEOC to fulfill (1) procedural requirements imposed upon it by statute (*Williams v. Owens-Illinois, Inc.*, 665 F.2d 918, 923 n. 2 (9th Cir. 1982), *opinion modified on denial of reh'g,* No. 79-4110, 1982 WL 308873 (9th Cir. June 11, 1982); *Watson v. Gulf & Western Industries*, 650 F.2d

990, 992-93 (9th Cir. 1981)) or (2) the procedures it has imposed upon itself.  *Roberts v. Arizona Board of Regents*, 661 F.2d 796, 799 (9th Cir. 1981) (stating that the Court is "unwilling to allow the EEOC's violation of its own procedural regulations to redound to [plaintiff's] detriment" where such regulations required the EEOC to forward charge to state civil rights division).

It appears that the EEOC failed to issue Right-To-Sue letters that match the allegations Green actually made in any of his three Charges.  As mentioned above, the "Dismissal and Notice of Rights" forms for the '803 or '813 Charges Green attaches to his RAC contain only generic "Notice of Suit Rights" sections that do not specify on which bases Green is permitted to sue, and the Right-To-Sue letter for the '1585 Charge refers only to discrimination based on disability under the ADA and Title V, Section 503, but not race, color, or age discrimination or to retaliation.[17]  These shortcomings seem to be an EEOC oversight for which Green himself should not be penalized.  Green's EEOC charges themselves put the City on notice to as to all the discriminatory bases of his lawsuit.

Following direction from the Ninth Circuit, the Court will not penalize Green based on the apparent deficiencies of the EEOC letters.  In the absence of contraindications and in order not to prejudice Green for issues beyond his control, the Court will assume his right to sue extends to all bases of discrimination alleged in his EEOC Charges.  Accordingly, the Court will consider allegations regarding the City's conduct that are properly alleged and not otherwise barred by the statute of limitations or not actionable for some other reason.

**3.       Green's Claims Under FEHA Are Barred As Not Properly Exhausted**

In its Amendment Order, the Court found good cause to permit Green to amend his complaint to add allegations concerning conduct from November 2017 to February 2018, including his medical separation, and to add violations of the Fair Employment and Housing Act ("FEHA") as a basis for liability for those allegations only.  Consequently, to the extent Green's RAC can be read to include FEHA liability for conduct prior to November 2017, such claims are

---

[17] In its Amendment Order, the Court made clear that it expressed no view as to whether there may be an exhaustion problem with respect to Green's inclusion of his termination in his first claim for relief for race discrimination because the '1585 Right-To-Sue letter, on its face, authorizes Green to sue only under the ADA and Section 503.  *See* ECF No. 89 at n. 3.

1  not properly part of this case and the Court **STRIKES** these allegations as a violation of the

2  Amendment Order.

3          Furthermore, although Green alleges he filed FEHA complaints with Department of Fair

4  Employment and Housing ("DFEH") (RAC ¶¶ 17, 18, 24), he provides no evidence of this for the

5  '1585 Charge.  Green submitted his right to sue letters from both the EEOC and DFEH for the

6  '803 and '813 Charges.  *See* June 4, 2015 DFEH right to sue letter for '803 EEOC Charge, ECF

7  No. 157-1 [69 of 291] and June 7, 2016 DFEH right to sue letter for '813 EEOC Charge, ECF No.

8  157-1 [81 of 291].  However, he submitted only an EEOC right to sue letter for the '1585 Charge

9  (ECF No. 157-1 [89 of 291]), no DFEH right to sue letter or even a letter from the EEOC stating

10  that the charge was dual-filed with DFEH, as he provided for both the '803 and '813 Charges.  *See*

11  undated EEOC notices of automatic filing of '803 and '813 Charges with DFEH.  ECF No. 157-1

12  [68 & 80 of 291].

13          The Ninth Circuit has held that the filing of a charge with either EEOC or DFEH is

14  deemed to be a filing with the other agency.  *See Paige v. State of Cal.*, 102 F.3d 1035, 1041 (9th

15  Cir. 1996); *EEOC v. Dinuba Med. Clinic*, 222 F.3d 580, 585 (9th Cir. 2000) ("Constructive filing

16  is made possible by 'worksharing agreements,' which designate the EEOC and the state agency

17  each other's agents for the purpose of receiving charges.").  Nonetheless, the failure to obtain a

18  DFEH right to sue letter is "a jurisdictional, not a procedural, defect, and thus . . . failure to

19  exhaust administrative remedies is a ground for a defense summary judgment."  *Martin v.*

20  *Lockheed Missiles & Space Co.*, 29 Cal. App. 4th 1718, 1724 (1994).  "[U]nder the federal statute

21  it implements (42 U.S.C. § 2000e–5(f)(1)), an EEOC right-to-sue letter satisfies the requirement of

22  exhaustion of administrative remedies *only* for purposes of an action based on Title VII."  *Id.* at

23  1726 (emphasis in the original).  A "claimant cannot file a lawsuit until receiving a right-to-sue

24  notice from the agency that specifically enforces those laws."  *Dornell v. City of San Mateo*, 19 F.

25  Supp. 3d 900, 905 (N.D. Cal. 2013); *Alberti v. City & County of S.F. Sheriff's Dept.*, 32 F. Supp.

26  2d 1164, 1174 (N.D. Cal. 1998), *disagreed with on other grounds by Zimmerman v. Oregon Dept.*

27  *of Justice*, 170 F.3d 1169, 1175 (9th Cir. 1999).

28          Hence, Green cannot bring FEHA claims without proof of receiving a right-to-sue letter

39

from DFEH, the agency that specifically enforces FEHA.  Green's bare assertion of DFEH filing, without more, is an insufficient basis on which to establish jurisdiction over his FEHA claims.

Because this Court cannot waive the jurisdictional requirement that mandates that individuals must obtain a right to sue notice from DFEH before bringing a civil suit under FEHA, the Court **GRANTS** summary judgment on Green's FEHA claims.

**B.      First Claim for Relief, Discrimination/Disparate Treatment - Race**

Green alleges race discrimination based on the following actions by the City:

(1) medical separation ('1585 Charge, RAC ¶ 27(a))

(2) non-promotion to a 5502 Project Manager 1 position in January 2015 ('803 Charge, RAC ¶ 27(b))

(3) non-promotion claims for thirty-five other positions (RAC ¶¶ 27(b), 36, 78, 79)

(4) transfer to CSD in March 2015 ('803 Charge, RAC ¶¶ 27(b), 30)

(5) denial of immediate transfer from CSD ('803 Charge, RAC ¶¶ 27(b), 30)

(6) change in work responsibilities to "menial" work of reviewing and coding sewer videos at CSD ('803 and '1585 Charges, RAC ¶¶ 27(c), 27(d))

(7) being denied training "and other equal opportunities" ('803 and '1585 Charges, RAC ¶¶ 32, 36, 37)

(8) formal discipline ("unfair" or "uneven") and "constant threats of insubordination," a.k.a. "multiple write-ups" for behavior such as performance, attendance, punctuality, attempting to record conversation illegally ('803 and '1585 Charges, RAC ¶¶ 27(c), 27(d), 27(e), 30)

(9) other actions: continued harassment and "different terms and conditions of employment" ('813 and '1585 Charges); subjected to bullying, false claims, stalking, intimidation ('1585 Charge, RAC ¶ 36); being placed on sick leave restriction ('803 and '813 Charges, RAC ¶ 34), having vacation time docked ('803 and '813 Charges, RAC ¶ 35), being accused of being AWOL ('813 Charge, RAC ¶ 36); being denied the opportunity to "assist fellow coworkers" ('813 and '1585 Charges, RAC ¶¶ 27(e), 31, 32); being tested by Supervisor Lipps on coding duties, having documents taped to his computer screen, and being subject to "micromanagement tactics" at work (*see* RAC ¶¶ 35, 36); being denied access to use city vehicle to conduct business affairs (RAC ¶

40

1   35); while on medical leave: being denied access to computer and email ('813 and '1585 Charges,

2   RAC ¶¶ 27(c), 30, 32), being sent harassing letters and "inappropriate emails" and "negative

3   criticism" ('813 and '1585 Charges, RAC ¶ 35)

### 1.   Medical Separation ('1585 Charge, RAC ⁋ 27(a))

#### a.   Prima Facie Case

6        Title VII of the Civil Rights Act of 1964, provides that it is unlawful for an employer "to

7   discriminate against any individual with respect to his compensation, terms, conditions, or

8   privileges of employment."  42 U.S.C. § 2000e–2(a)(1).  The Supreme Court has held that "this

9   not only covers 'terms' and 'conditions' in the narrow sense, but 'evinces a congressional intent to

10  strike at the entire spectrum of disparate treatment ... in employment.'"  *Oncale v. Sundowner*

11  *Offshore Servs., Inc.,* 523 U.S. 75, 78 (1998).

12       The Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),

13  established a three-stage burden-shifting test for evaluating claims of discrimination, including

14  race discrimination.  Under this test, the plaintiff bears the initial burden of establishing a prima

15  facie case of discrimination.  *Id*., 411 U.S. at 802.  To establish a prima facie case of race

16  discrimination, plaintiffs must show that (1) they belong to a class of persons protected by Title

17  VII; (2) they performed their job satisfactorily; (3) they suffered an adverse employment action;

18  and (4) the employer treated them differently than a similarly situated employee who does not

19  belong to the same protected class.  *Cornwell*, 439 F.3d at 1028.[18]  Under the *McDonnell Douglas*

20  framework, "[t]he requisite degree of proof necessary to establish a prima facie case for Title VII

21

22  ───────────────────

[18] The Court found above that it may not exercise jurisdiction over Green's FEHA claims in the
23  absence of proof of a right to sue letter from DFEH.  Were the Court to consider Green's FEHA
claims, however, the analysis would differ little and the result not at all because claims for race
24  discrimination under FEHA, like the Title VII, are subject to the *McDonnell Douglas* three-stage
burden-shifting framework.  *Guz v. Bechtel Nat. Inc.,* 24 Cal.4th 317, 354 (2000) ("Because of the
25  similarity between state and federal employment discrimination laws, California courts look to
pertinent federal precedent when applying our own statutes"); *Arnold v. Dignity Health*, 53 Cal.
26  App. 5th 412, 423–24 (2020) ("In analyzing claims of discrimination under FEHA, California
courts have long used the three-stage burden-shifting test established by the United States
27  Supreme Court in *McDonnell Douglas*.").

28

United States District Court
Northern District of California

1    ... on summary judgment is minimal and does not even need to rise to the level of a preponderance

2    of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994), *as amended on*

3    *denial of reh'g* (July 14, 1994) (citation omitted); *Chuang v. University of California Davis, Bd. of*

4    *Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000).

5          Once the prima facie case is established, the employer must then offer a legitimate,

6    nondiscriminatory reason for the adverse employment decision. *McDonnell Douglas*, 411 U.S. at

7    802.  Although the burden of production shifts to the defendant at this point, the burden of proof

8    remains with the plaintiff at all times. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253

9    (1981).

10         Finally, the plaintiff must prove, by specific and substantial evidence, that the employer's

11   proffered reason was pretextual. *McDonnell Douglas*, 411 U.S. at 804.  To defeat summary

12   judgment with a showing of pretext, a plaintiff can "show pretext directly, by showing that

13   discrimination more likely motivated the employer, or indirectly, by showing that the employer's

14   explanation is unworthy of credence." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th

15   Cir. 2003), *as amended* (Jan. 2, 2004).  In addition, a showing that a defendant treated similarly

16   situated employees outside plaintiff's protected class more favorably would be probative of

17   pretext. *Id.*

18         Although the requisite degree of proof necessary to establish a prima facie case for Title

19   VII is minimal, the Court concludes that Green has failed to do so here.

20                  **i.      Green Did Not Demonstrate Satisfactory Job Performance**[19]

21         Green's prima facie case fails first because he cannot show he was "performing

22   satisfactorily in the position held."  To be considered qualified for a job, a plaintiff must prove he

23   "was doing [his] job well enough to rule out the possibility that [he] was fired for inadequate job

24   performance." *Sengupta v. Morrison-Knudsen Co., Inc.,* 804 F.2d 1072, 1075 (9th Cir. 1986).  In

25   ────────────────────

26   [19] Green has identified himself as African American/Native American of Cherokee ancestry (*see,
     e.g.*, RAC ¶¶ 6, 28).  The City has not challenged this designation.  Hence, for the purposes of this
27   motion, the Court accepts that Green belongs to a class of persons protected from race
     discrimination by Title VII.  With respect to Green's medical separation, the Court also takes for
28   granted the third element (adverse employment action) of the prima facie case of race
     discrimination.

United States District Court
Northern District of California

1    this Green has categorically failed.

2         Green makes only the most cursory attempt to establish this crucial element of his prima

3    facie case.  With respect to the relevant time period, Green has not proved – nor does it seem he

4    has tried very hard to prove – that he was doing his job well enough to rule out the possibility that

5    he was fired for inadequate job performance.  The only representation Green makes about his job

6    performance covers the time prior to his transfer to CSD, from August 24, 2009 to March 1, 2015,

7    during which he argues that his performance appraisal reviews either met or exceeded

8    expectations under his previous supervisor, Ahmad, and that he "met the minimum qualifications

9    while possessing various academic degrees."  The only documentary evidence Green submits on

10   this crucial element of his prima facie case is five performance reviews, one each for the years

11   2010-2014, in which he either met or exceeded expectations.  But he submitted no evidence at all

12   of satisfactory – or even minimally competent – performance of his job at CSD.

13        In contrast, the City argues convincingly that Green's performance left much to be desired.

14   In the four and a half months between his first day at CSD on March 15, 2015 and the start of his

15   first medical leave on July 30, 2015, Green coded 9,723.5 feet, or the equivalent of just 7.8 days

16   worth of coding.  Hence, the record vividly demonstrates that his performance was entirely

17   unsatisfactory – when, that is, he actually showed up at work.  A sick time audit from that period

18   revealed that he took so much sick time – one hundred twenty-two hours – that he was put on sick

19   leave restriction.

20        The City also presented evidence that between November 1, 2017, his first day back on the

21   job in over two years, and December 3, 2017, Green engaged in several acts of misconduct and

22   insubordination, resulting in a written warning for attempted non-consensual and therefore illegal

23   use of a tape recorder, refusal to put the recorder away after his supervisors objected, and

24   insubordinate disruption of the work meeting, to which he responded with what the City deemed

25   to be further insubordination when he refused to sign for receipt of the warning.

26        The City also submitted testimony from multiple employees and contemporaneous emails

27   as evidence that he responded to efforts to manage him as "harassment."  Evidence showed that he

28   spoke rudely and aggressively to his supervisor, telling him to "stop harassing me" and to "get out

United States District Court
Northern District of California

in the field and do some work," and accusing him of not doing his job.  He also repeatedly refused to complete standard on-boarding paperwork (which apparently remained incomplete since March 15, 2015), to resolve his self-inflicted non-driving status by providing a copy of his driver's license and filling out a standard form, and to participate in routine human resources meetings without his union representative present.

Furthermore, from the start of his first medical leave to the day the City finally medically separated him, that is, for the two and a half years between July 30, 2015 and February 8, 2018, Green reported to work for a total of fifteen days.  At the time of his medical separation, Green had been on medical leave for over two years in contravention of the City's one-year medical leave policy and he was AWOL for over two months.

Both testimony and documentary evidence show that the day after Green reported to work for the first time in two years and four months on November 1, 2017, he requested even more time off.  First, he asked for every Monday off, for which he never provided reasonable accommodation paperwork as requested, though the City granted him the whole day off every week as an interim "accommodation."  Then he simply never came back to work after December 4, 2017.  Instead, he retroactively requested medical leave from December 1 to 10, 2017, supported by a note dated December 1, 2017 from Dr. Bakal, the doctor he switched to after his original doctor refused to certify him for any more medical leave.  Dr. Bakal placed Green off work for unspecified reasons from December 1 to 10, but deemed him "able to return to work at full capacity on 12/11/2017." He next requested an additional year of "personal leave" from December 11, 2017 through December 11, 2018.  Though these requests were not approved, Green did not return to work and was therefore AWOL.  He remained AWOL from that date forward.

Even so, the City did not medically separate Green for an additional two months.  It did so, finally, because he failed to respond to the City's January 25, 2018 letter notifying him of its intent to medically separate him because he was unable to perform his job duties, did not engage in the interactive process, and requested an unreasonable accommodation and because he failed to attend or reschedule the February 5, 2018 meeting, which he was fully informed would have been his last chance to show he could perform his job.

The City has provided ample evidence of Green's record of absenteeism, his refusal to cooperate with even the most mundane administrative tasks or provide required paperwork, his refusal to participate in meetings and active disruption of them, and the fact that between July 30, 2015 and February 8, 2018 Green worked a total of fifteen days.

Perhaps the most salient aspect of Green's performance, however, is that he was certified by a doctor as permanently unable to work under his supervisor, a fundamental requirement for the satisfactory performance of his job. As discussed more fully below, Green presented no evidence that he suffered from a disability recognized under the ADA and, in any event, he refused to complete paperwork for a reasonable accommodation. Consequently, the City had no obligation to provide him with reasonable accommodation or to continue his employment.

Green has provided no relevant or admissible evidence raising a genuine issue concerning the material fact, essential to a prima facie case of race discrimination, that he was not performing his job satisfactorily. Rather, the evidence demonstrates that he could or would not perform his duties as assigned. Thus, he cannot show – and has not shown by competent evidence put before this Court – that he performed his job satisfactorily. This fact is fatal to all of his claims based on race discrimination. Nevertheless, the Court will continue its analysis in the interests of a thorough analysis of Green's case.

### ii. There Is No Evidence That The City Treated Green Differently Than A Similarly Situated Employee Outside His Protected Class

Under *McDonnell Douglas*, it is Green's burden to present evidence establishing – or at least raising an inference of – each element of the *prima facie case*. Green provided no evidence that similarly situated employees outside his protected class were treated more favorably, a required element of a prima facie case of race discrimination. *See Davis*, 520 F.3d at 1089. Individuals are similarly situated "when they have similar jobs and display similar conduct." *Vasquez*, 349 F.3d at 641. At a minimum, then, Green must proffer evidence that a comparator employee had a "similar job" and engaged in a similar course of conduct. *Id.* Green has identified no other employee who is similarly situated to him. In fact, the only time he references "similarly situated non-black employees" in his Opposition is in the context of hostile work environment,

and then only in general terms.  Opp. ¶ 15.

In his RAC, he repeats the phrase "similarly situated" three times, but seemingly only as a catch-phrase, since he identifies not a single other employee who was "similarly situated" to him. He alleges only that he was "singled out and treated less favorably than others similarly situated on account of race" when he was transferred to CSD.  RAC ¶¶ 30, 57(b)(i), 67(a).  But he fails even to allege, much less submit evidence, that anyone outside his protected class with a similar job and displaying similar conduct – including completing less than eight days of work in four and a half months, alleging a disability not recognized under the ADA, and AWOL for over two months – was not medically separated as he was.

The City, in contrast, presented evidence that it previously medically separated an employee outside of Green's protected class for a similar unwillingness or inability to work with a different supervisor.  As to the behavior that, in part, constituted Green's poor performance, the City also showed that it took similar corrective action against other employees outside of Green's protected class for attempting to record meetings without consent.

Even drawing all reasonable inferences in the light most favorable to Green, the Court concludes that he has failed to establish two of the four of the elements of a prima facie case of race discrimination with respect to the City's decision to medically separate him.  As a result, there is no presumption that the City unlawfully discriminated against Green and the burden of proof does not shift back to the City to provide a legitimate, non-discriminatory reason for his termination.

### b.      The City Had A Legitimate Interest In Medically Separating Green

Even had Green established a prima facie case, however, the City offered legitimate non-discriminatory reasons for its actions.  According to the evidence submitted to the Court, the City desperately needed Green to actually perform his assigned duties on the Cross Bore Project.  The City presented undisputed evidence that the Cross Bore Project was critical to public safety and that it was "in dire straits" and needed all the help it could get.  Green's job performance was well below expectations, having completed the equivalent of 7.8 days coding in over four and a half months.  In addition, his extended absences prevented him from performing his job at all and, in

turn, interfered with the City's ability to get work done that was critical to public safety.  The City thus articulated a legitimate reason for preventing further disruption to its business.

### c. Green Presented No Evidence Of Pretext

Finally, Green has not proven by specific and substantial evidence – or any evidence whatsoever – that the City was motivated by discriminatory intent, nor has Green shown that the City's explanation is not believable for some other reason.  To show pretext using circumstantial evidence, Green must put forward specific and substantial evidence challenging the credibility of the City's motives.  This he has not done.

Green has presented no direct evidence of pretext raising a genuine dispute that discrimination more likely motivated the City.  Indeed, he admitted in his deposition that no one at the City said anything to him that any action taken in relation to him was based on race. Furthermore, he has presented no specific and substantial indirect evidence of pretext challenging the credibility of the City's motives by showing that the City's explanation is unworthy of credence.  Instead, Green only repeats the same arguments and makes assertions unsupported by admissible or relevant evidence.  In addition, although a showing that the City treated similarly situated employees outside Green's protected class more favorably would be probative of pretext (*see Vasquez*, 349 F.3d at 641), he identifies no other employees with similar jobs behaving in a similar manner who were treated better than him.

Green has failed to rebut the City's legitimate reasons for Green's medical separation. Therefore, even assuming that Green could establish his prima facie case, his claim would fail because he could not show that the City's reason to medically separate him was a pretext for discriminatory intent.

Although the requisite degree of proof necessary to establish a prima facie case for Title VII is minimal, the Court concludes that Green has failed to do so here.  Green has not produced even the "very little evidence" required to overcome the City's motion for summary judgment on this claim.  He has not provided evidence from which a trier of fact may infer that he performed his job satisfactorily at any time relevant to the motion, that similarly-situated employees were treated differently, that the City lacked a legitimate interest in medically separating him, or that its

United States District Court
Northern District of California

reasons for the separation were pretextual.  Accordingly, summary judgment is **GRANTED** for Green's claim of race discrimination for his medical separation.

### 2. Green's Non-Promotion To A 5502 Project Manager 1 Position In January 2015 Was Justified Because A More Qualified Candidate Was Hired

#### a. Prima Facie Case

A claim for racial discrimination for non-promotion or failure to hire is also subject to the *McDonnell Douglas* framework, but the prima facie case requires a slightly different showing, namely that plaintiffs (i) belong to a racial minority; (ii) applied and were qualified for a job for which the employer was seeking applicants; (iii) despite qualifications, they were rejected; and (iv) after rejection, the position remained open and the employer continued to seek applicants from persons of complainants' qualifications. *McDonnell Douglas*, 411 U.S. at 802.  Plaintiffs must show that at each phase of the process "the employer continued to review applicants possessing comparable qualifications." *Lyons*, 307 F.3d at 1110.  The remainder of the *McDonnell Douglas* burden-shifting framework then applies – if plaintiffs establish a prima facie case, the employer then must offer a legitimate, nondiscriminatory reason for the adverse employment decision; finally, plaintiffs must prove, by specific and substantial evidence, that the employer's proffered reason was pretextual. *McDonnell Douglas*, 411 U.S. at 802-03.

#### i. Green Has Not Shown That He Was Qualified For The Position

Other than his own unsupported assertion, Green produced no evidence that he was qualified for the position.  Opp. at p. 5-6.  Oddly, Green not infrequently makes conditional assertions, for example, when he alleges he is "*likely able to establish* that he was qualified for some of the over thirty jobs to which he applied to" (Opp. at 5 (emphasis added)) or that he "*is likely to* make a prima facie case" of race discrimination.  Opp. at 6 (emphasis added).  Such assertions do not satisfy his burden at summary judgment to produce evidence.   He must at this point make an actual showing, or at least raise an inference, of discrimination.

Green argues in his Separate Statement that he "directly performed project management work as a Resident Engineer (RE) at WWE for multiple related to Repair & Replacement (R&R) projects for a number of years."  Green's Response to SMFs 12 & 13.  Green also contends that

48

United States District Court
Northern District of California

1   "some of these 'candidates' who received interviews lacked wastewater experience."  Opp. at pp.

2   5, 17.  However, he cites no evidence to support this allegation and does not establish that

3   wastewater experience was mandatory for the Project Manager I position.  Furthermore, Green

4   admits that his application was "only" two points away from the questionable interviewing scoring

5   threshold (Opp. at 5:19-21), meaning, of course, that he failed to meet the minimum threshold the

6   City required of all applicants regardless of protected category.

7          In addition, Green never connects his purported qualifications with the requirements for

8   the Project Manager I position, nor does he present evidence that his qualifications were

9   comparable to other applicants at either the hiring committee or interview panel level.  Green

10  asserts that his qualifications were better because he says so and speculates that he therefore must

11  have been denied the promotion because of discrimination, but these bare assertions are

12  insufficient on summary judgement.  *See, e.g., Villiarimo*, 281 F.3d at 1061 (no "'genuine issue'

13  where the only evidence presented is 'uncorroborated and self-serving' testimony.")

14          **ii.     Green Has Not Shown That Despite Qualifications, He Was Rejected**

15

16         Green has produced no evidence that he was rejected for the Project Manager I job despite

17  his qualifications.  Green contends that the City "admitted in the discovery process" that he

18  "should have been selected to participate in the interview over candidates with no WWE

19  experience."  Opp at 6, citing SMF 11 and 12.  However, no such admission exists in Green's

20  Statement of Material Fact or evidence he cites therein.  The City acknowledged that Green met

21  the minimum requirements to apply (*see* SMF 11) but this is not an admission that Green should

22  have been interviewed.  As discussed, Green himself admits in his Opposition that he fell short of

23  a paper application scoring threshold for the Project Manager I position and provides no evidence

24  that the scoring process was somehow unfair or biased based on race or any other discriminatory

25  basis.

26         The record shows that the City used one set of decisionmakers to select a group with

27  superior qualifications from the candidates (*see* mail from Clerk Bair explaining that she was not

28  involved in the hiring committee's selection of applicants for interviews, ECF 157-1 at 10-12), but

United States District Court
Northern District of California

a different set of decisionmakers to make the final selection.  *See* Ahmad Decl., ECF 133-2 ¶ 6 (stating that she was on the interview panel but was not part of the hiring committee that selected candidates).  Thus, although Green may have met the minimum qualifications to apply for the Project Manager I position, the qualifications that the hiring committee used to select interviewees and the qualifications that the interview panel considered to be most important for the position are separate issues.

        **iii.**       **Green Has Not Shown That, After He Was Rejected, The Position Remained Open And The Employer Continued To Seek Applicants From Persons Of Complainant's Qualifications.**

Assuming that Green was qualified for the position of Project Manager 1 when he applied, he must show that the City "promoted someone outside of the protected group who was not better qualified for the position that [he] sought."  *Jaburek v. Foxx*, 813 F.3d 626, 631 (7th Cir. 2016). Green does not establish with competent evidence that he had qualifications comparable to the interviewees or the individual hired for the Project Manager I position.  Green fails to provide competent evidence that the other candidates were outside of his protected class or that the other candidates were "not better qualified for the position."

Whereas Green provided no evidence that he was competitive with the employees who were invited to interview, the City provided evidence that the decision-makers believed they selected candidates with better experience in project control, environmental planning, and supervision, and that they eventually hired someone with special project experience they considered particularly valuable.  Indeed, Green entirely ignores the fact that the candidate the City hired had experience with "special assignments" for WWE, was in a more senior classification than Green, and had a California State Professional Engineering License – qualifications Green lacked.

        **b.**       **The City Had Legitimate, Nondiscriminatory Reasons For Hiring A Candidate With Special Qualifications**

The City presented evidence that it hired a candidate who had experience with "special assignments" for WWE, was in a more senior classification than Green, and had a California State Professional Engineering License.  It is undisputed that hiring someone with particularly useful

1   qualifications and special project experience the City considered particularly valuable for the

2   position is a justifiable business decision.

3                   **c.**               **Green Provided No Evidence of Pretext**

4         Green does not rebut the City's legitimate basis for hiring candidates with special

5   qualifications with any evidence of pretext indicating that discrimination more likely motivated

6   the City, nor does he provide any other evidence about the hiring process and decision-makers

7   showing that the City's explanation is unworthy of credence.  Hence, there is no evidence of

8   discriminatory pretext sufficient to rebut the City's evidence that the more qualified applicant was

9   hired for that reason.

10         Green has produced no evidence to support his claim that he was denied promotion to

11   Project Manager I on the basis of race.  Accordingly, the Court **GRANTS** summary judgment

12   with respect to race discrimination on the non-promotion claim.

13           **3.**        **Green Fails To Establish A Prima Facie Case For His Other Non-Promotion**

14                  **Claims**

15         Green alleges that he was denied promotion to thirty-five other positions listed at the end

16   of his RAC.  *See* RAC (ECF No. 97) at ¶ 79 (listing thirty-one job titles for which he alleges he

17   was not hired based on his race) and ¶ 81 (listing five positions for which he alleges he was told he

18   would not be considered because he "already hold[s] a slot as a 5201 Junior Engineer currently.").

19   As part of his RJN, he attempts to admit a twenty-page print-out of sent and unsent applications to

20   various positions beginning in 2007 that is not identified by name nor verified in any way.

21   "Employment Job Applications/Job Announcements," Exh. F.18; ECF No. 157-2.  A few pages

22   after this document are four job announcements with no indication whether he actually applied to

23   them or not.  *Id.*  In the absence of evidence that he actually applied for all of the jobs listed in his

24   RAC, the Court cannot find that he was discriminated against when he was not hired for or

25   promoted to them.  *See, e.g., Yartzoff*, 809 F.2d at 1374 (rejecting claims for failure to hire and

26   promote, holding that failure to complete applications and otherwise comply with proper hiring

27   and reclassification procedures was bar to claims); *Jaburek*, 813 F.3d at 631 (Title VII claim fails

28   where plaintiff did not prove she actually applied for an alternative position).

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5

Assuming that the print-out is his record of job applications, it remains a jumble of posting, application, and cut-off dates, with no indication of when or even whether a hiring decision was made and by whom.  It is unclear whether any positions are within any of Green's EEOC charge periods or related to allegations made during those periods, making it impossible to determine the statute of limitations and whether the claims were properly exhausted.

6
7
8
9
10
11
12
13
14

The City argues that these claims were not, in fact, properly exhausted because Green's 2015 '803 Charge only mentions being "denied promotion to a project manager;" his 2016 '813 Charge doesn't include any promotional decision; and his 2018 '1585 Charge doesn't "identify with precision" any of the myriad job applications cited in the RAC, but instead alleges only that he was "denied several promotional opportunities for many positions that I applied to and qualified for."  Employment decisions such as refusal to promote are considered discrete actions and therefore barred if not filed within the 300-day period prior to an EEOC charge so, again, the lack of information to determine the time of the alleged denial of promotion makes it impossible to determine whether the claims are properly exhausted.

15
16
17
18
19
20
21
22
23
24

The list of positions in the RAC also fails to provide any details whatsoever about the qualifications required for any given position, information regarding other applicants to use as similarly-situated comparators, who made decisions regarding interviews and hiring, nor who was hired, what their qualifications were, whether they themselves were in a protected class, or any other information to enable the Court to analyze the discriminatory bases alleged.  Green's general description would not have permitted the EEOC to investigate the claims that Green later included in his RAC.  Likewise, the lack of information prevents the Court from determining whether these employment decisions are "like or reasonably related to" allegations in any of his three EEOC charges or whether they are within the scope of the EEOC investigations that reasonably could be expected to grow out of the allegations.

25
26
27
28

Thus, even applying the most liberal standard of interpretation, this lack of detail is a sufficient basis to grant summary judgment on these claims.  The Court need not examine the entire file for evidence establishing a genuine issue of fact.  Green has clearly not met his burden to identify with reasonable particularity the evidence that precludes summary judgment on this

claim.[20]

However, even if these claims were a part of the action and properly exhausted, Green has not established a prima facie case for racial discrimination under *McDonnell Douglas*.  Green makes only an unsupported assertion that he was generally qualified for some jobs: "Given my many years of service at SFPUC, accompanied with my educational background (i.e., Academic degrees in Engineering and Urban Planning) and work experience, I am qualified for several positions for which I have applied to."  RAC ¶ 7.  Green does not even specify to which of the "several positions" he refers and his subjective belief that he is qualified is not evidence.

Green submitted his resume but failed to link his qualifications to the requirements for any particular job in order to demonstrate that he had the kind of qualifications and experience relevant to and specifically sought for any given position.  Other than his resume, Green included none of his application materials or information about other applicants.  Hence, he provided no evidence that he was even minimally qualified for any of these specific positions, much less competitive with other applicants.  Accordingly, he has not produced sufficient evidence on which a factfinder could infer that he was qualified for the positions he sought.

Moreover, rather than attempting to meet his summary judgment burden, Green impermissibly attempts to shift the burden of proof onto the City.  *See, e.g.,* Opp. at 5 ("it is unlikely that the City can negate that he was qualified for at least some jobs to which he applied"); Opp. at 17 ("The City . . . cannot establish[] that those candidates were selected based on objective measures that have nothing to do with race.").  As with the Project Manager I position, Green makes a vague statement that some applicants "had no wastewater experience and were selected for several positions."  *Id.*  But again, Green cites no evidence and fails to identify which of the thirty-five job applications referenced in his RAC constitute the "several positions" for which these applicants were selected, nor how he was equally or more qualified than they were.

As with the Project Manager I position, Green has not produced evidence that the candidates chosen for interviews were not better qualified than him and were outside his protected

---

[20] On this claim, there are not even "truffles" for which the Court could attempt to hunt.  *See Christian Legal Soc.*, 626 F.3d at 488.

1

2

3

4

5

class, that people equally or less qualified than Green and outside his class were hired for even one of these positions, or that the City's hiring decisions were pretext for any of these unspecified "several positions."  Green also fails to produce any evidence that, after he was not selected, the position remained open and the City continued to seek applicants from persons with Green's qualifications.

6

7

8

9

The complete lack of evidence on these elements of the prima facie case creates an independent basis for summary judgment.  Accordingly, the Court to **GRANTS** summary judgment on the claim that Green was not promoted to the thirty-five positions listed in his RAC because of racial discrimination.

10

### 4.        Transfer to the CSD Cross Bore Project

11

#### a.        Prima Facie Case

12

13

Green's complaints regarding transfer to CSD and denial of transfer out are evaluated under the same *McDonnell Douglas* test as his medical separation.

14

15

##### i.        Green Did Not Suffer An Adverse Employment Action When He Was Transferred[21]

16

17

18

19

20

21

22

23

24

25

An adverse employment action is one that "materially affect[s] the compensation, terms, conditions, or privileges of ... employment."  *Chuang*, 225 F.3d at 1126; *Davis*, 520 F.3d at 1089 (finding plaintiff established an adverse employment action to state a prima facie case with disproportionate amount of hazardous work, exclusion from areas of the work site, and failure to respond to her radio communications).  An adverse employment action must be significant, and trivial harms such as petty slights or minor annoyances are not actionable.  *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").  Examples of significant adverse actions

26

27

28

---

[21] The Court will not repeat its analysis regarding Green's lack of evidence of satisfactory performance of his job though, of course, it applies with equal force to each allegation of race discrimination.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    include termination of employment, a demotion evidenced by a decrease in wage or salary, a less

2    distinguished title, a material loss of benefits, significantly diminished material responsibilities, or

3    other indices that might be unique to a particular situation.  *See, e.g., Delanda v. Cty. of Fresno*

4    *Dep't of Prob.,* No. 1:10-CV-1857 AWI SKO, 2012 WL 253190, at *4 (E.D. Cal. Jan. 25, 2012).

5        Not every employment decision amounts to an adverse employment action.  *Strother v. S.*

6    *California Permanente Med. Grp*., 79 F.3d 859, 869 (9th Cir. 1996), *as amended on denial of*

7    *reh'g* (Apr. 22, 1996), *as amended on denial of reh'g* (June 3, 1996) ("mere ostracism in the

8    workplace is not enough to show an adverse employment decision"); *Steiner v. Showboat*

9    *Operating Co.,* 25 F.3d 1459, 1465 n.6 (9th Cir. 1994) (questioning existence of "adverse"

10   employment action where employee "was not demoted, or put in a worse job, or given any

11   additional responsibilities"); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000)

12   (employee suffered no adverse employment action because, *inter alia*, she was not demoted, was

13   not stripped of work responsibilities, was not handed different or more burdensome work

14   responsibilities, was not fired or suspended, was not denied any raises, and was not reduced in

15   salary or in any other benefit).

16       Green's transfer to the CSD Cross Bore Project did not change his compensation or terms

17   of employment, nor did his remaining there, i.e., not being transferred out of CSD.  It is

18   undisputed that Green remained in the same classification, with the same seniority, title, salary,

19   and benefits.  Green was not, for example, assigned a disproportionate amount of hazardous work,

20   was not handed different or more burdensome work responsibilities, was not fired or suspended,

21   was not denied any raises, and was not reduced in salary or in any other benefit.  He did not

22   experience a "demotion," as evidenced by a decrease in wage or salary, a less distinguished title,

23   or a material loss of benefits.  He simply did not like his new job responsibilities and did not stay

24   in the job long enough to learn the basics so that he could be assigned more advanced work.

25       The evidence demonstrates that the transfer to CSD did not result in a material change to

26   terms and conditions of Green's employment.  Hence, it did not constitute an adverse employment

27

28

1    action.[22]

2        ii.  **The City Did Not Treat Green Differently Than A Similarly**
3           **Situated Employee Who Does Not Belong To The Same**
       **Protected Class**

4      Green bears both the burden of production and the burden of proof on this element, yet he

5    has not shown that the City treated him differently than a similarly situated employee.  Green has

6    identified not one single comparable employee outside his protected class who had a similar job

7    and qualifications and whose transfer would not disrupt the projects on which he was already

8    working but who was not transferred, as he was.

9      Green has thus failed to present evidence supporting three of the four of the elements of a

10   prima facie case for race discrimination for the City's decision to transfer him to CSD and its

11   denial of transfer out.

12       b.  **The City Had Legitimate Reasons For Its Actions**

13     Even had Green established a prima facie case, the City offered legitimate non-

14   discriminatory reasons for transferring Green to CSD.  As discussed above, the City presented

15   undisputed evidence that the Cross Bore Project was considered to be critically important to public

16   safety for preventing ruptured gas lines and gas main explosions.  The City has shown that the

17   project was in "dire straits" and in need of employees like Green.  Green's immediate supervisor,

18   Ahmad, identified Green as the engineer who could move to CSD to work on the Cross Bore

19   Project without disrupting the department where he then worked.  Henderson, who was involved

20   in the decision to transfer Green, believed that Green was a good fit for the project.  Both Ahmad

21   and Henderson felt that that the assignment would be beneficial to Green's career and provide a

22   path to promotion.

23     According to the evidence submitted to the Court, the City has shown it had a legitimate

24   interest in transferring Green to CSD.

25

26   _____

27   [22]  There is an argument that, in the context of a claim for retaliation under Title VII, a lateral
transfer *may* constitute an adverse employment action.  *See Yartzoff*, 809 F.2d at 1376 (holding
that transfers of job duties, if proven, would constitute "adverse employment decisions"

28   cognizable for retaliation claim under Title VII).  Here, however, the undisputed evidence shows
that the transfer was also intended to provide a path to career advancement.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### c.      Green Has Presented No Evidence of Pretext

Green fails to rebut the City's evidence that the relevant decision-maker believed and acted on the City's legitimate reasons for transferring Green.  Green submitted no evidence that the City's decision to transfer Green was more likely motivated by discriminatory animus, nor that its explanation is unworthy of credence.  Hence, there is no evidence of discriminatory pretext sufficient to rebut the City's stated reasons for transferring Green to CSD.

Once again, Green has not produced even the "very little evidence" required to overcome the City's motion for summary judgment on this claim.  Accordingly, the Court **GRANTS** summary judgment on Green's claim of race discrimination for his transfer to CSD.

### 5.      Denial of Immediate Transfer Out of CSD

### a.      Green Does Not Establish A Prima Facie Case

Green vaguely alleges that he was improperly denied formal transfer out of PUC to another City department because of racial discrimination. *See, e.g.,* RAC ¶ 13.  As a subset of his claim of discriminatory transfer, all the reasons discussed above for his transfer to CSD apply equally to his denial of transfer out of CSD.  Remaining at CSD was not an adverse employment action and Green has not shown that he was performing his job satisfactorily or that similarly situated employees outside his class were treated differently, plus the City had the same legitimate reasons for not transferring Green out of CSD as for transferring him there in the first place.  Green has not shown those reasons are pretextual.

Yet there's an even more compelling reason why not transferring Green out of CSD was not discriminatory: there is no evidence that Green ever completed the application process for such a transfer.  Green complains about the process for applying for formal transfer and alleges that he filled out the Employee Request for Transfer form.  However, he provides only an incomplete transfer form in his exhibits that does not include a specific department request by Green. *See* ECF No. 154-1 [355 of 357].  The only other evidence Green provides about the transfer are emails and letters stating that he wanted a transfer or specifically that he desired to be transferred away from Supervisor Lipps as an accommodation. *See, e.g.,* ECF No. 154-1 [352-53 of 357].

Thus, Green has failed to demonstrate with competent evidence that he ever submitted a

United States District Court
Northern District of California

complete application for a transfer to an appropriate department or otherwise complied with the standard transfer application process.  Nor is there any evidence that any particular transfer would have been available or appropriate for Green's qualifications, or that CCSF treated similarly situated persons outside his protected class differently.

Indeed, the City produced correspondence with Green that repeatedly instructed him about the process of transferring and informed him that the responsibility to identify and apply for another job was his.  Green's emails and complaints about a transfer do not satisfy the City's clear procedures, required to be followed by all employees, to request a transfer.

Absent proof that he actually applied for a departmental transfer, Green cannot make out a prima facie case claim for failure to transfer.  *See, e.g., Yartzoff*, 809 F.2d at 1374 (granting summary judgment where plaintiff failed to prove they completed applications and otherwise complied with hiring procedures); *Jaburek*, 813 F.3d at 631 (Title VII claim fails where plaintiff did not prove she actually applied for an alternative position).

### b.    The City Articulates Legitimate Reasons and Green Submits No Evidence of Pretext

The City' legitimate reasons for transferring Green to CSD also apply to its decision not to transfer him away from the project and Green's lack of evidence of pretext is dispositive, such that any claims grounded in a denial of transfer must fail.

Accordingly, the Court **GRANTS** summary judgment on the claim that Green was not transferred out of CSD because of racial discrimination.

### 6.    Change In Green's Work Responsibilities at CSD

### a.    Prima Facie Case

Green's complaint regarding the change in his work responsibilities at CSD is evaluated under the same *McDonnell Douglas* test as his medical separation.

### i.    Green Did Not Suffer an Adverse Employment Action When His Work Responsibilities Changed

The change in Green's responsibilities on the Cross Bore Project to what he characterizes as "menial" work was not a "demotion."  As with the transfer itself, it is undisputed that Green's

58

1    compensation or terms of employment did not change with his new duties.  But, despite retaining

2    the same seniority, title, salary, and benefits, Green insists that he was "demoted" to "menial work

3    duties such as watching poor quality sewer videos 8 hours/day, 5 days/week."  RAC ¶¶ 27(c)-(d).

4    As in *Kortan*, however, Green suffered no adverse employment action because he was not

5    assigned more burdensome work responsibilities (*Kortan*, 217 F.3d at 1113), or hazardous

6    assignments.  *Davis*, 520 F.3d at 1089.

7         Green alleges that the new assignment was "menial" in light of his education and work

8    experience but, as the City points out, he complained at the time that the work was not "menial" to

9    Green at the time but rather too hard.  In his weekly status report, Green blamed his poor

10   performance on the fact that he did not have as much experience as other staff doing video coding

11   – they had "5+ year's experience" that he lacked.

12        Moreover, Green's subjective loss of job satisfaction based on his belief that his new role

13   was "menial" does not convert it to an adverse employment action.  *See Nidds v. Schindler*

14   *Elevator Corp.*, 113 F.3d 912, 915, 919 (9th Cir. 1996) (declining to characterize an employee's

15   subjective loss of job satisfaction as an adverse employment action).

16        Green complains in three different places in his Opposition that that while he was on

17   medical leave, his position was filled by interns and a non-engineer PUC employee.  Opp. at 8:5-

18   6, 15:2-3, 17:20-21.  But he provides no evidence to support these allegations.  He does not

19   identify any interns or the non-engineer PUC employee or provide any evidence of their

20   credentials that could be used to substantiate his allegation.  Given that he was out on medical

21   leave, he does not even demonstrate he has personal knowledge of who performed the work he

22   was supposed to be doing.  Nor does he attempt to show that any alleged intern or non-engineer

23   was performing video coding as preparation for more advanced work, as he himself was meant to

24   do.  Thus, Green's vague and unsupported accusations are insufficient to create a genuine dispute

25   of material fact.

26        Green also complains about the work duties assigned to him at CSD because he believed

27   he might work on other projects as well, he was unclear on whether the new assignment was

28   temporary or permanent, and work environment, work schedule and office policies and procedures

1   were not discussed.  However, Green's frustrations with transparency around a critical safety

2   project are simply not actionable.  *See, e.g., Thomas v. Department of Corr.*, 77 Cal. App. 4th 507,

3   511 (2000) ("[W]ork places are rarely idyllic retreats, and the mere fact that an employee is

4   displeased by an employer's act or omission does not elevate that act or omission to the level of a

5   materially adverse employment action.").

6        Furthermore, City employees testified that Green was slow to progress to new tasks

7   because he performed poorly at the video coding.  The City produced evidence that Green was

8   expected to take on a variety of tasks at CSD and the coding tasks about which he complains were

9   considered training and "foundational experience" to become fully-qualified for field inspections

10  and other CSD tasks.

11       Hence, Green's assignment of job duties at the Cross Bore Project at CSD does not

12  constitute an adverse action because not only was it not a demotion, but was the first step in

13  training Green for more advanced work.

14        ii.    **Green Was Not Treated Differently Than A Similarly Situated Employee Who Does Not Belong To The Same Protected Class**

15

16       Once again, although Green repeatedly argues that the City treated him differently than

17  similarly situated employees not in his protected class, he presents absolutely no competent

18  evidence to support this argument.  Green has identified no other employee who is similarly

19  situated to him.  He presented no evidence of different treatment of an employee in the same job

20  with Green's qualifications that the relevant decision-maker believed was a good fit for the

21  project, who could be reassigned without undue disruption to PUC business, and whom the

22  assignment could benefit their career and provide a path to promotion.  Although Green doubles-

23  down on his allegation that the new assignment was "menial" in light of his "education and work

24  experience," he does not substantiate his argument with evidence that any similarly-situated

25  employee was treated differently.

26       Hence, there is a complete absence of evidence on this element and Green's prima facie

27  case fails.

28

United States District Court
Northern District of California

1

**b.     The City Articulated Legitimate Business Needs For Green's Work Assignments**

As discussed in relation to Green's transfer to CSD, his work assignments were based on the City's legitimate business need to identify potentially dangerous cross bores throughout the City and address them before they caused actual damage.  So, even if Green's new duties were cognizable as an adverse employment action, the City has shown that the work Green was assigned was considered to be critically important to public safety for preventing ruptured gas lines and gas main explosions and that the project was in "dire straits" and in need of employees like Green.  The City has thus demonstrated the work assignments given to Green were legitimate and served an important safety need, as well as being the first steps to train Green for more advanced field work.

**c.     Green Has Presented No Evidence of Pretext**

Green has produced no evidence that the legitimate reasons for the job duties assigned to Green project were pretext for discriminatory racial animus.

Accordingly, the Court **GRANTS** summary judgment on Green's race discrimination claim based on his work assignments at CSD.

**7.     Denial of Training And Development Opportunities**

**a.     Prima Facie Case**

**i.     Green Did Not Suffer an Adverse Employment Action**

There is no evidence to support Green's failure to train claim because Green received both mandatory and optional training.  In addition, Green cannot establish a prima facie case for failure to train because he has provided no evidence of actual denial of training opportunities within three hundred days of an EEOC charge.  In contrast, the City has produced evidence that he was provided both mandatory training and access to optional training upon request.  Green himself alleges that, on April 16th, 2015, his "training for NASSCO coding of pipelines, manholes and laterals, was completed."  RAC ¶ 71(a).

In his Opposition, Green alleges a couple of examples of discriminatory denial of training opportunities.  However, Green fails to provide evidence that any particular opportunity he was denied qualified as "adverse" rather than merely "inconvenient."  In particular, he submits no

1    proof that any of the incidents he alleges in any way affected his seniority, title, salary, or benefits.

2        Green cites an example where he was initially denied permission to attend an SSIP retreat

3    in 2015 while three other people were allowed to attend.  Opp. at 7, citing to Exh. 5, pp. 570, 586-

4    595.  However, it is undisputed that Green was subsequently granted permission to attend so no

5    denial of training actually occurred.

6        Green also cites to a list of trainings attended by an arbitrary set of individuals over a

7    twelve-year period that was produced as part of the City's discovery responses.  Opp. at 7, citing

8    to Exh. 10, "Def's Discovery Response Interro. No. 18, Set No. 2, p. 1426-1432."  There is no

9    information on whether these incidents in his twelve-year long list occurred within the time period

10   covered by any of Green's three EEOC Charges or that the lack of this training negatively affected

11   the terms and conditions of his employment.

12       Green has provided no evidence of actual denial of training opportunities during the

13   relevant periods, i.e., within 300 days of an EEOC charge, hence there was no actionable adverse

14   employment action.

15           ii.     **The City Did Not Treat Green Differently Than A Similarly**
16                   **Situated Employee Who Does Not Belong To The Same**
                     **Protected Class**

17       As with many of Green's allegations, he has presented no competent evidence that the City

18   treated him differently than any similarly situated employee.

19       Green relies on the same list of trainings produced by the City that allegedly contains

20   names of an arbitrary set of individuals over a twelve-year period that was produced as part of the

21   City's discovery responses.  Opp. at 7, Exh. 10.  Although Green argues that this evidence shows

22   that others at WWE were granted training opportunities while Green was not, Green provides no

23   evidence regarding the people whose names appear on the list – how they are "similarly-situated,"

24   (including their job titles and responsibilities (for relevance of training), seniority, education and

25   experience) and whether they part of Green's or any protected class.

26       Once again, Green has provided no evidence that similarly situated persons outside his

27   protected class actually attended a specific training he was denied permission to attend, nor that

28   individuals who attended any given training were similarly situated in material respects to him,

United States District Court
Northern District of California

United States District Court
Northern District of California

nor any explanation whatsoever why they are the relevant employees for comparison.  As a result, the Court is unable to determine whether any of them is an appropriate comparator to Green.

### b.    Legitimate Reasons and Pretext

Given the lack of specificity in identifying training opportunities Green was denied that similarly situated individuals were permitted to attend, it would be difficult for the City to articulate a legitimate reason for its actions or likewise for Green to present evidence of discriminatory animus motivating any training decision so as to constitute pretext.

None of the evidence presented by Green is sufficient to establish a prima facie case or create a material dispute regarding denial of training.  Accordingly, the Court **GRANTS** summary judgment for failure to train based on racial discrimination.

### 8.    Formal Discipline, a.k.a. "Multiple Write-Ups" For Behavior Such As Performance, Attendance, Punctuality, Attempting To Record Conversation Illegally

### a.    Prima Facie Case

#### i.    Adverse Employment Action

Green claims generally that he was "disciplined and treated unfairly regarding performance and attendance and punctuality" ('803 Charge) and was subjected to "uneven discipline" ('1585 Charge).  He also claims his formal discipline – a Letter of Instruction and Written Warning for habitual tardiness, and a Written Warning for attempting to non-consensually record a meeting – constitute race discrimination.  *See, e.g.,* RAC ¶ 19.

Formal discipline may not itself affect the terms and conditions of employment when given, but it is logical to expect that, over time, an accumulation of such discipline could affect an employee's salary, benefits, and/or promotional prospects.  Hence, Green's receipt of a Letter of Instruction and Written Warning could contribute to an adverse employment action in the future.

#### ii.    The City Did Not Treat Green Differently Than A Similarly Situated Employee Who Does Not Belong To The Same Protected Class

Green has presented no competent evidence that the City treated him differently than a similarly situated employee in applying formal discipline.  The City, for its part, has produced

63

evidence that (1) no other employees under supervisor Lipps were habitually late or attempted to record a work meeting illegally and (2) the City disciplined other employees for the same misconduct.

### b.      The City Articulated Legitimate Reasons For Green's Formal Discipline

The City has presented evidence that formal discipline was justified by Green's tardiness, attempted illegal activity, and insubordination.  The City has a legitimate interest in its employees coming to work on time.  *Mason v. Avaya Communications,* Inc. 357 F.3d 1114, 1120. (10th Cir. 2004) ("regular and reliable level of attendance is a necessary element of most jobs").

Green argues that non-consensual use of a tape recorder in a private conversation for "note-taking purposes . . . is not eavesdropping or against the law."  Opp. at 16.  However, Green misunderstands the law, as California is a two-party consent state with respect to recording private conversations – it is illegal to record a conversation unless all parties agree to the recording.  Cal. Penal Code § 632.  The City has articulated a legitimate reason to prevent an illegal attempt to record a meeting and to discipline Green after what the City describes as his "insubordinate refusal" to put his tape recorder away after others objected to the recording.

### c.      Green Has Presented No Evidence Of Pretext

Green has provided no evidence of pretext for this discipline.  He fails meaningfully to address the reasons why such discipline was imposed, discounting the impact on the workplace of his habitual tardiness, attempted illegal activity, and insubordination.

Accordingly, the Court **GRANTS** summary judgment on Green's race discrimination claims based on the imposition of formal discipline.

### 9.      Miscellaneous Actions Green Challenges Are Not Actionable As Race Discrimination

Green complains of a range of miscellaneous actions by the City as being racially discriminatory, including being subjected to continued harassment and "different terms and conditions of employment" ('813 and '1585 Charges), as well as to bullying, false claims, stalking, intimidation.  '1585 Charge, RAC ¶ 36.  Because these categories are too general to

64

United States District Court
Northern District of California

enable the Court to analyze them as possible adverse employment actions, the Court understands them as general categories of behavior, of which these more specific allegations are examples: being placed on sick leave restriction (RAC ¶ 34), having vacation time docked (RAC ¶ 35), being accused of being AWOL ('813 Charge, RAC ¶ 36), being subject to "micromanagement tactics" at work (RAC ¶¶ 27(d), 35, 36, 38), such as having documents taped to his computer screen (*see* RAC ¶¶ 35, 36), being given a "pop quiz on coding" by Supervisor Lipps and being denied access to use city vehicle to conduct business affairs (RAC ¶ 35), being denied the opportunity "to assist fellow coworkers," including "to assist with tours" ('813 and '1585 Charges, RAC ¶¶ 27(e), 31, 32), being subjected to "negative criticism" (RAC ¶ 36); and while he was on medical leave by being denied access to computer and email ('813 and '1585 Charges, RAC ¶¶ 27(c), 30, 32), and being sent harassing letters and "inappropriate email." ('813 and '1585 Charges, RAC ¶¶ 27(e), 35).

As to these miscellaneous actions, Green fails to establish a *prima facie* case of race discrimination because he has not presented competent evidence that any of them were adverse employment actions, that they materially changed the terms and conditions of his employment, or that other employees outside his protected class were treated more favorably. Furthermore, even if Green had established a *prima facie* case of race discrimination, the City has articulated legitimate reasons for its conduct and Green has provided no evidence of pretext.

### a.   Being Placed On Sick Leave Restriction

Green's complaint of being placed on sick leave restriction makes its first appearance in Green's RAC. Although the Court cannot consider incidents of discrimination not included in Green's EEOC charge, this allegation may be considered "like or reasonably related to" allegations made before the EEOC and/or within the scope of an EEOC investigation that reasonably could be expected to grow out of the allegations regarding unfair or "uneven" discipline. Green's allegations and the factual statements supporting them are part of the same race discrimination claim, ostensibly occurred within the same time frame of the four months he spent at CSD before going on leave, were performed by the same supervisor (Lipps is specifically named in the '813 Charge), and the actions alleged occurred at CSD.

Nevertheless, Green's complaint of being put on sick leave restriction was not an adverse action, as the City presented evidence that it did not affect his accrued sick leave.  Even if the restriction were considered adverse, it was the result of a neutral audit policy.  The City submitted evidence of its neutral policy of routinely conducting a regular audit of the use of sick leave and that, if employees were using an excessive amount of sick leave, they would be placed on sick leave restriction, as permitted by the City Civil Service Rules, and would be required to submit medical certification for sick leave, i.e., a doctor's note.  After an audit revealed Green had taken three weeks of sick leave in his first four months at CSD, the City followed its routine policy and placed him on a sick leave restriction.  Although Green asserts this action was based on racial discrimination, the evidence shows that the policy was applied to all employees without distinction – even Green's own supervisor, who is not a member of a protected class, had previously been placed on the same restriction after a similar audit.

In addition, the use of sick leave restriction was plainly justified by PUC's interest in preventing business disruption by reducing absenteeism to ensure its employees come to work regularly to perform their jobs.  There is no evidence of discrimination or pretext involved in Green's sick leave restriction.

### b.      Having Vacation Time Docked

Green complains that he had vacation time docked, but the only incident he describes is a fifteen-minute discrepancy between the time he says he took and the time he was marked absent.  The City submitted evidence that this single incident was resolved as Green requested, with the fifteen minutes not charged against his vacation time.  Hence, no vacation time was actually docked and there were no negative consequences whatsoever in relation to this incident that affected Green in any way whatsoever.  With no other incidents and no further details provided about this allegation, the Court cannot find an inference of race discrimination.

### c.      Being Accused of Being AWOL

Green complains of being marked AWOL as a result of a single incident where he asked one supervisor to leave early but did not inform his own supervisor, who marked him as AWOL.  When this miscommunication was resolved, the initial AWOL status was retracted and he was not

1    actually marked AWOL or disciplined in any way.

2           As to later AWOL incidents, the City provided evidence that Green was, in fact, absent

3    from his job without permission, and he did not submit evidence that he was not AWOL, e.g., that

4    he had a legitimate, documented reason not to be at work that was recognized and accepted by his

5    employer.  Being marked as absent without leave is not an adverse employment action when it is a

6    fact that one has not reported to work and one has no authorization to miss work.  In addition, the

7    City provided a legitimate reason for marking Green AWOL, namely, that it needs to keep track of

8    its employees and their work, and Green provided no evidence of pretext.

9           **d.      Being Subjected To "Micromanagement Tactics"**

10          Green complains that he was subjected to "micromanagement tactics" such as having

11   documents taped to his computer screen, being given  a "pop quiz on coding" by Supervisor Lipps

12   and being denied access to use a city vehicle to conduct business affairs, being denied the

13   opportunity "to assist fellow coworkers," including "to assist with tours," and being subjected to

14   "negative criticism."[23]   None of these allegations constitute adverse employment actions, as none

15   affected his salary, benefits, or title.  For example, while being sent emails with "negative

16   criticism" can be hurtful, being hurt does not constitute an adverse employment action.  Such

17   conduct is no more than a "mere inconvenience," as his salary, benefits, and title all remained the

18   same.  Some of these events were likely frustrating and may even have felt insulting, but Green's

19   subjective response does not convert such conduct to adverse employment actions or act as

20   evidence of discrimination.

21          Similarly, an allegation such as being denied the opportunity "to assist fellow coworkers,"

22   including "to assist with tours" ('813 and '1585 Charges, RAC ¶¶ 27(e), 31, 32), with no examples

23   and no indication of how this affected the terms of Green's employment, leaves the Court with no

---

[23] Again, these allegations were first raised in the RAC, but the Court will consider them because they are "like or reasonably related to" the differential treatment allegations made before the EEOC and/or within the scope of an EEOC investigation that reasonably could be expected to grow out of the allegations.  Green's allegations and the factual statements supporting them are part of his race discrimination claims, allegedly occurred within the same time frame of the four months he spent at CSD before going on leave, were performed by the same supervisor, and occurred at CSD.

United States District Court
Northern District of California

1    means to evaluate the significance or impact of the alleged conduct and, since on its face it does

2    not appear to have an adverse effect, the Court cannot find that it is an adverse employment action.

3        Finally, Green complains that, while he was out on leave, he was sent harassing letters and

4    "inappropriate emails" and was denied access to computer and email.  None of these allegations

5    constitute adverse employment actions in the strict sense that none affected his salary, benefits, or

6    title.  But, even more to the point, Green was out on leave and had no work justification for access

7    to the City's computer or email system.  Logically, where there is no work reason to use these

8    resources, there can be no adverse employment action in the denial of their use.  Even so, the City

9    only disabled his email after he was absent from work for well over a year and, when he

10    complained about it, the City restored his access.

11        What's more, the City restored his access even though it clearly articulated legitimate

12    security concerns about having someone who had not appeared to do his job for a very, very long

13    time retain access to his work computer and email systems.  One cannot even call such conduct a

14    "mere inconvenience" since the issue of convenience for access to work-based computer services

15    is irrelevant when such services would not be used for work since Green was not then performing,

16    nor had he performed, any work for a significant period of time.  Green's apparent outrage at

17    being denied a work-related service while not attending or performing work does not convert such

18    conduct to adverse employment actions or act as evidence of discrimination.

19        Accordingly, the Court **GRANTS** summary judgment for Green's complaints regarding

20    miscellaneous actions of the City.

21        In sum, the Court **GRANTS** summary judgment for Green's claims of race discrimination

22    as to all conduct alleged.

23    **C.**      **Second Claim for Relief, Disability Discrimination/Disparate Treatment**

24        **1.**      **Disability Limited to Mental Disability Alleged in Initial Complaint**

25        As stated above, Green was not given leave to amend his complaint to expand his claimed

26    disability to include eye, neck and back strain.  In the Amendment Order, the Court stated that

27
               Green's proposed amended complaint expands his claimed disability
28               to include eye, neck and back strain.  Compare Pr. Am. Complaint,
               page 10, with Complaint, page 10.  The proposed amended complaint

states that the "physical disability that caused eye, neck, and back strain result[ed] from watching poor quality sewer videos 8 hours/day 5 days/week at a poor ergonomic work station; while being constantly harassed and retaliated against, isolated, falsely accused, micromanaged, etc." Pr. Am. Complaint, page 10. However, this conduct was specifically alleged in the original complaint (*see, e.g.,* page 15). Green has not shown good cause for not alleging this broadened disability by the November 27, 2017 deadline to amend.

ECF No. 89 at p. 6. Despite this clear directive, Green included allegations in his RAC regarding "physical disability" involving "eye, neck, and back strain" he says resulted from "watching poor quality sewer videos 8 hours/day 5 days/week at a poor ergonomic work station." *See, e.g.,* RAC at ¶¶ 42, 53. The Court will consider his claim for disability discrimination based only on his description in his original Complaint: "mental disability resulting from excessive occupational work stress and depression while working in a hostile work environment." ECF No. 1, p. 10 of 37.

Consequently, to the extent Green's RAC can be read to include allegations based on a definition of disability broadened beyond the allegations in his original Complaint, such claims are not properly part of this case and the Court **STRIKES** them.

### 2.    Actions Alleged To Constitute Disability Discrimination

Green alleges disability discrimination for the following actions by the City:

(a) medical separation ('1585 Charge)

(b) change in work responsibilities to "menial" work of reviewing and coding sewer videos at CSD ('1585 Charges)

(c) being denied training "and other equal opportunities" ('1585 Charge)

(d) "uneven" discipline, write-ups, and "constant threats of insubordination" ('1585 Charge)

(e) other actions: continued harassment and "different terms and conditions of employment" ('813 and '1585 Charges); subjected to bullying, false claims, stalking, intimidation ('1585 Charge); being accused of being AWOL ('813 Charge); "harassing letters and emails" ('813 and '1585 Charges); and, again, being "micromanaged." RAC ¶ 19.[24]

---

[24] In his RAC, Green alleges "threats that his pay may be withheld." This appears to be no more than repeated references (in five separate places) to the warning accompanying the Sick Leave Restriction, that if an employee does not comply with it, his pay may be withheld. *See, e.g.,* RAC ¶ 34, "If I failed to provide medical certification, my pay may be withheld. In addition, failure to

United States District Court
Northern District of California

Green's allegations that the Court has determined are not actionable as race discrimination are also not actionable as disability discrimination, because either they were not adverse employment actions and/or they were justified by legitimate reasons with no showing of pretext. Specifically, these include: being assigned "menial" work of reviewing and coding sewer videos at CSD,[25] being denied training "and other equal opportunities," "uneven" discipline, write-ups, and "constant threats of insubordination," and other actions: continued harassment and "different terms and conditions of employment"; subjected to bullying, false claims, stalking, intimidation; being accused of being AWOL; being sent "harassing letters and emails;" being put on nondriving status and other miscellaneous complaints.[26]  As a result, only one claim for disability discrimination remains.

### 3.     Medical Separation

#### a.     Prima Facie Case

Claims for disability discrimination under the ADA are subject to the *McDonnell Douglas* three-stage burden-shifting framework.  *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th

---

[25] comply with these requirements or failure to decrease incidents of sick leave use will be considered insubordination, and will subject me to progressive disciplinary action, up to and including termination of my employment."  Green also alleges as adverse employment action the "failure to conduct a citywide search" to find him a different job, which appears multiple times in his RAC, *e.g.*, ¶¶ 46 (disability discrimination), 57(b)(vii) (failure to provide reasonable accommodation), 78(l) (retaliation).  However, the City presented evidence that it explained multiple times in letters and emails that it was Green's responsibility to conduct his own search for other positions.  In any event, neither allegation affected Green's salary, benefits, or any other feature of his employment.  Accordingly, these are not adverse employment actions and the Court will not consider these allegations further.

[25] According to Green's own allegations, the "menial" work assignments he received while working with Lipps at CSD *caused* his disability, so they could not have been the *result* of disability discrimination.  In other words, Green's purported disability post-dates the discriminatory conduct alleged so City could not have known about it and discriminated against him because of it.

[26] Although in the '1585 Charge Green alleges that he was "unethically and involuntarily transferred to CSD," the Court will not consider allegations of disability discrimination for Green's transfer to CSD.  This is first because, as with his "menial" duties allegation, Green claims his disability arose from conditions at CSD, so the transfer pre-dates his claimed disability.  Second, the claim is time-barred because disability discrimination was not included in his '803 EEOC Charge in 2015 and the transfer occurred well before 300 days prior to Green filing the '813 Charge (reaching back only to July 31, 2015) in which Green alleges only an unspecified disability, or the '1585 Charge (reaching back only to September 12, 2017), in which Green alleges a "disability that I suffered from at CSD in 2015 and beyond."

United States District Court
Northern District of California

Cir. 2014).[27]  Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of

disability discrimination under the ADA by demonstrating that (1) he suffers from a disability

within the meaning of the statue, (2) with or without reasonable accommodation (which he must

describe), he is able to perform the essential functions of the job, and (3) he experienced an

adverse employment action as a result of his disability.  *See Sanders v. Arneson Prod., Inc.*, 91

F.3d 1351, 1353 (9th Cir. 1996).  As to the second element, plaintiffs bear the burden of

demonstrating that they can perform the essential functions of the job with or without reasonable

accommodation.  *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (1996).

### i.      Green Has Presented No Evidence That He Suffers From A Disability Recognized Under The ADA

Fatal to all of Green's disability discrimination claims is the fact that he has failed to show

that he was "a disabled person within the meaning of the ADA" during the relevant time period.

Green has provided no evidence to support a claim of a recognized disability, much less

discrimination resulting from such a disability.

Green offered no description of his alleged disability in his '813 Charge and in his '1585

Charge called it a "disability that [he] suffered from at CSD in 2015 and beyond."  In his RAC, he

alleges that he has "a mental disability resulting from excessive occupational work stress and

depression while working in a harassing and hostile work environment" (RAC ¶ 42) and that his

disability "resulted from the hostile and toxic CSD work environment"  RAC ¶ 19.[28]

---

[27] The Court has found that it may not exercise jurisdiction over Green's FEHA claims in the absence of proof of a right to sue letter from DFEH.  Nevertheless, because claims for disability discrimination under FEHA, like the ADA, are subject to the *McDonnell Douglas* three-stage burden-shifting framework (*Zeinali v. Raytheon Co.*, 636 F.3d 544, 546 (9th Cir. 2011) (applying the *McDonnell Douglas* framework to a disability discrimination claim brought under FEHA); *see also Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 999 (9th Cir. 2007) (applying "qualified individual" analysis under ADA to same inquiry under FEHA)), the outcome for any claims the Court might otherwise have analyzed would be the same as for Green's ADA claims.

[28] As noted above, pursuant to the Court's Amendment Order, Green may base his discrimination claim only on the disability he includes in the '1585 Charge and the original Complaint, not the other physical impairments of which he later complained.  His claim that working for Lipps caused his physical symptoms is insufficient to "piggy-back" the physical symptoms into his disability claim when they were not previously included.  Green's expanded claim of disability explicitly disallowed by this Court's Order will not be considered.

1     Green has steadfastly maintained that his disability was being unable to work under

2     Supervisor Lipps.  He even managed to get a doctor to certify that he had "permanent restrictions,"

3     namely that he was "permanently unable to work for Supervisor Lipps."  Green contends that this

4     disability was legitimate because his inability to work under Supervisor Lipps "affected one or

5     more of Green's major life activities" and that "[i]t is well established that stress, depression and

6     other mental impairments constitute a disability under the law."  Opp. at 9.

7            However, Green errs on the legal significance of his alleged impairment and this error is

8     fatal both to his disability claim and to his claim for failure to provide reasonable accommodation.

9     In our own Northern District of California, mental impairment from an inability to work for a

10    particular supervisor is not a recognized disability under the ADA.  *See, e.g., McCauley v.*

11    *Stanford Univ. Med. Ctr.,* No. C07-01784 JFHRL, 2007 WL 2070326, at *3 (N.D. Cal. July 17,

12    2007) (on motion to dismiss, rejecting disability discrimination claim where plaintiff alleged only

13    that she became disabled as a result of the stress caused by working under her supervisor and other

14    unnamed manager).  Courts in other circuits have also rejected disability discrimination claims in

15    which the alleged disability is an inability to work with a particular supervisor.  The Seventh

16    Circuit has held that if an employee can perform the same job for another supervisor, she can do

17    the job and does not qualify under the ADA, despite allegations of depression, anxiety and a TMJ

18    disorder.  *See Weiler v. Household Fin. Corp.,* 101 F.3d 519, 524 (7th Cir. 1996) (the "major life

19    activity of working is not 'substantially limited' if a plaintiff merely cannot work under a certain

20    supervisor because of anxiety and stress related to . . . job performance").  "Standing alone, a

21    personality conflict between an employee and a supervisor—even one that triggers the employee's

22    depression—is not enough to establish that the employee is disabled, so long as the employee

23    could still perform the job under a different supervisor."  *Schneiker v. Fortis Ins. Co.,* 200 F.3d

24    1055, 1062 (7th Cir. 2000).

25            The record before this Court presents this very scenario in that Green alleges only that he

26    cannot work when supervised by Lipps.  Even viewing the evidence in the light most favorable to

27    Green, there is no genuine dispute on any material fact as to whether Green is disabled generally

28    or whether he would have been able to work for the City or another employer as a result of his

72

alleged disability.  Indeed, he has clamored loudly that he would have been able to work for

someone – anyone – else at the City and, for this very reason, the City should have transferred

him.  But such a restriction is not a recognized disability under the relevant statute.  Thus,

notwithstanding his arguments to the contrary, Green has presented no competent evidence that he

was actually disabled or apparently disabled in any way perceivable by relevant City employees at

any time, much less within 300 days of an EEOC charge claiming disability discrimination, that is,

after July 31, 2015.

Green's inability to present evidence raising a genuine dispute as to whether he suffered

from a disability within the meaning of the statue is fatal to both his disability discrimination

claim and his claim for failure to provide reasonable accommodation.  As a result, Green's claims

for disability discrimination and failure to accommodate claim need not be addressed any further.

However, to ensure that all possible consideration is given to Green as a *pro se* litigant, the Court

will continue its analysis of his disability discrimination allegations.

        **ii.**       **Green Has Not Shown That He Was Able to Perform The Essential Functions of His Job With or Without Reasonable Accommodation**

Green argued that he could perform the essential functions of the job *only* if he had a

different supervisor (the only "accommodation" he ever considered or demanded), yet he failed to

submit any evidence whatsoever showing that he did or could actually perform his job in a

satisfactory way during the relevant period.  As discussed at length above in relation to

"satisfactory job performance," the City provided substantial evidence that Green did not

adequately perform the work assigned to him.  Green argues only that his performance appraisal

reviews from August 24, 2009 to March 1, 2015, from his supervisor prior to transferring to CSD,

either met or exceeded expectations and he submitted five performance reviews, one each for the

years 2010-2014, but he submitted no evidence at all that he performed his job satisfactorily at

CSD.

The City submitted both testimony and documents demonstrating that his coding was well-

below what was expected of an employee, completing 7.8 days' worth of coding in the four and a

half months before he began his first medical leave on July 30, 2015.  In a contemporaneous

weekly status report and in email, Green himself admitted, complained about, and justified why he was unable to meet the job's most basic performance expectations. This was also during the period when a sick time audit revealed that he took so much sick time – one hundred twenty-two hours – that he was put on sick leave restriction.

As discussed above, the City argues convincingly that Green's performance was entirely unsatisfactory. The City submitted testimony and written evidence demonstrating that when Green returned to work after almost two and a half years of leave, Green engaged in misconduct resulting in a written warning for attempted non-consensual use of a tape recorder and insubordinate disruption of a work meeting, followed by a further insubordinate refusal to sign for receipt of the warning. The City also submitted testimony and written evidence showing Green's rude and aggressive reactions to his supervisor, repeated refusal to complete standard on-boarding paperwork, to resolve his self-inflicted non-driving status, and to participate in routine human resources meetings without his union representative present. In addition, after Green reported to work for the first time in two years and four months, both testimony and documentary evidence show that he requested more time off and, when some of these requests were not approved, Green still did not show up for work and was therefore deemed AWOL, which he remained until his eventual medical separation more than two months later.

In the two and a half years between July 30, 2015 and February 8, 2018, Green reported to work for a total of fifteen days. When the City finally did medically separate Green, he had been on medical leave for over two years in contravention of the City's one-year medical leave policy, he was AWOL for over two months, and his doctor certified that he was permanently unable to work under his supervisor. It was only after he failed to respond to the City's January 25, 2018 letter notifying him of its intent to medically separate him because he was unable to perform his job duties, did not engage in the interactive process, and requested an unreasonable accommodation and because he failed to attend or reschedule the February 5, 2018 meeting, which he was fully informed would have been his last chance to show he could perform his job, that the City finally medically separated him. These facts cannot be characterized as an ability to "perform the essential functions of the job."

United States District Court
Northern District of California

Hence, while Green has provided no relevant or admissible evidence raising a genuine issue concerning the material fact – essential to a prima facie case of disability discrimination – that he was able to perform the essential functions of his job with or without reasonable accommodation, the City has provided ample evidence of Green's record of absenteeism, his refusal to cooperate with even the most mundane administrative tasks or provide required paperwork, his refusal to participate in meetings and active disruption of them, and most importantly, his medical certification as being "permanently restrict[ed]" from working under his supervisor, a fundamental requirement for the satisfactory performance of his job.

The evidence before the Court demonstrates that Green could not or would not perform his duties as assigned.  Thus, he cannot show – and has not shown by competent evidence put before this Court – the existence of a genuine dispute as to whether he was able to perform the essential functions of his job.  This fact, too, is fatal to all of his claims based on disability discrimination and failure to provide reasonable accommodation.

### iii.  Green Provided No Evidence That The City Terminated Him As A Result Of A Disability Recognized Under The ADA

Once Green's doctor certified that he could not work at all under Supervisor Lipps – a condition not recognized as a disability under the ADA – the City medically separated Green expressly for this reason.  The City medically separated him based on the medical certification he himself sought and presented as "proof" of his purported disability, a certification that actually demonstrated that he had a condition that prevented him from performing the essential functions of his job – a required element of disability discrimination – *not* that he had a disability recognized under the ADA.

Hence, Green's medical separation was explicitly because he proved that he did *not* suffer from a recognized disability but insisted he did, because he refused to do his job, and because he failed for over two years to show up for work.  As a result, Green's claim fails on all three prongs of the prima facie case of disability discrimination under the ADA.

///

///

75

### b. The City Articulated Several Legitimate Reasons For His Medical Separation

Even if Green had established a *prima facie* case for disability discrimination, the City articulated legitimate reasons for his medical separation.  Because it would be unworkable to transfer every employee who did not like their supervisor, the City legitimately requires its employees to work under their assigned supervisors.  It was only after Green's doctor certified him *permanently* unable to work under his supervisor – *permanently* unable to perform his job – that the City medically separated him.  The City presented clear evidence that this restriction permanently precluding him from doing his job was a primary basis for his medical separation.  Requiring employees to learn to work under their assigned supervisor is in itself a legitimate, nondiscriminatory reason for medical separation.

Green's inability to work for his supervisor hampered the City's ability to carry on its business functions, particularly when he absented himself for over two years as a result of the situation.  Plus, after he had been on leave for over two years, he worked for just 15 days before he went AWOL and requested another year of personal leave.  The City's policy of only approving one year of leave promotes its interests in providing services to the public.  The prohibition against indefinite leave is designed to prevent ongoing disruption of the City's capacity to run its business with the employees it expects to show up to perform their duties.  The City's attempts to prevent further business disruption were legitimate reasons to medically separate Green.  Although Green frames this decision as the result of discriminatory animus, the City – as a matter of law – was not obligated to grant Green's request for a new supervisor, nor to keep Green on the payroll when he could not or would not do his job.

### c. Green Provides No Evidence That The City's Reasons Were Pretextual

Green has provided no evidence that the City's decision-making was predicated on discriminatory animus.  None of Green's speculative arguments and unsupported contentions satisfy his burden to demonstrate pretext at summary judgment.  Instead, Green admitted in his deposition that no one at the City made any comments to him that any action taken was based on any perceived or actual disability.

In multiple respects, Green has not adduced evidence sufficient to create a disputed issue

1   of material fact on his medical separation claim.  Given that Green's condition is not a disability

2   recognized under the ADA, his medical separation is not actionable as disability discrimination.

3   As with his failure in the race discrimination claim to demonstrate that he was performing his job

4   in a satisfactory manner, Green's similar failure to show he could perform the essential functions

5   of the job with or without reasonable accommodation is fatal to his allegations of discrimination

6   based on disability.

7        Accordingly, the Court **GRANTS** summary judgment as to disability discrimination for

8   his medical separation and for all other claims based on disability discrimination.

9   **D.    Third Claim for Relief, Disability Discrimination - Failure to Provide Reasonable Accommodation**

10

11       Green claims that the City wrongfully denied his request to transfer out or change

12   supervisor as a "reasonable accommodation" for his inability to work under Supervisor Lipps.

13   *See, e.g.*, RAC ¶¶ 53-59.  His '803 Charge contains no claim for disability discrimination, hence

14   no claim for failure to reasonably accommodate him.  His '813 Charge, covering July 31, 2015 -

15   May 26, 2016, contains a claim for discrimination based on an unspecified disability and an

16   allegation that the City denied his also unspecified reasonable accommodation request.  His '1585

17   Charge contains a claim for discrimination based on his "disability that [he] suffered from at CSD

18   in 2015 and beyond" and a claim that the City "failed to provide [him] with reasonable

19   accommodation" of transfer from CSD that he "request [sic] in 9/16/2016."[29]

20       To establish a *prima facie* case of failure to accommodate under the ADA, plaintiffs must

21   show that (1) they are disabled; (2) they are qualified for the job in question and capable of

22   performing it with reasonable accommodation; (3) the employer had notice of their disability; and

23   (4) the employer failed to reasonably accommodate their disability.  *Samper v. Providence St.*

24

25   _____

26   [29] Although Green has no EEOC charge that relates to conduct between May 26, 2016 and
     September 12, 2017, the Court will consider Green's claim for failure to accommodate as if he
27   alleged a continuing violation, picking up as of the three-hundredth day back from his '1585
     Charge.  *See, e.g., Nat'l. R.R. Pass. Corp.*, 536 U.S. at 116-18 (2002) (to make out a continuing
28   violation, there must be at least one timely act that is related to the other, untimely acts comprising
     a hostile work environment).

United States District Court
Northern District of California

1    *Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012).[30]

2        A *sine qua non* to prevail on a claim for failure to provide reasonable accommodation is, of

3    course, showing – or at a minimum creating a triable issue of fact as to the existence of – a

4    disability cognizable under the ADA.  Because, as a matter of law, failure to get along with one's

5    supervisor does not constitute a disability under either the ADA, the City had no obligation to

6    provide Green with reasonable accommodation.

7        However, even if the City had been obligated to accommodate Green, Green did not

8    submit properly completed documents required to provide him with his requested accommodation.

9    Green alleges he submitted to PUC HR department in September 2016 a request to transfer (RAC

10   ¶ 56(b)) and he produced a reasonable accommodation request form hand-marked received

11   9/18/16.  ECF No. 153-1 [276-77 of 491].  However, the City produced uncontroverted evidence

12   that Green did not submit a completed and signed, usable version of the medical release form until

13   eight months later on May 24, 2017, and hence he did not actually complete his reasonable

14   accommodation request until that date.[31]

15       After approximately six more months, Green returned to work at CSD and soon submitted

16   a note from Dr. Bakal dated December 1, 2017, which certified that Green had "permanent

17   restrictions" and "need[ed] to work at a different location and with a different supervisor."  This

18   medical note confirmed not that Green had a recognized disability but only that he could not work

19   under his assigned supervisor or perform work in his assigned location.  Thus, the only

20   substantiation of Green's 'medical condition' that he provided was that he was either unable,

---

[30] Similarly, FEHA makes it an unlawful employment practice "[f]or an employer...to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee."  Cal. Gov't Code § 12940(m).  As a result, if the Court were to consider Green's FEHA claims, it would come to the same conclusions.

[31] The City alleges that Green obfuscated his status and appears to have purposefully misled the City regarding his certification to return to work and/or for reasonable accommodation, extending his time off work by at least four months after he was first certified to return to work and causing the City to send him duplicative correspondence that he now claims was harassment.  The City also alleges that Green's delays, omissions, and misstatements effectively extended his leave of absence, medical benefits, and seniority, while obscuring evidence detrimental to his claims in this litigation.  Be that as it may, for as long as Green took to search for a medical provider to certify him as having a disability recognized under the ADA, he was ultimately unsuccessful.

1    unwilling, or both, to work under his assigned supervisor and that he would not be showing up to

2    work or perform his job duties as assigned.

3          Yet, even if Green had presented evidence of a cognizable disability and even if he had

4    submitted the required, completed documents in a timely manner, his request to transfer away

5    from a supervisor he did not get along with is not a reasonable accommodation.  In fact, the Equal

6    Employment Opportunity Commission itself has stated that such an accommodation is neither

7    reasonable nor required.  *See* U.S. Equal Emp't Opportunity Comm'n, Enforcement Guidance on

8    Reasonable Accommodation and Undue Hardship under the ADA ¶ 33 (2002),

9    https://www.eeoc.gov/policy/docs/accommodation.html#workplace ("An employer does not have

10   to provide an employee with a new supervisor as a reasonable accommodation.").  Absent unusual

11   circumstances, courts routinely reject "boss-ectomy" claims like Green's "where plaintiffs argue

12   that their employer is liable for failing to assign them to another supervisor."  *See Byrnes v.*

13   *Lockheed-Martin, Inc.,* No. C-04-03941 RMW, 2005 WL 3555701, at *5 (N.D. Cal. Dec. 28,

14   2005), *aff'd and remanded sub nom. Byrnes v. Lockheed Martin Corp.*, 257 F. App'x 34 (9th Cir.

15   2007); *Weiler v. Household Finance Corp.*, 101 F.3d 519, 525 (7th Cir. 1996) (employer not liable

16   under ADA "if a plaintiff merely cannot work under a certain supervisor"); *Kennedy v. Dresser*

17   *Rand Co.*, 193 F.3d 120, 122-23 (2d Cir. 1999) ("[t]here is a presumption, however, that a request

18   to change supervisors is unreasonable").  As in *Byrnes*, Green presents no evidence or argument

19   that his request to transfer away from Supervisor Lipps falls outside this general rule.

20         The City was not required to transfer Green as a reasonable accommodation because (1) he

21   did not suffer from a disability recognized by the ADA and (2) transfer from a particular

22   supervisor, a.k.a., a "boss-ectomy," does not constitute a reasonable accommodation.

23   Accordingly, the Court **GRANTS** summary judgement on Green's claim for failure to

24   accommodate.

25   **E.**     **Hostile Work Environment Created by Green's Supervisor and Co-Workers**

26         Green claims that he was subjected to hostile work environment created by his supervisor

27   (fourth claim for relief, RAC ¶¶ 60-67) and co-workers (fifth claim for relief, RAC ¶¶ 68-74)

28   based on race and disability and alleges that much of the same conduct that constituted

discrimination also created a hostile work environment.  *See generally* Opp. pp. 10-13.

### 1.    Prima Facie Case

Harassment in the form of a hostile work environment constitutes unlawful discrimination in violation of Title VII.  *Nichols v. Azteca Rest. Enter., Inc.*, 256 F.3d 864, 871 (9th Cir. 2001) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).  To prevail on a hostile work environment claim based on race discrimination, a plaintiff must show that he (1) was subjected to verbal or physical conduct of a racial nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment.  *Surrell v. California Water Service Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008).[32]

The Ninth Circuit has not definitively decided whether or not a claim may be asserted under the ADA predicated on an alleged hostile work environment created by disability harassment.  *See Brown v. City of Tucson,* 336 F.3d 1181, 1190 (9th Cir. 2003) (declining to decide issue).  However, numerous courts in the Ninth Circuit have followed other circuits, though they assume rather than hold that such a claim is cognizable.  *See, e.g., Meirhofer v. Smith's Food & Drug Ctrs. Inc.*, 415 F.Appx. 806, 807 (9th Cir. 2011) (unpublished decision in which Ninth Circuit "assum[ed], arguendo, that hostile work environment claims are cognizable under the ADA"); *Keller-McIntyre v. San Francisco State Univ.*, No. C-06-3209 MMC, 2007 WL 776126, at *13 (N.D. Cal. Mar. 12, 2007) (citing *Flowers v. Southern Regional Physician Services, Inc.*, 247 F.3d 229, 232 (5th Cir. 2001)); *Wynes v. Kaiser Permanente Hosps.*, 936 F. Supp. 2d 1171, 1185 (E.D. Cal. 2013) (citing *Walton v. Mental Health Ass'n*, 168 F.3d 661, 667 (3d Cir. 1999) (applying Title VII hostile work environment standard to ADA claim)).

Assuming for the purposes of this motion, then, that the Ninth Circuit would recognize a hostile work environment claim under the ADA, a plaintiff would have to demonstrate that (1) he is a qualified individual with disability; (2) he suffered from unwelcome harassment; (3) the

---

[32] Harassment in the form of a hostile work environment also violates FEHA.  *Lyle v. Warner Bros. Television Prod.*, 38 Cal.4th 264, 279 (2006).  The *prima facie* case for a hostile work environment under FEHA is essentially the same as under Title VII.  *See Aguilar v. Avise Rent A Car System, Inc.*, 21 Cal.4th 121, 130-31 (1999).

harassment was based on his disability or a request for accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive working environment; and (5) defendant knew or should have known of the harassment and failed to take prompt remedial action. *See Wynes*, 936 F. Supp. 2d at 1185. As with Green's claims for disability discrimination, the fact that he is not disabled within the meaning of the ADA precludes a finding of liability and mandates that the Court **GRANT** summary judgment on hostile work environment based on disability.

When alleging hostile work environment for either race or disability discrimination, plaintiffs must prove that the workplace was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Nichols,* 256 F.3d at 871-72 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). When determining whether an environment was sufficiently hostile or abusive, courts examine all of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with an employee's work performance. *Faragher*, 524 U.S. at 787-788; *Vasquez*, 349 F.3d at 642. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale,* 523 U.S. at 78 (citing *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21 (1993)).

However, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Oncale*, 523 U.S. at 81 (citing *Harris*, 510 U.S. at 21). Case law explicitly requires repeated severe misconduct, such as racial slurs, physical threats, or humiliation, that rises to the level of "intolerably offensive" to a reasonable person for such a claim to be actionable. *See, e.g., Reynaga v. Roseburg Forest Prod*., 847 F.3d 678, 686-88 (9th Cir. 2017); *Woodland v. Joseph T. Ryerson & Son, Inc.,* 302 F.3d 839, 843-844 (8th Cir. 2002) (incidents of racial harassment by coworkers, including racial epithets, an obscene gesture, the circulation of a racist message, and racist graffiti, were neither severe nor pervasive enough to

create a hostile work environment under the circumstances); *Vasquez*, 349 F.3d at 642.

Plaintiffs must prove that the conduct at issue was not merely tinged with offensive connotations, but actually constituted discrimination because of a prohibited basis. *See, e.g., Oncale,* 523 U.S. at 81 (in claim for hostile work environment based on sex discrimination, affirming need for link between offensive sexual conduct and discrimination based on sex). Even so, the Ninth Circuit has found sufficient evidence of a hostile work environment where clear evidence linked employers' conduct to plaintiffs' protected class, such as an employer posting a racially offensive cartoon and making racially offensive slurs (*see, e.g., Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir.1990)) and making two overtly race-based statements regarding "typical" Hispanic attitudes and characteristics. *Vasquez*, 349 F.3d at 642.

### 2.      Conduct Constituting Alleged Hostile Work Environment

Green once more resorts to the conditional, claiming that the ongoing harassment "*can* be causally connected to [his] medical issues that led to severe stress and mental and physical injuries." Opp. at 12:10-12 (emphasis added). On summary judgment, however, a plaintiff must have moved well beyond asserting that something "can be" proved but must instead produce evidence that raises a triable issue that it is actually so. This Green has failed to do.

Although Green asserts that he was subjected to a hostile work environment, he identifies no verbal or physical conduct from which a reasonable jury could draw this conclusion.

#### i.      Green Fails To Present Evidence That He Was Subjected To Verbal Or Physical Conduct Because Of A Protected Characteristic[33]

Green argues that many actions of Green's Supervisor, Lipps, and Henderson, as well as Green's co-worker, Kaumil Parghi, an Assistant Engineer at CSD, constituted "harassment" that created or contributed to a hostile work environment.

In his RAC, he alleges that Lipps sent him inappropriate emails, blocked his pathway (June 2015), docked his vacation time (May 2015) (RAC ¶ 67(e)); falsely accused him of being AWOL

---

[33] Green's EEOC Charges and this lawsuit clearly indicate that Green found the conduct unwelcome.

United States District Court
Northern District of California

and not properly doing his work (RAC ¶ 67(f)); "denied use or approved [his] personal time (i.e., sick and vacation time)" (RAC ¶ 67(g)); placed him on "non-driving" status (RAC ¶ 67(e), (h)). He also complains that he was approached, coached with follow-up, and "pressured" by Lipps and co-worker Kaumil Parghi, an Assistant Engineer at CSD, on May 1, 2015 about work expectations/requirements – review of 1250 linear feet of video per day – of coding inspection. RAC ¶ 71(a)-(d).

In his Opposition, Green includes as the hostile work environment Lipps' "micromanaging tactics," blocking his pathway, being singled out and targeted, taping emailed documents onto his computer screen (which Lipps had done to others as well), making false claims about how incidents transpired and Green's performance and behavior, and threatening remarks from his supervisors, among other intimidating, bullying, hostile and aggressive behaviors.  *See* Opp. at 11, citing RAC ¶¶ 30-37.[34]

Green alleges that certain behaviors were initiated by his supervisor and supported by Harrison.[35]  Green gives as an example that Harrison instructed Lipps to issue a Letter of Instruction (LOI) "for disciplinary purposes for language or behavior he deemed 'insulting' or 'rude' about the Plaintiff when in actuality Harrison's language was 'insulting' or 'rude' when he shamefully referred to [Green] as 'misfits…that no one can deal with' and 'we want to be the proving ground for getting this type of behavior under control.'"  Opp. at 11-12.

Green also alleges that his complaints against Lipps were ignored and not addressed and makes the following citations: "(Harrison 7/23 Dep. at 30:25-31:5 (complaints), 36:2-11 (shock), 37:14-39:18 (misfits), 41:2-44:8 (misfits), 50:24-51:11 (uncomfortable/harassed), 52:17-56:9 (no

---

[34] The Court notes that Green cites his own RAC to bolster his arguments.  As indicated in the RJN rulings, *supra*, such references are not evidence, as Green's complaint is not verified.

[35] Once again, Green's allegations that the Court has determined are not actionable as race or disability discrimination are also not actionable as creating a hostile work environment, either because they were not adverse employment actions and/or because they were justified by legitimate reasons with no showing of pretext.  These allegations include being assigned "menial" work of reviewing and coding sewer videos at CSD, being denied training "and other equal opportunities," "uneven" discipline, write-ups, and "constant threats of insubordination," continued harassment and "different terms and conditions of employment," being accused of being AWOL, and receiving "harassing letters and emails."

1    investigation/complaints), 53:4-14 (no investigation conducted on Lipps), 53:4-56:9 (leaving not

2    an option), 58:22-59:17 (medical leave)." Opp. at 12.

3            Green nowhere identifies how any of the conduct alleged was based either on his race, an

4    actual or perceived disability, or informal and formal complaints regarding race discrimination.

5    Green has provided no direct evidence of discrimination, as he himself testified that no one –

6    neither supervisors nor co-workers – said that any action they took was because of his race. Green

7    has also provided no evidence of indirect or circumstantial linkage of words or conduct by anyone

8    at the City to any discriminatory basis.

9            Moreover, the City has demonstrated that the discipline of which Green complains was

10   based on actual instances of behavior his employer found unacceptable, such as perpetual

11   tardiness, excessive absenteeism, and the illegal use of a tape recorder. The things Green

12   characterizes as "micromanaging tactics," while obviously unwelcome, were done in response to

13   Green's behavior. For example, he complained that he was harassed when his supervisor and

14   more experienced co-worker, Parghi, coached him, followed-up with him, and reminded him

15   about standard CSD work expectations. Such coaching and follow-up are clearly performance-

16   based workplace interventions. The fact that he felt "pressured" by his supervisor and co-worker

17   to meet expectations does not transform their coaching into race or disability-based harassment.

18           Green claims that the ongoing harassment "*can* be causally connected to [his] medical

19   issues that led to severe stress and mental and physical injuries." Opp. at 12:10-12 (emphasis

20   added). On summary judgment, however, a plaintiff must have moved well beyond asserting that

21   something "can be" proved but must instead produce evidence that raises a triable issue that it is

22   actually so. This Green has failed to do.

23                    ii.    **The Conduct Was Not Sufficiently Severe Or Pervasive To Alter
                            The Conditions Of Green's Employment And Create An
24                          Abusive Work Environment**

25           Green must demonstrate not only that he subjectively found the workplace offensive, but

26   that the workplace was so objectively hostile that a reasonable person would consider the

27   environment abusive. *See Davis*, 520 F.3d at 1095. In order to bolster his allegations of

28   mistreatment, Green relies primarily upon his own declaration, which the Court struck as an

United States District Court
Northern District of California

84

impermissible attempt to circumvent page limitations and much of which, in any event, is inadmissible as conclusory arguments and assertions of presumptions and beliefs. Green's uncorroborated and self-serving statements do not create triable issues of material fact. *See Villiarimo*, 281 F.3d at 1061.

When examining all of the circumstances in light of the evidence presented, Green's complaints amount to little more than minor workplace irritations. He expresses outrage at what he calls his supervisor's "micromanaging tactics," such as being repeatedly coached about work expectations – not at all surprising when his performance fell so far short of acceptable standards (completing 7.8 days of coding in four and a half months). Other minor irritations Green complains of include being sent "inappropriate emails," having vacation time docked (which the City proved did not actually happen), being accused of being AWOL (which the City proved was reversed when it was found to be inaccurate), having his pathway blocked (with no indication of when, where, why, for how long, and whether it was purposeful or inadvertent), and being placed on "non-driving" status as a result of his own refusal to fill out standard paperwork. Ordinary discipline such as receiving an LOI for language and behavior his supervisor deemed "insulting" or "rude" – notwithstanding Green's disagreement with that characterization – also cannot be said to be abusive. Although Green found this conduct "tinged with offensive connotations," his subjective responses do not transform his workplace into a hostile environment.

Green has provided no evidence of repeated severe misconduct, such as racial slurs, physical threats, or humiliation, that rises to the level of "intolerably offensive" to a reasonable person. Green's dissatisfaction with how the City responded to his complaints also does not give rise to a claim for hostile work environment harassment. Compared to incidents of racial harassment such as racial epithets, an obscene gesture, the circulation of a racist message, and racist graffiti, which were found to be neither severe nor pervasive enough to create a hostile work environment, the isolated comments Green considers 'shameful' – referring to Green as "misfits…that no one can deal with" and being "the proving ground for getting this type of behavior under control" – fall well below the level of intimidation, ridicule, or insult. Situations where an employer posted a racially offensive cartoon and made offensive, overtly race-based

85

slurs and where an employer made two overtly race-based statements were held not to create a hostile work environment.  How much less so is the City's conduct here.

On the record before the Court, it cannot be said that Green's workplace was permeated with "discriminatory intimidation, ridicule, and insult" so "severe or pervasive to alter the conditions of [his] employment and create an abusive working environment."  The Court finds that Green was not subjected to behavior that could reasonably be called discriminatory, much less severe and pervasive conduct sufficient to alter his working conditions.  There is simply no admissible evidence in the record from which a reasonable jury could conclude that Green was subjected to the kind of frequent, severe, physically threatening and/or humiliating treatment that would "unreasonably interfere" with his work performance.  Hence, Green's claim for hostile work environment is not actionable.

With no evidence that the City harassed Green either because of his race or his purported disability or that any of the conduct of which he complains was either severe or persuasive, the behavior complained of falls well outside the purview of Title VII and, for argument's sake, the ADA.

Accordingly, the Court **GRANTS** summary judgment with respect to Green's claims of hostile work environment created by his employer and by his co-workers based upon race, disability, and formal and informal complaints.

### F.   Sixth Claim for Relief, Retaliation

####       1.   Prima Facie Case

Green alleges he was subjected to retaliation by his supervisor, management, and other employees for filing EEOC Charges and this lawsuit and for complaining about unfair treatment of himself and other African Americans.

Retaliation claims are subject to the same the three-step, burden-shifting framework of *McDonnell Douglas* as are claims of race and disability discrimination.  *See Davis*, 520 F.3d at 1093-94.[36]  Hence, to prevail on a claim for retaliation, plaintiffs must meet their initial burden of

_____

[36] Again, if the Court were to consider Green's claims under FEHA, they would also be subject to the same burden-shifting framework of *McDonnell Douglas*.  *See Yanowitz v. L'Oreal USA, Inc.*,

United States District Court
Northern District of California

1    establishing a prima facie case, namely that (1) they were engaged in a protected activity; (2) they

2    were thereafter subjected by their employer to an adverse employment action; and (3) there was a

3    causal link between the protected activity and the adverse employment action.  *Davis*, 520 F.3d at

4    1093-94; *Wallis*, 26 F.3d at 891.  For purposes of a Title VII retaliation claim, "an action is

5    cognizable as an adverse employment action if it is reasonably likely to deter employees from

6    engaging in protected activity."  *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000).

7         Plaintiffs making a retaliation claim under Title VII [§ 2000e–3(a)] and the ADA must

8    establish that the protected activity was a but-for cause of the alleged adverse action by the

9    employer.  *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII

10   retaliation claims must be proved according to traditional principles of but-for causation, not the

11   lessened causation test stated in § 2000e-2(m)."); *Murray v. Mayo Clinic*, 934 F.3d 1101, 1107

12   (9th Cir. 2019) (the Ninth Circuit has adopted the "but-for causation" standard for ADA retaliation

13   claims); *Brooks v. City of San Mateo*, 229 F.3d 917, 917 (9th Cir. 2000) (recognizing a concern

14   that "employers will be paralyzed into inaction once an employee has lodged a complaint under

15   Title VII, making such a complaint tantamount to a 'get out of jail free' card for employees

16   engaged in job misconduct").

17        For the third element of the prima facie case, causation may sometimes be inferred based

18   on the temporal proximity between the protected activity and the alleged retaliation, *see Manatt v.

19   Bank of America, NA*, 339 F.3d 792, 802 (9th Cir. 2003), but the connection in time must be "very

20   close."  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  For example, courts have

21   "required temporal proximity of less than three months between the protected activity and the

22   adverse employment action for the employee to establish causation based on timing alone."

23   *Yartzoff*, 809 F.2d at 1376; *Vasquez*, 349 F.3d at 646 (thirteen months too long); *Miller v.

24   Fairchild Indus.*, 885 F.2d 498, 505 (9th Cir. 1989) (two months sufficient).

25        If the plaintiff establishes a prima facie case of retaliation, the employer must articulate a

26   legitimate, nondiscriminatory reason for the challenged action.  *Ray*, 217 F.3d at 1240.  Finally, if

27

28   _____

36 Cal. 4th 1028, 1042 (2005).

United States District Court
Northern District of California

the employer satisfies this burden, the plaintiff must show that the "reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Davis*, 520 F.3d at 1088-89.  In contrast to the possibility of showing causation, mere temporal proximity is generally insufficient to show pretext.  *Brooks v. Capistrano Unified School Dist.*, 1 F. Supp. 3d 1029, 1038 (C.D. Cal. 2014).

### 2. Green's Purported Protected Activities and the City's Alleged Retaliatory Actions

Green alleges that he engaged in protected activities and that the City retaliated against him based on the following conduct:

### a. The '803 Charge

In the '803 Charge, covering August 1, 2014 to May 28, 2015, Green alleges that he complained of discriminatory treatment of African-Americans, for which the City retaliated with denial of promotion to 5502 Project Manager 1, denial of multiple trainings "and other equal opportunities," transfer to CSD, discipline and unfair treatment for his poor performance, attendance, and punctuality.

Green has failed to establish with competent evidence two of the three prima facie elements.  The Court has previously determined that the conduct Green complains is retaliatory – nonpromotion to 5502 Project Manager 1, denial of multiple trainings "and other equal opportunities," transfer to CSD,[37] and discipline and unfair treatment for his poor performance,

---

[37] It may be arguable that the definition of an "adverse employment action" is slightly broader in relation to a retaliation claim, as the EEOC has interpreted it to mean "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity."  *See Ray*, 217 F.3d at 1242-43 (citing EEOC Compliance Manual Section 8, "Retaliation," ¶ 8008 (1998) and finding EEOC Guidelines not binding but informative to courts); *see also Yartzoff*, 809 F.2d at 1376 (holding that transfers of job duties, if proven, would constitute "adverse employment decisions" cognizable for retaliation claim under Title VII).  However, even if *theoretically* Green's transfer were considered an adverse employment action because it might deter Green from further informal complaints, Green gives no indication of when his informal discrimination complaint was made, so causality has not been shown.  Moreover, the City has amply proven that it had legitimate nondiscriminatory reasons for the transfer and that the transfer was also intended to provide a path for career advancement.

United States District Court
Northern District of California

1    attendance, and punctuality – are either not adverse employment actions or the City has presented

2    evidence of legitimate nondiscriminatory reasons for its actions that Green has not shown are

3    pretextual.

4         As for causation, Green does not even try to establish a causal link between his protected

5    activity and the employment actions he alleges are retaliatory.  Instead of submitting evidence that

6    raises an issue of material fact on this essential element, Green simply states, as to *all* of his

7    retaliation claims, that he will "rely on the temporal proximity between his protected activity and

8    the respective adverse actions to establish his retaliation case."  Opp. at 14.  His lack of detail

9    about the timing of his complaints about the treatment of African-Americans in relation to the

10    City's conduct makes it impossible to determine whether the timeframe falls within the less than

11    three month window in which courts have found causation based on timing alone.  This lack of

12    information prevents even the most tangential causal link to be established, much less the "but-

13    for" causation required for a prima facie case of retaliation.  Green has also completely failed to

14    produce the required proof that the City would not have performed the actions of which he

15    complains if he had not engaged in the protected activity.

16         Hence, Green has not demonstrated a genuine issue of material fact regarding retaliation in

17    the '803 Charge.

18            **b.**      **The '813 Charge**

19         In his '813 Charge, which covers the period from July 31, 2015 to May 26, 2016 (during

20    which Green was on medical leave), Green alleges retaliation based on filing the '803 Charge in

21    the form of "continued harassment and different terms and conditions of employment,"[38]  being

22    sent harassing letters and emails and being accused of being AWOL.  While filing an EEOC

23    charge is clearly protected activity, an employer sending letters and emails to an employee is not

24    cognizable as an adverse employment action because it did not affect the terms of Green's

25    employment in any way.  Also, although Green alleges he experienced the letters and emails as

26    "harassing," sending correspondence is "not reasonably likely to deter employees from engaging

27

28    [38] Again, such allegations are too general to analyze properly so the Court treats them as umbrella categories.

*United States District Court*
*Northern District of California*

in protected activity" – here, from filing an EEOC charge.  *See Ray*, 217 F.3d at 1243.  Again, besides unspecified temporal proximity, Green fails to show any causal link, much less the "but-for" causation required for a prima facie case of retaliation.

Furthermore, the City submitted both testimony and documentary evidence that the correspondence sent to Green was based on legitimate business needs, *inter alia*, to determine when and if Green would return to work and to assess Green's medical condition to determine the need for a reasonable accommodation.  The City has also established that the frequency of such correspondence was entirely due to Green's failure to respond in a timely manner and often not at all.

Hence, Green has not demonstrated a genuine issue of material fact regarding retaliation in the '813 Charge.

### c.    The '1585 Charge and the RAC – Retaliation Based On Participation In Investigations

As the initial complaint in this matter was filed prior to the '1585 Charge, some of Green's RAC allegations overlap with that charge.  Hence, in both his '1585 Charge and his RAC, Green alleges that he was retaliated against, *inter alia*, because "in 2014 and February 2015" he "participated in an investigation or hearing" (i) by a WWE Operations Division Manager about the disclosure of a co-worker's protected health care information (RAC ¶ 76(a); *see also* '1585 Charge ("testifying in support of a fellow coworker")), and (ii) by a PUC HR Services Director about alleged unfair hiring practices, policies, and procedures regarding "several positions that [he] applied to."  RAC ¶ 76(b).[39]

### i.    Investigation about disclosure of co-worker's protected health care information

The '1585 Charge covers the period between September 12, 2017 and July 9, 2018, so Green's allegation concerning investigations "in 2014 and February 2015" is well-past the three-

---

[39] This allegation is not included in any of Green's EEOC Charges but only in his RAC. However, this conduct is "reasonably related" to Green's more general complaints about not being promoted to "various positions" and an investigation into Green's nonpromotion allegations would reasonably be expected to uncover it.

United States District Court
Northern District of California

1    hundred day statute of limitations beginning September 12, 2017 and the retaliation claim for that

2    participation is therefore time-barred.  *See, e.g., Nat'l R.R. Pass. Corp.*, 536 U.S. at 105 (holding

3    that Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur

4    outside the statutory time period").

5          Further, even assuming that participation in an informal HR investigation constitutes

6    "protected activity" under Title VII, Green presented no evidence connecting his participation

7    with any specific retaliatory conduct.  *Passantino v. Johnson & Johnson Consumer Prods, Inc.*,

8    212 F.3d 493, 506 (9th Cir. 2000) (causal link required).  Hence, Green's participation in an

9    informal HR investigation in 2014 and February 2015 is not an actionable basis on which to assert

10   a claim of retaliation.

11                    **ii.     Complaint to HR staff about alleged unfair hiring practices,
                             policies, and procedures regarding "several positions that [he]
12                           applied to"**

13         Although informal complaints concerning race-based unfair treatment constitute protected

14   activity (*see, e.g., Ray*, 217 F.3d at 1240 n.3), Green has provided insufficient details to evaluate

15   this claim and no evidence to support it – neither about the substance of this "investigation or

16   hearing" to determine whether Green's activity was actually protected, nor the date of the event in

17   order to evaluate a causal link to potential consequences, nor whether anyone besides the HR

18   director knew about this alleged protected activity also to evaluate a possible causal link.  He also

19   fails, yet again, to include sufficient identifying information regarding the "several positions that

20   [he] applied to" to evaluate whether the hiring decisions were actual adverse employment actions

21   and any causal link between the complaints and the hiring decisions.  This lack of information also

22   makes it impossible for the City to respond and for the Court to determine whether the City had

23   legitimate, nonpretextual business reasons for its hiring decisions.

24                    **d.     The '1585 Charge and the RAC – Retaliation Based On EEOC Charges
                           and Complaints of Race Discrimination**

25

26         In addition, Green alleges that because he filed the '803 and '813 EEOC Charges and this

27   lawsuit and because he complained about unfair treatment of himself and other African

28   Americans, i.e., race discrimination ('813 and '1585 Charges; RAC ¶ 76(c)), he experienced

United States District Court
Northern District of California

1    retaliation in the form of:

2        • January 2015 denial of promotion to Project Manager 1 ('1585 Charge; RAC ¶ 78(b))

3    and March 2015 "involuntary" transfer to CSD 1 ('1585 Charge; RAC ¶ 78(c)):

4        However, the three-hundred day 'look-back' period for the '1585 Charge begins on

5    September 12, 2017, a full two and a half years after the latest action of which Green complains.

6    Hence, these allegations were made well-past the statute of limitations and are therefore time-

7    barred.

8        • Menial job duties ('1585 Charge, RAC ¶ 78(d)):

9        Green alleges that he was assigned menial job duties as retaliation, but the Court

10   determined above that not only was this not an adverse employment action, especially in light of

11   the City's testimony that his initial assignment was foundational experience for more advanced

12   field work, but also that the City articulated legitimate – and pressing – business reasons for

13   Green's duties and Green submitted no evidence of pretext.  Furthermore, Green's allegations in

14   the '1585 Charge may only begin with conduct after September 12, 2017, at which time he was on

15   medical leave and reported to work for only a few weeks before his medical separation.  Green has

16   submitted no evidence regarding his job duties beyond arguments about his treatment from March

17   15 to July 30, 2015.  In the absence of any evidence during the relevant period, no retaliation

18   claim may lie.

19       • Being placed on sick leave restriction (RAC ¶ 78 (h) and (j)):

20       As discussed above, the Court has found that sick leave restriction is not an adverse

21   employment action, as it does not affect the balance of sick leave available.  The "restriction"

22   merely requires that employees who take more than a certain amount of sick leave, as determined

23   by a regular audit made of all employees, must submit a doctor's note when they return to work, a

24   simple administrative requirement.  The City placed Green on sick leave restriction after an audit

25   revealed he had taken three weeks of sick leave in his first four months at CSD.  Although Green

26   asserts this action was retaliation, the evidence shows that the policy was applied to all employees

27   – even Green's own supervisor, who had previously been placed on the same restriction after a

28   similar audit.  The use of sick leave restriction was also justified by PUC's interest in preventing

United States District Court
Northern District of California

1   business disruption by reducing absenteeism to ensure its employees come to work regularly to

2   perform their jobs.  Green submitted no evidence of retaliation in the imposition of sick leave

3   restriction.

4          • Miscellaneous conduct:  Green repeats a familiar litany of complaints and recasts his

5   allegations of discrimination as retaliation, such as "constant threats of insubordination,

6   disciplinary actions, write-ups" ('1585 Charge, RAC ¶ 78(c)), including accusations of retaliation

7   for actions that, on their face, are no more than standard office policies like the use of an In/Out

8   Board (which he characterizes as "disciplinary action with the improper use of the In/Out Board as

9   a disciplinary tool") (RAC ¶ 78(g)); being questioned about his whereabouts (RAC ¶ 78(g)); and

10  being given a pop quiz on coding, being sent inappropriate emails and experiencing adverse

11  behavior, having his pathway blocked, having documents taped to his computer screen, being

12  placed on "non-driving" status and being denied access to use a City vehicle to conduct business

13  affairs, being questioned about lunch and break times, having vacation time docked and being

14  reported AWOL during the brief period he actually showed up to work at CSD.  RAC 78 ¶ (k); *see*

15  *also supra*, for more discussion regarding the fact that Green was not actually docked vacation

16  time or marked AWOL.

17         Such *de minimis* actions do not rise to the level of adverse employment actions, as they did

18  not affect the conditions of Green's employment, nor are they reasonably likely to deter

19  employees from engaging in protected activity, in this case, filing EEOC charges and a

20  discrimination lawsuit or complaining about discrimination.  Furthermore, Green again fails to

21  establish any causal link between his activities and the allegedly retaliatory conduct, much less the

22  "but-for" causation required for a prima facie case of retaliation, and he does not demonstrate

23  pretext for the City's actions by asserting only temporal proximity as a link.

24         • Vague allegations: The following allegations are too vague to determine what actions the

25  City actually took that he complains about or to determine whether any causal connection exists

26  between Green's activity and the City's actions; plus, Green provides no competent evidence in

27  support of these allegations: denial of "several promotional opportunities" (unable to determine to

28  which "promotional opportunities" he refers, when they happened, or if/why there was he was

United States District Court
Northern District of California

denied promotion) ('1585 Charge, RAC ¶ 78(b)); not receiving training "and other equal opportunities" (as explained above, the City produced evidence that he received mandatory and optional training and, in any event, the Court is unable to determine to which "other equal opportunities" he refers, when they happened, or if/why there was an actual denial) ('1585 Charge, RAC ¶ 78(c)); subjected to "different terms and conditions of employment," bullying, false claims, stalking, intimidation ('1585 Charge) and harassment ('1585 Charge, RAC ¶ 78(c)); refusal to engage in criminal/fraudulent acts (this claim makes its first appearance in Green's RAC, not in any EEOC Charge, so it has not been exhausted administratively; furthermore, this accusation remains completely unexplained, as Green neither discusses it nor provides any evidence in support of it) (RAC ¶ 78(d)); "harassing letters and emails" (as discussed above, Green's characterization of business communication as "harassment" is insufficient to convert it to an adverse employment action to support a claim of retaliation).  '1585 Charge.

• Revocation of computer access while out on medical leave:

Green alleges that the City "changed [his] computer access, resources, e-time capabilities without [his] knowledge" (RAC ¶ 78(c)); "disabled [his] work account access on October 5, 2016 when [he] was still an active employee at that time and on medical leave when other workers who were in similar positions, but did not have this disability were treated better than [him]."  RAC ¶ 78(m).

These allegations were not included in any EEOC Charge but appear only in the RAC. Plus, they appear to fall within a gap not covered by any EEOC Charge, between the '813 Charge and the '1585 Charge from May 26, 2016 and September 12, 2017, so they were not "administratively exhausted."  In addition, as previously discussed, the City articulated that because Green was on medical leave during that time, there were legitimate security concerns regarding an individual who, at that point, had been on medical leave for fifteen months, having access to a business-only, City computer system.  There is also no causal evidence of retaliation.

• Denial of disability benefits:

Green alleges that the City's Workers' Compensation Division "denied [his] rights to receive disability benefits after [his] State Disability Insurance (SDI) payments was [sic]

1    exhausted as of August 4, 2016."  RAC ¶ 78(n).  This allegation concerns conduct for which the

2    specific City defendant, the PUC, bears no responsibility, nor does it have any power to affect the

3    availability of disability insurance from the State of California.  In addition, the allegation does not

4    appear in any EEOC Charge nor is it "related to" any charge, so it has not been properly

5    exhausted.  Moreover, Green never explains the causal relationship to his protected activity and

6    submits no evidence related to it.

7         • Provision of personnel records without authorization to Qualified Medical Evaluator

8    (QME):

9         Green alleges that the City retaliated against him by providing "some of [his] personnel

10   records" without authorization to the QME doctor in "an attempt to slander, manipulate, persuade,

11   and negatively influence [his] medical evaluation related to [his] disability, which was supposed to

12   be unbiased, impartial, and without prejudice."  RAC ¶ 78(o).  This is pure argument, or more

13   accurately pure invective, for which Green never provides any explanation or supporting evidence

14   of either the action itself or a causal link to his activity.

15        Given this analysis, the sole remaining claim for retaliation is Green's medical separation.

16                              **e.      Medical Separation**

17        Given this analysis of retaliatory conduct, the sole remaining retaliation allegation is that

18   the City medically separated Green from his employment because he filed the '803 and '813

19   EEOC Charges and this lawsuit and because he complained about unfair treatment of himself and

20   other African Americans.  '1585 Charge, RAC ¶ 78(a) (*inter alia*).

21                              **i.      Prima Facie Case**

22                         **(a) Green Was Engaged In A Protected Activity**

23        It is undisputed that filing EEOC Charges, instituting an employment discrimination

24   lawsuit, and complaining about race discrimination constitute protected activity.

25                         **(b) Green Was Thereafter Subjected By His Employer To An**
26                         **Adverse Employment Action**

27        Being separated from employment is perhaps the quintessential adverse employment

28   action, as the "terms and conditions of employment" are terminated.

95

### (c) Green Has Not Shown A Causal Link Between The Protected Activity And The Adverse Employment Action

Green asserts that he can prove causation between his alleged adverse employment actions and alleged protected activities, but he has produced no evidence of a causal link between his protected activities and any adverse actions by the City.  He simply asserts that the adverse actions occurred "after engaging in . . . protected activities" so that "[a]ccordingly, a causal link exists between the protected activity and the adverse action that followed."  Opp. ¶ 20.  Instead of submitting evidence that raises an issue of material fact on this essential element, Green relies on "the temporal proximity between his protected activity and the respective adverse actions to establish his retaliation case."  Opp. ¶ 21.

Yet there is no temporal proximity.  There are long gaps between Green filing EEOC charges and this lawsuit and his complaints about race discrimination, on the one hand, and his medical separation on February 8, 2018, on the other.  The medical separation occurred almost three years after Green filed the '803 Charge on May 28, 2015 that in part complained about race discrimination, almost two years after Green filed the '813 Charge on May 26, 2016, a full year after Green filed the original Complaint in this action on February 6, 2017, and five months *before* he filed the '1585 Charge on July 9, 2018.  This is certainly not a case where an adverse employment action "follows on the heels of protected activity," *Villiarimo*, 281 F.3d at 1065, hence causation cannot be inferred from timing alone.

Given his reliance on timing, Green also completely fails to produce the required proof that, "but for" his protected activity, the City would not have medically separated him.  Under these circumstances, an inference of causation based only on the timing of these events is simply not possible.  *See, e.g., Manatt,* 339 F.3d at 802 (no causation shown where nine months lapsed between the date of protected activity and the alleged adverse action).

With such scant temporal proximity between Green's protected activities and the City's actions and without other corroborating evidence, the Court concludes as a matter of law that Green has failed to raise an inference of the required but-for causality in this case.  Hence, Green fails to establish a prima facie case of retaliation for his medical separation.

United States District Court
Northern District of California

United States District Court
Northern District of California

### ii. Legitimate Business Reasons And No Evidence Of Pretext

As with so much of Green's case, his belief that something is true does not make it so.  Just because he says the City medically separated him because of his complaints about discrimination does not erase or override the plethora of evidence submitted by the City demonstrating its legitimate business reasons to end his employment.

Green relies exclusively on the timing of his activity and the City's actions, but courts in the Ninth Circuit are clear that "mere temporal proximity is generally insufficient to show pretext."  *Brooks,* 1 F. Supp. 3d at 1038.  Here, mere temporal proximity, with nothing more, is insufficient to establish that that the City's decision to medically terminate him was pretext for retaliation.

In the absence of evidence of causality or of pretext, Green's claims that the City retaliated against him based on his race, disability, filing EEOC Charges and this lawsuit, and/or for complaining about the treatment of African-Americans lack evidentiary support.

Accordingly, the Court **GRANTS** summary judgment on all retaliation claims on all bases alleged.

### VI.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** the City's motion for summary judgment in its entirety.

**IT IS SO ORDERED.**

Dated: August 26, 2021

THOMAS S. HIXSON
United States Magistrate Judge